1

Honorable Thomas S. Zilly

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

8

| | |
|---|---|
| M.R., S.J., C.B., D.W., A.B., M.B., An.B, J.B., K.S., T.M., A.R., M.J.B., J.H., H.C., THE ARC OF WASHINGTON, SERVICE EMPLOYEES INTERNATIONAL UNION HEALTHCARE 775NW and PUGET SOUND ALLIANCE FOR RETIRED AMERICANS,<br><br>            Plaintiffs,<br><br>    v.<br><br>SUSAN DREYFUS, in her professional capacity as Secretary of Washington State Department of Social and Health Services and WASHINGTON STATE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, a Department of the State of Washington,<br><br>            Defendants. | No. 2:10-cv-02052-TSZ<br><br>MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION<br><br>Noted on Motion Calendar for TRO:<br>    To be set by Court<br><br>Preliminary Injunction:<br>    Friday, January 14, 2011<br><br>**ORAL ARGUMENT REQUESTED** |

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) -

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1

### I. INTRODUCTION

2    On January 1, 2011, the State of Washington plans to reduce the in-home personal care

3    hours of 40,000 severely disabled and low-income Medicaid recipients by an average of 10%

4    *below* the level the State's own individualized assessment process has deemed necessary for

5    them to remain safely at home.  This budget-driven cut follows the 2009/2010 reduction of their

6    personal care hours to an average of 4% *below* assessed needs.  With the 1/1/2011 cut, the State

7    acknowledges "some needed tasks may not be completed on a regular basis" and "[i]n some

8    cases, a safe in-home plan of care will not be possible and clients may need to go to community

9    residential or nursing facility settings," more expensive care for which they are eligible.

10    Beneficiaries will be deprived of necessary care resulting in serious health risks and the

11    displacement from their families and their homes.  Plaintiffs' health and freedom to live at home

12    depend upon their continued access to personal care hours at the level the State assessed them to

13    need.  Unless enjoined, these reductions will cause immediate and irreparable harm to the very

14    Medicaid beneficiaries the in-home care programs were designed to serve.  They will lose

15    providers who can't afford to work for free, have gaps in care, and do without essential services

16    such as eating, transferring position, using the toilet, and bathing that will create an imminent

17    and serious risk of harm to their health and safety.

18    Plaintiffs are likely to prevail on their legal claims.  The reductions place Plaintiffs at risk

19    of having to move to nursing homes or other institutional facilities just to get the Medicaid long-

20    term care services to which they are entitled.  This violates the Americans with Disabilities Act

21    of 1990, 42 U.S.C. § 12312 ("ADA"), and Section 504 of the Rehabilitation Act of 1973, 29

22    U.S.C. § 794 ("Section 504"). The deprivation of needed services without adequate notice,

23    individual reassessments, transition to replacement services, or an opportunity to be heard,

24    deprives Plaintiffs of Medicaid benefits without Due Process afforded by the 14th Amendment to

25    the United States Constitution.  In addition, the reduction of necessary health care services on

26    arbitrary, budget-drive grounds violates the requirements of Title XIX of the Social Security Act,

27    42 U.S.C. § 1396a ("the Medicaid Act") that States provide (1) services according to reasonable

---

MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 1

**MACDONALD HOAGUE & BAYLESS**
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1   standards; (2) that are sufficient in amount, duration, and scope to reasonably achieve their

2   purposes; (3) comparable to Medicaid services to individuals with similar needs; and (4) the right

3   to choose non-institutional care options.  Defendants' implementation of these changes without

4   federal approval also violates the Medicaid Act.

5                                    **II.     ISSUE PRESENTED**

6        Should this Court issue a Temporary Restraining Order preserving the status quo and

7   prohibiting Defendants from implementing reductions of Medicaid in home personal care hours

8   below assessed need, until a preliminary injunction hearing can be held?

9                                  **III.     EVIDENCE RELIED UPON**

10        Plaintiffs rely upon their detailed Complaint, incorporated here by reference, the

11   Declaration of Andrea Brenneke (Brenneke Dec.) and its exhibits, as well as the 42 declarations

12   of experts, providers, guardians, Plaintiffs and others listed on Ex. A to this Motion.

13                                 **IV.     SUMMARY OF FACTS**

14   **A.      Background on Washington State System**

15        Defendants administer multiple Medicaid programs to provide in-home personal care

16   services for elderly and other disabled people.  The beneficiaries have severe disabilities

17   including cognitive impairments such as dementia or Alzheimer's; chronic conditions arising out

18   of traumatic brain or spinal cord injuries, Multiple Sclerosis, Muscular Dystrophy, or Diabetes;

19   developmental disabilities; and various forms of physical disabilities.  Reed Dec. ¶11.

20        Approximately 15,000 individuals receive such in-home personal care services under the

21   State Medicaid Plan's Medicaid Personal Care (MPC) program, and almost 30,000 obtain them

22   through various Medicaid waiver programs.  RCW 74.39A.030; Reed Dec. ¶¶19-20.  These

23   programs enable the beneficiaries to remain in their homes with assistance in basic activities of

24   daily living: eating, bathing, toileting, mobility, catheter and bowel care, turning and

25   repositioning, passive range of motion, dressing, medication management, essential shopping,

26   and housework.  WAC 388-106-0075, 388-106-0105, 388-106-0210.

27        Without in-home personal care services, the beneficiaries would be at serious and

MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 2

**MACDONALD HOAGUE & BAYLESS**
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

1  imminent risk of institutionalization.  DSHS individually assessed and certified that *all* of the

2  individuals receiving in-home personal care services under waiver programs qualify for nursing

3  facility or intermediate care facility for the mentally retarded (ICFMR) levels of care without in-

4  home services; the vast majority of the MPC beneficiaries are so disabled that they, too, meet the

5  functional eligibility criteria entitling them to nursing facility level of care.  *See* WAC 388-106-

6  0310(4), 388-106-0510 (4); 388-405-0030(2).  *See, also,* Reed Dec. ¶19.

7  Washington prioritizes in-home over institutional care, based on consumer preferences,

8  the integration mandate of federal law, and cost effectiveness.  Reed Dec. ¶¶21-23, 35-36.

9  Home-based care respects individual autonomy, preserves integration in the community and it

10  saves the State enormous resources.  Reed Dec. ¶¶10, 20, 23, Exs. 1-2; Black Dec. ¶34; LaPlante

11  Dec. ¶¶18-20.  It costs the State an average of $1,443 per month, as compared to monthly

12  nursing home costs of $4,100.  Reed Dec. ¶20.

13  Since approximately 2003, DSHS has utilized the centralized, automated Comprehensive

14  Assessment Reporting Evaluation (CARE) system in order to assess individual needs and assign

15  in-home personal care hours to meet those individually assessed needs.  Reed Dec. ¶¶26-28, 32;

16  Black Dec. ¶¶6-9.  The CARE assessment relies upon in-person evaluations and information

17  from all sources; it is based upon standardized screening tools[1] that have been proved to increase

18  the accuracy and reliability of clinical assessments.  Black Dec. ¶¶8-12, 18, 20-21, 25.  DSHS

19  determines unmet needs, and classifies beneficiaries into acuity and need-based categories based

20  upon the individualized CARE assessments of cognitive performance, clinical complexity,

21  mood/behaviors symptoms, and Activities of Daily Living (ADL)s.  WAC 388-106-0085.

22  DSHS authorizes each beneficiary to receive Medicaid in-home personal care service

23  hours based on the acuity and need-based categories[2] following individualized: CARE

24
25
26

[1] For the DDD programs, DSHS has incorporated the Supports Intensity Scale ("SIS") into the CARE assessment process.  WAC 388-828-4000.  The SIS is a nationally normed instrument that applies specific and uniform standards to determine the level of care needed for developmentally disabled individuals.  Black Dec., ¶12; Brenneke Dec., Ex. 10 (Basic Plus Waiver, Appendix B-6: 4).  Hereinafter, we use the term "CARE tool" to refer to all individualized assessments made using the CARE tool, including those that incorporate the SIS tool.

27  [2] On the basis of those CARE assessments, DSHS determines the amount of medically necessary covered services through assignment of beneficiaries to acuity and need-based categories, with allocation of base personal care hours

MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 3

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1   assessment; finding of financial and functional eligibility for services; consent for services and

2   approval of the plan of care; and selection of an Individual or Agency provider qualified for

3   payment by DSHS, as required by WAC 388-106-0045; Black Dec. ¶¶9-10.  The hours

4   authorized represent the *minimum* number that is essential to permit each individual to remain

5   safely in his or her home, based on scientific time studies that connect tasks with hours of service

6   and resource allocation algorithms.  Reed Dec. ¶¶29-30; Black Dec. ¶¶14, 26, 28.[3]  "The State

7   has never provided benefits or authorized hours above those necessary to meet an individual's

8   minimum health and safety needs.  The benefit level is, by definition, the minimum; there simply

9   is no fat to cut in the hours authorized by the CARE tool."  Reed Dec. ¶¶3-4, 9, 30.

10       The CARE assessment results and Medicaid authorizations are summarized in a "care

11   plan" or Individual Service Plan (ISP).  Black Dec. ¶14**.**  DSHS provides beneficiaries (and/or

12   their guardians) with a copy of the CARE assessment, care plan/ISP, and a Planned Action

13   Notice (PAN) that summarizes the authorized hours of monthly in-home personal care and may

14   be appealed.  Black Dec. ¶¶15**.**  The approved provider also receives these notices and directives

15   as to the tasks to perform and the number of hours awarded to perform them.  *Id.*  Through the

16   CARE assessment, the care plan/IP, and PAN, the amount, duration, and scope of the medically

17   necessary in-home personal care services are awarded to meet individual needs.

18       Through the CARE assessment process, beneficiaries are afforded choice among types of

19   long term care (in-home, community residential settings, or institutional settings) as well as the

20   selection of qualified providers, and must agree to the Care Plan or ISP that sets the number of

21   personal care hours they can rely upon for the year.  Reed Dec. ¶¶12, 14, 33, 38-40; Black Dec.

22   ¶¶14, 16.[4]  *See also* Brenneke Dec., Ex. 16 (choice form).

---

23

24   to meet the assessed needs in each category, with additional individual adjustments and possible, but infrequent, exceptions to rules.  Reed Dec. ¶29; WAC 388-106-0055; WAC 388-106-0125.

25   [3] Although Defendants may argue otherwise, "It is not true that the CARE assessment tool simply measures client need relative to other clients in order to allocate fairly the limited resources available for personal care services. Rather, [it] is designed to, has proven effective to, and is used by the Department to measure the unmet needs that

26   must minimally be met in order to support a client in his or her home without compromising health or safety." Black Dec. ¶28.

27   [4] In addition to in-home personal care services, Defendants provide long-term care and personal care services in nursing facilities, intermediate care facilities for developmentally disabled individuals, and community based

MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 4

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1    The CARE assessment occurs annually, or when there is a change in the condition of the

2    beneficiary, provider, or services.  Black Dec. ¶¶10, 17; WAC 388-106-0050(1).  Changes to the

3    care plan/ISP, including the amount of benefits awarded, are only made for individually changed

4    circumstances, requiring reassessment.  WAC 388-106-0140; 388-106-0050(2).

**B.    Plaintiffs and Other Class Members Are Disabled Beneficiaries of In-Home Care Services Who Require Services to Remain In Their Homes**

6        Plaintiffs are severely disabled and the in-home personal care services permit them to

7    continue to live safely and independently in their homes.  For example, 55-year-old Plaintiff

8    **C.B.**'s history of heart attacks and strokes left her with limited mobility and she suffers from

9    chronic illnesses including Hepatitis B and C.  C.B. Dec. ¶¶4-8.  DSHS determined that she is so

10   disabled she is eligible for nursing facility level care, but she chooses to live in her own home

11   with her provider's assistance with personal hygiene, cooking, and trips to the doctor.  *Id.* at

12   ¶¶11, 16.  These services permit her to live independently, enjoy her "relationship with friends

13   and neighbors," and "easily interact with other non-disabled people."  *Id.* at ¶13.

14       Jane B. is the guardian of four adopted adult children: **A.B., M.B., An.B. and J.B.**  They

15   suffer from physical, cognitive, and psychiatric disabilities, including Down Syndrome, Multiple

16   Sclerosis (MS), autism, Cerebral Palsy, epilepsy, depression and anxiety disorders.  J.B. Dec.

17   ¶10a-d.  J.B. is physically disabled and cannot meet all their needs.  *Id.* at ¶22.  The monthly 495

18   hours of in-home care services allow them to live together as family.  *Id.* at ¶¶4a-d, 15a-d.

19       Plaintiffs require assistance with a variety of fundamental and often very personal tasks,

20   including bathing, dressing, and using the toilet.[5]  **A.R.** is paralyzed on her right side; her care

21   provider helps her move to the toilet without injury.  Frederick Dec. ¶11.  She uses an ileostomy

22   bag for her bowel movements that her provider must clean every two hours, round-the-clock.  *Id.*

23   Many Plaintiffs are unable to use the toilet reliably or at all, require provider help with frequent

24
---
residential settings such as Adult Family Homes, Boarding Homes, and Assisted Living Facilities.  RCW 74.09.520,
25   74.09.700, 74.39A.005; Reed Dec. ¶¶10, 12, 39; Black Dec. ¶6.
[5] *E.g.,* A.H. Dec. ¶6c; C.B. Dec. ¶11c; D.V.S. Dec. ¶7a, c-d; D.W. Dec. ¶13h; J.B. Dec. ¶10a-d; K.S. Dec. ¶8; M.J.B
26   Dec. ¶3; N.N.A Dec. ¶3; S.J. Dec. ¶8b, d; Albott Dec. ¶10; Allington Dec. ¶13c, e-g; Braddock Dec. ¶18a-c;
Chatwin Dec. ¶14b-c; Davis Dec. ¶16e; Dockstader Dec. ¶10c-d, f; Faatoafe Dec. ¶9, 12b-c, g; Flint Dec. ¶10, 12a-
27   c; Frederick Dec. ¶11b-e; Guin Dec. ¶13d-e, 18 a, c, e; Hayes Dec. ¶13g-h, n, p; Hays Dec. ¶15a, c; Ivonav Dec. ¶13
b, d-e; Maxson Dec. ¶8d-e; McIntosh Dec. ¶9b; Paolino Dec. ¶14 c-d, f, n; Partridge Dec. ¶5a-d; Starr Dec. ¶¶7, 21.

MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 5

10099.1 dl226303

episodes of incontinence,[6] and regular perineal care.[7]

Many Plaintiffs need assistance with meal preparation, because their physical disabilities,[8] dementia or other cognitive impairments[9] prevent them from cooking.  Providers ensure continued health and nutrition, particularly for beneficiaries in need of special diets,[10] and assistance to eat, such as spoon feeding or help swallowing.[11]  Providers clean and do laundry.[12]

Many Plaintiffs rely on provider assistance to move around within their own homes, get out of bed, or turn and reposition themselves.[13]  Mobility limitations make it impossible for many to go out into the community on their own,[14] so providers accompany them to medical appointments,[15] and assist with essential shopping and errands.[16]

Providers also ensure that Plaintiffs take prescription medication at the right time and in the right amounts,[17] monitor their clients' physical state (for seizures or blood glucose levels),[18]

[6] *E.g.*, A.H. Dec. ¶6c; K.S. Dec. ¶8; S.J. Dec. ¶8d; Albott Dec. ¶10; Allington Dec. ¶13l; Braddock Dec. ¶10a-c; Faatoafe Dec. ¶12b; Guin Dec. ¶13d; Maxson Dec. ¶8d; Paolino Dec. ¶14c; Partridge Dec. ¶9d.
[7] J.B. Dec. ¶10a, d; Maxson Dec. ¶8d; Starr Dec. ¶21.
[8] *E.g.*, A.H. Dec. 6d; C.B. Dec. 11b; D.V.S. Dec. 7b; D.W. Dec. 13e-f; J.B. Dec. 10a; K.S. Dec. 9; N.N.A Dec. 3; S.J. Dec. 8e; Albott Dec. 9; Chatwin Dec. 14a; Davis Dec. 16b-c; Docstader Dec. 10b; Faatoafe Dec. 12a; Flint Dec. 12e; Frederick Dec. 11g; Guin Dec. 13c; Hayes Dec 13a-b; Ivonav Dec. 13j; McIntosh Dec. 9c-d; Paolino Dec. 14b, f.
[9] *E.g.*, D.V.S. Dec. 7b; N.N.A. Dec. 3; Allington Dec. 13d, m; Chatwin Dec. 14a; Guin Dec. 17, 18d; Hays Dec. 15b; Ivonav Dec. 13c, j; Maxson Dec. 8a; Partridge Dec. ¶9c.
[10] *E.g.*, A.H. Dec. 6d; C.B. Dec. 11b; D.W. Dec. 13e; K.S. Dec. 9; Albott Dec. 8; Davis Dec. 16b-c; Guin Dec. 13c; Hayes Dec. 13a; Maxson Dec. 8b.
[11] *E.g.*, D.W. Dec. ¶13f; J.B. Dec. ¶10a; S.J. Dec. ¶8e; Dockstader Dec. ¶10b; Hayes Dec. ¶13b; Paolino Dec. ¶14g; Partridge Dec. ¶5a; Starr Dec. ¶7.
[12] *E.g.*, C.B. Dec. ¶11b; D.V.S. Dec. ¶7g; D.W. Dec. ¶13a; K.S. Dec. ¶11; N.N.A. Dec. ¶3; Albott Dec. ¶9; Allington Dec. ¶13l; Davis Dec. ¶16d; Dockstader Dec. ¶10j; Flint Dec. ¶12g; Guin Dec. ¶13f; Hayes Dec. ¶13d; Hays Dec. ¶15h; Ivonav Dec. ¶13k; Maxson Dec. ¶8f; Paolino Dec. ¶14h. Many care beneficiaries risk injuries if they attempt to clean their homes themselves.  For those with suppressed immune systems, a clean home is particularly important. C.B. Dec. ¶11b; Davis Dec. ¶16d.
[13] *E.g.*, C.B. Dec. ¶11a; D.V.S. Dec. ¶7a; N.N.A. Dec. ¶3; Davis Dec. ¶16a-b; Dockstader Dec. ¶10a; Faatoafe Dec. ¶12d; Flint Dec. ¶12d; Guin Dec. ¶13b; Hayes Dec. ¶13i-l; Ivonav Dec. ¶13a, f; Maxson Dec. ¶8g-h; Paolino Dec. ¶14e, m; Partridge Dec. ¶9a.
[14] *E.g.*, J.B. Dec. 10c-d; Allington Dec. 13j; Guin Dec. 18f; Hays Dec. 15f; Ivonav Dec. 13h; Paolino Dec. 14l
[15] *E.g.*, C.B. Dec. ¶11d-e; D.W. Dec. ¶13c; K.S. Dec. ¶11; Allington Dec. ¶13i; Davis Dec. ¶16f; Flint Dec. ¶12h; Guin Dec. ¶13g; Hayes Dec. ¶13c; Hays Dec. ¶15f; Ivonav Dec. ¶13h; McIntosh Dec. ¶9f, 16d; Paolino Dec. ¶14c.
[16] *E.g.*, A.H. Dec. ¶6b; C.B. Dec. ¶11; K.S. Dec. ¶9, 12; N.N.A. Dec. ¶3; Albott Dec. ¶9; Allington Dec. ¶13k; Davis Dec. ¶16b; Guin Dec. ¶13f; Hayes Dec. ¶13o; Hays Dec. ¶15g; Ivonav Dec. ¶13h-i; McIntosh Dec. ¶8d; Paolino Dec. ¶14j.
[17] *E.g.*, A.H. Dec. ¶6e; C.B. Dec. ¶11g; D.V.S. Dec. ¶7d; D.W. Dec. ¶11; K.S. Dec. ¶10; N.N.A. Dec. ¶3; S.J. Dec. ¶8a; Albott Dec. ¶8; Allington Dec. ¶13h; Braddock Dec. ¶18e; Dockstader Dec. ¶10h; Faatoafe Dec. ¶12e; Flint Dec. ¶12f; Guin Dec. ¶13a, 18g; Hayes Dec. ¶13 e-f; Hays Dec. ¶15e; Ivonav Dec. ¶13g; Maxson Dec. ¶8b; McIntosh Dec. ¶9e; Paolino Dec. ¶14a; Partridge Dec. ¶9i.

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1   and directly administer medication through subcutaneous injections or feeding tubes.[19]  Clients'

2   behavioral and mood disorders make personal care considerably more challenging.[20]

3        Personal care services providers work as Independent Providers (IP)s, who are chosen by

4   the beneficiaries themselves, or Agency Providers (AP)s, who are hired through agencies.  WAC

5   388-106-0040.[21]  Some IPs became providers because a loved one needed care.[22]

6        **C.    Reduction in In-Home Personal Care Services**

7        In September 2010, Governor Christine O. Gregoire issued Executive Order 10-04, which

8   ordered the reduction of general funds appropriations by 6.287 percent, the shortfall in the

9   current fiscal period.  Brenneke Dec., Exs. 2, 3.  In response, Defendants submitted a plan that

10  provided for a ten percent reduction in personal care hours for Medicaid in-home care

11  beneficiaries – a reduction far higher than the average reduction in spending required of the

12  agency.  *Id.*, Ex. 4 at 5-6, Ex. 5 at 1-2.  That plan explained that "[t]he actual reduction will vary

13  from 6 percent to 18.4 percent based upon acuity," with lower acuity clients receiving higher

14  percentage reductions, and acknowledged that this reduction would be on top of an average four

15  percent decrease that took place in FY 2010 and some additional targeted reductions in FY 2011.

16  *Ibid.*; *see also* Black Dec. ¶29 (discussing FY 2010 cuts implemented in 2009).

17       That DSHS plan states: "With reduced hours, in-home clients will need to choose which

18  tasks their employees spend their time on and there may not be enough time to complete all

19  tasks"; at the higher percentage reductions dome needed tasks might not be completed on a

20  regular basis; clients will have longer times without paid care; and "[i]n some cases, a safe in-

21

22  [18] Leamy Dec. ¶6; D.V.S. Dec. ¶7e; J.B. Dec. ¶10b; .S.J. Dec. ¶8; Chatwin Dec. ¶14e; Faatoafe Dec. ¶10, 12e; Guin Dec. ¶18a; Hayes Dec. ¶5, 12, 13f, n; Maxson Dec. ¶7; Paolino Dec. ¶14n.

23  [19] Faatoafe Dec. ¶12a; Hayes Dec. ¶13f; Maxson Dec. ¶8b; Partridge Dec. ¶9i.
    [20] D.W. Dec. ¶9a-b, 22e; Maxson Dec. ¶3, 8i-e (pg. 4); C.B. Dec. ¶11g, 13; J.B. Dec. ¶10a-d; Albott Dec. ¶5;

24  Allington Dec. ¶11-12; Braddock Dec. ¶17; Chatwin Dec. ¶13; Davis Dec. ¶15, 16g, 26d; Flint Dec. ¶11; Guin Dec. ¶12, 31; Hays Dec. ¶5, 14; Ivonav Dec. ¶12; McIntosh Dec. ¶9g, 16g; Paolino Dec. ¶13, 26; Partridge Dec. ¶¶5a-d, 9f; Starr Dec. ¶¶3, 9, 16.

25  [21] Glickman Dec. ¶8; Elliott Dec. ¶6.

26  [22] *Ibid.*; *see also, e.g.*, A.H. Dec. 4; DVS Dec. 4; JB Dec. 2; MJB Dec. 2; NNA Dec. 4; Albott Dec. 3; Allington Dec. 3-4; Braddock Dec. 2-3; Chatwin Dec. 2; Flint Dec. 2; Guin Dec. 3; Hays Dec. 3; Ivonav Decl 3; Maxson Dec. 2; Paolino Dec. 2-3. But many beneficiaries employ unrelated providers. C.B. Dec. 3; D.W. Dec. 3; K.S. Dec. 6; S.J.

27  Dec. 3; Davis Dec. 4; Dockstader Dec. 2-3; Faatoafe Dec. 2, 4; Frederick Dec. 3; Hayes Dec. 4; McIntosh Dec. 4; Morrow Dec. 3.

MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 7

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1   home plan of care will not be possible and clients may need to go to community residential or

2   nursing facility settings."  Brenneke Dec., Ex. 4 at 6.

3        On November 30, 2010, DSHS issued an HCS Management Bulletin outlining the

4   agency's plan to implement the 10% personal care services cut and the specific cuts to base

5   monthly hours for the various classification groups, ranging from 6.4 percent to 25 percent and

6   including reductions of up to 27 hours per month.  *Id.*, Ex. 1.  The Bulletin directs client letters

7   be mailed the week of December 6, 2010.  *Id.* at 2-3.  The letter notifies clients of the hours cuts,

8   but does not provide for individual reassessments or inform them of alternative Medicaid

9   services for which they qualify.  It states: "There are no appeal rights for this change . . . because

10  this is a service change directed by the Governor and applies to the entire program."  *Id.*, Ex. 1A.

### D.    The Reduction in In-Home Care Services Will Injure Plaintiffs.

11       The reduction in services effective January 1, 2011, will put Plaintiffs and other

12  beneficiaries at serious risk of injury, deterioration in health, and institutionalization.

13

### 1.    Injury and Effect on Health

14

15       Plaintiffs will receive fewer essential services,[23] have providers less frequently,[24] and be

16  left alone.[25]  Some providers will stop providing services, leaving their clients without care.[26]

17       Experts agree that unmet needs in activities of daily living "cannot be tolerated for long"

18  and have "immediate and serious consequences" such as injury, worsening health, and even

19  death.  Gardner Dec. ¶¶11-18.  Unmet need for in-home care services puts beneficiaries in

20  danger of injury and serious deterioration in their mental and physical health.  LaPlante Dec. ¶7

21  (higher rates of "discomfort . . ., wasting . . . , injuries due to falls, burns, bedsores" and

22  "contractures"); ¶10.  The specific cuts at issue here will reduce services to a level below that

---

23  [23] *E.g.*, C.B. Dec. ¶26; D.W. Dec. ¶22; J.B. Dec. ¶22; K.S. Dec. ¶15; Frederick Dec. ¶18; Dockstader Dec. ¶15; McIntosh Dec. ¶16; Morrow Dec. ¶6; Partridge Dec. ¶13; Starr Dec. ¶¶25a-b, 26.

24  [24] *E.g.*, A.H. Dec. ¶12; C.B. Dec. ¶26; D.V.S. Dec. ¶16; D.W. Dec. ¶22b; K.S. Dec. ¶15; N.N.A. Dec. ¶6; Albott
25  Dec. ¶12; Davis Dec. ¶26d; Frederick Dec. ¶18; Flint Dec. ¶16; Guin Dec. ¶29; Hays Dec. ¶25; Ivonav Dec. ¶24; McIntosh Dec. ¶16; Morrow Dec. ¶6.

26  [25] *E.g.*, K.S. Dec. ¶15; A.H. Dec. ¶12; C.B. Dec. ¶26; D.V.S. Dec. ¶16; D.W. Dec. ¶22b; N.N.A. Dec. ¶6; Davis
    Dec. ¶26; Flint Dec. ¶16; Guin Dec. ¶29; Hays Dec. ¶29; Ivonav Dec. ¶24; McIntosh Dec. ¶16; Paolino Dec. ¶24; Starr Dec. ¶24.

27  [26] *E.g.*, S.J. Dec. ¶25, 29; Braddock Dec. ¶27, 32; Faatoafe Dec. ¶23; Frederick Dec. ¶19; Hayes Dec. ¶8; Paolino Dec. ¶24; *see, also,* Walsh Dec.

---

MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 8

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1  required for beneficiaries "to live safely and healthily."  *Id.* ¶22.  The reductions "will place

2  many people receiving in-home personal care services at immediate risk of serious health

3  deterioration and even death."  Reed Dec. ¶44.  "Many consumers will experience immediate

4  and substantial harm from these hours cuts, are likely to have more medical emergencies and

5  hospitalizations, and will experience serious and irreparable harm to their physical and mental

6  health condition."  Black Dec. ¶33.  *See also,* Dapper Dec. ¶¶14-17; Walsh Dec. ¶12 ("the 10%

7  or more reduction of in-home Personal Care Hours will result in hundreds or thousands of cases

8  of . . . hospitalizations, as well as increases in preventable injury and death."

9         The consequences will be severe and immediate.  Without adequate toileting help or care

10  for incontinence, beneficiaries are at risk of skin tearing, infections and bowel obstructions.[27]

11  Without medication assistance, beneficiaries risk missing necessary medication or taking

12  improper doses.[28]  With fewer hours of provider assistance, beneficiaries may miss essential

13  medical appointments.[29]  Those with mobility impairments risk falling when unattended, which

14  can lead to serious injuries, hospitalization,  and rapid deterioration.[30]  Those who cannot be

15  turned or physically adjusted as often as needed will suffer bed sores and muscle problems.[31]

16  For example, Z.J., a quadriplegic man, requires a two-hour bowel program every morning.  If it

17  is delayed, he risks bowel obstruction and possible hospitalization.  Faatoafe Dec. ¶20.  He must

18  also be turned in bed every two hours to prevent bedsores, which have led to hospitalization in

19  the past.  *Id.* ¶12d.  With the reduced hours, his providers will begin his bowel program later in

20  the day, reduce showering if necessary to prevent infections, and be unable to monitor his

21

22  [27] *E.g.*, A.H. Dec. ¶12; Flint Dec. ¶16 (going to the bathroom without assistance will lead to sitting in "her own mess" and potentially "another bladder infection" at which point they may have to remove her kidney); Guin Dec.
¶30 (not changing pull-ups regularly will cause infections.); Hays Dec. ¶15d (diarrhea can lead to needing assistance

23  with cleaning mess, self, and clothes); Leamy Dec. ¶4 (improper incontinence care can lead to skin infections);
Maxson Dec. ¶8d (frequent bathroom accidents and cannot use toilet alone); Partridge Dec. ¶13a.

24  [28] *E.g.*, McIntosh Dec. ¶16, 16d; D.V.S. Dec. ¶7d, 16b; D.W. Dec. ¶22a, 22c; N.N.A. Dec. ¶6; Guin Dec. ¶31;
Partridge Dec. ¶13d.

25  [29] *E.g.*, D.W. Dec. ¶22a; Davis Dec. ¶26b; McIntosh Dec. ¶16; C.B. Dec. ¶26b.

26  [30] *E.g.*, Leamy Dec. ¶5 ("I have often seen this situation before: when elderly people are left alone, they fall, break a bone, catch pneumonia and die."); KS Dec. ¶ 15; McIntosh Dec. ¶¶16a-b; AH Dec. ¶11; DVS Dec. ¶¶16a, 18; NNA
Dec. ¶6; Chatwin Dec. ¶¶4d, 23; Davis Dec. ¶26a; Guin Dec. ¶¶30-31; Ivanov Dec. ¶24; Jensen Dec. ¶8c; Maxson

27  Dec. ¶¶8g, 26; Portelance Dec. ¶6.

[31] *E.g.*, Portelance Dec. ¶5; J.B. Dec. ¶23a; Faatoafe Dec. ¶19; Maxson Dec. ¶26.

MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 9

1   bladder drainage or reposition him when needed.  *Id.* ¶¶17-21.

2        Compromising domestic support will also cause injury.  Beneficiaries with suppressed

3   immune systems become sick in unsanitary conditions.[32]  Some will try to clean or cook food

4   and injure themselves.[33]  Others will be unable to maintain the healthy or special diet they need

5   to avoid exacerbating their medical conditions.[34]  Some cannot eat safely without assistance, and

6   will risk choking or will go hungry at times without care.[35]

7        Beneficiaries with family member providers will experience a reduced standard of living

8   from the reduction in family income,[36] leading some beneficiaries to go without medical

9   assistance and medications.[37]  Some will lose caregivers and have difficulty finding new

10  providers.[38]  For individuals with cognitive and psychiatric disabilities, the harm and fear of

11  losing services may be particularly harsh.  Dapper Dec. ¶5.  Beneficiaries rely on providers for

12  essential physical care and psychological and emotional support, and the stress of losing services

13  will trigger fear and symptomatic behaviors such as hurting themselves or damaging property.[39]

14               **2.       Risk of Institutionalization**

15       If the reductions in in-home care services are implemented, class members risk of

16  unnecessary institutionalization.  Most class members already have been assessed to need

17  institutional care in the absence of in-home services.[40]  The magnitude of these hours reductions

18  have substantially increased their risk of institutionalization.  LaPlante Dec.¶9, 12, 17, 23; Reed

19  Dec. ¶44; Black Dec. ¶33; Walsh Dec. ¶12; Dapper Dec. ¶17.

20  _____

21  [32] *E.g.*, C.B. Dec. ¶26d.
    [33] *E.g.*, Abbott Dec. ¶13; Chatwin Dec. ¶14a; Hays Dec. ¶15b; Ivonav Dec. ¶24.

22  [34] *E.g.*, C.B. Dec. ¶26; Davis Dec. ¶26a; Guin Dec. ¶30.
    [35] *E.g.*, D.W. Dec. ¶13f; S.J. Dec. ¶8e; Braddock Dec. ¶18b; Brown Dec. ¶24a; Dockstader Dec. ¶10b; McIntosh

23  Dec. ¶9c.
    [36] *E.g.*, Allington Dec. ¶17; A.H. Dec. ¶12; D.V.S. Dec. ¶18; Chatwin Dec. ¶21; Flint Dec. ¶16; Guin Dec. ¶29;

24  Hays Dec. ¶29; Maxson Dec. ¶22; Paolino Dec. ¶24.
    [37] *E.g.*, Allington Dec. ¶17; Chatwin Dec. ¶23.

25  [38] *E.g.*, C.B. Dec. ¶27-28; Faatoafe Dec. ¶23; Guin Dec. ¶33; Maxson Dec. ¶24; Paolino Dec. ¶13, 24; Partridge
    Dec. ¶25.

26  [39] *E.g.*, C.B. Dec. ¶11g, 26e; K.S. Dec. ¶13; Davis Dec. ¶16g, 26d; D.W. Dec. ¶22e; N.N.A Dec. ¶6; Abbott Dec.
    ¶13; Brown Dec. ¶22d, 23c, 24b; Chatwin Dec. ¶13, 19, 26; Faatoafe Dec. ¶21; Hays Dec. ¶25-27; Ivonav Dec. ¶12,
    25; Maxson Dec. ¶8i-j, 27; McIntosh Dec. ¶9g, 16e; Gardner Dec. ¶¶ 17, 19.

27  [40] *E.g.*, CB Dec. ¶16; Allington Dec. ¶8; Brown Dec. ¶7; Chatwin Dec. ¶8; Davis Dec. ¶10; Flint Dec. ¶7; Frederick
    Dec. ¶6; Guin Dec. ¶9; Hays Dec. ¶8; Ivanov Dec. ¶8; Maxson Dec. ¶12; Paolino Dec. ¶8.

MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 10

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1    **J.H.** wishes to remain in his home, but has already been moved into a nursing home in

2    anticipation of the reduction in hours; his paralysis and inability to breathe on his own require

3    more care than the reduced care hours would provide.  D. Hayes Dec. ¶5, 8.  **S.J.**'s provider will

4    no longer be able to care for her with the reduced hours and is arranging for her to move into a

5    nursing home in January.  S.J. Dec. ¶25, 31, 33; Braddock Dec. ¶24-31.  J.B. is herself disabled

6    physically, cannot get to the bedrooms of her four severely physically and mentally disabled

7    adult children, and is and unable to replace the lost hours of care; a nursing home may be **A.B.,**

8    **M.B., An.B.** and **J.B.**'s only option.  Jane B. Dec. ¶22a-d; Partridge Dec. ¶27.  Others are likely

9    to move to nursing homes or group residential settings because the reduced hours will not

10   provide for their needs, and their condition is likely to deteriorate.[41]  Many family member

11   providers forced to seek outside employment will have to place relatives in institutions.[42]

12   Institutionalization will be detrimental to beneficiaries' quality of life and care.

13   Placement in an institution can destabilize already compromised mental or physical functioning

14   and it is extremely difficult to move back into the community.  Gardner Dec. ¶¶19-20.

15   Institutionalized individuals may be subjected to inadequate care due to chronic understaffing.

16   Schnelle Dec. ¶7.  Many Plaintiffs previously experienced poor institutional care.[43]  These

17   individuals currently live independent lives in their homes and communities, with family, pets,

18   and neighbors, the loss of which would be devastating.[44]

---

[41] *E.g.*, D.W. Dec. ¶22b, 25; C.B. Dec. ¶35; K.S. Dec. ¶17, 21; Abbott Dec. ¶13; Braddock Dec. ¶27-29; J.B. Dec. ¶22 at p. 9-10; Davis Dec. ¶32; Dockstader Dec. ¶19; Faatoafe Dec. ¶24; Frederick Dec. ¶22; Hayes Dec. ¶8; McIntosh Dec. ¶20-21; Morrow Dec. ¶6; Paolino Dec. ¶24; Partridge Dec. ¶27; Starr Dec. ¶¶16, 24, 26.

[42] Glickman Dec. ¶21; Elliott Dec. ¶6.; *see also*, *e.g.*, Allington Dec. ¶20; Chatwin Dec. ¶21, 25; Guin Dec. ¶¶29-33; Hays Dec. ¶29; Maxson Dec. ¶¶25, 31; Paolino Dec. ¶24.

[43] *E.g.*, C.B. Dec. ¶32 (hygiene needs were not cared for, frequently missed meals and was undermedicated, MRSA Septicemia spread to her kidneys and brain); K.S. Dec. ¶18 (felt she lost her "independence and dignity"); D.W. Dec. ¶27 (lost 135 pounds and lack of privacy stressful); Allington Dec. ¶15 (became so "upset and disruptive" that had to be sent home the same day); Flint Dec. ¶20 (not kept clean or attended to in timely manner); Maxson Dec. ¶¶10, 28 (received unskilled care and rate of seizures increased); Abbott Dec. ¶13.

[44] *E.g.*, Brown Dec. ¶15a-d (would lose relationships with siblings and pets, active church life, swimming, and art hobbies); Hays Dec. ¶20 (would lose family time, church life, participation in an association for developmentally disabled); A.H. Dec. ¶8 (will miss family and grandson); C.B. Dec. ¶13, 34a-b (living independently allows for relationships with friends, neighbors, and companion animals); D.V.S. Dec. ¶9 (has been hospitalized and institutionalized before; will lose companion dog and ability to make choices and daily routines); D.W. Dec. ¶15, 28a (would lose companion dog); K.S. Dec. ¶17 (living at home is good for mental health); M.J.B. Dec. ¶4; S.J. Dec. ¶10 (would lose ability to arrange own schedule, social life, and privacy); Frederick Dec. ¶14 (would be unable

---

MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 11

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1

E.     **The Cuts In In-Home Care Services Are Not Cost-Effective**

2       While beneficiaries of in-home care services will suffer irreparable harm, the State will

3  enjoy fewer cost savings than its budget anticipates from reduction in service hours.  The state

4  will incur millions of dollars in increased institutionalization costs.  Reed Dec. ¶¶20, 23;

5  LaPlante Dec. ¶20.  Reduced spending will cause a loss of nearly $50 million to the Washington

6  economy, and millions of dollars in tax revenue.  Lucia Dec. ¶¶5, 13.

7                               **V.     ARGUMENT**

8       A.     **Plaintiffs Meet the Legal Standard for a Preliminary Injunction.**

9       "A plaintiff seeking a preliminary injunction must establish that he is [1] likely to

10  succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of

11  preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in

12  the public interest."  *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir.

13  2009) (quoting *Winter v. Natural Res. Def. Council Inc.*, 129 U.S. 365, 374 (2008)).  Where

14  plaintiffs make a strong showing of irreparable harm and that the injunction is in the public

15  interests, they need not make as great a showing with respect to likelihood of success on the

16  merits, and vice versa.  *See Alliance for Wild Rockies v. Cottrell*, 622 F.3d 1045, 1049-53 (9th

17  Cir. 2010).  Plaintiffs meet this test and class-wide injunctive relief is proper.[45]

18      B.     **The Reduction in Personal Care Services Will Cause Irreparable Injury.**

19      The reduction or loss of needed medical benefits for low-income disabled or elderly

20  individuals *per se* constitutes an irreparable injury justifying prospective equitable relief.  *See*

21  *Beltran v. Meyers*, 677 F.2d 1317, 1322 (9th Cir. 1982) ("needed medical care"); *Independent*

22  *Living Ctr. of S. Cal., Inc. v. Maxwell-Jolley*, 572 F.3d 644, 658 (9th Cir. 2009) (hereinafter "ILC

23

24  to spend time with family or people her age); Guin Dec. ¶23-24 (would lose family life and visits from sister);
    Braddock Dec. ¶23; Chatwin Dec. ¶19; Davis Dec. ¶32; Dockstader Dec. ¶21; Hayes Dec. ¶14; Maxson Dec. ¶10;
    Paolino Dec. ¶19; Partridge Dec. ¶11, 28 (institutionalization will be traumatic for B. siblings who have never been
25  separated from mother or siblings).

    [45] Although Plaintiffs will be filing a motion for class certification shortly in an abundance of caution, "[d]istrict
26  courts are empowered to grant preliminary injunctions regardless of whether the class has been certified."  *Brantley*
    *v. Maxwell-Jolly*, 656 F.Supp.2d 1161, 1178 n.14 (N.D. Cal. 2009) (quotation marks omitted); *accord V.L. v.*
27  *Wagner*, 669 F.Supp.2d 1106, 1114 n.6 (N.D. Cal. 2009).  However, if this Court disagrees, it should certify the
    classes for the reasons set forth in Plaintiffs' Motion for Class Certification.

MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 12

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1   II") ("needed medical care"); *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983) (disability

2   benefits); *cf. LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 55-56 (2nd Cir. 2004)

3   (retiree health benefits); *Beno v. Shalala*, 30 F.3d 1057, 1064 & n.10 (9th Cir. 1994).

4       Individuals would suffer irreparable harm from loss of home care services.  *See, supra;*

5   *see, also, V.L. v. Wagner*, 669 F.Supp.2d 1106, 1121-22 (N.D. Cal. 2009), (deprivation of home

6   care services would cause irreparable injury and risk unnecessary institutionalization).  *See also*

7   *Martinez v. Schwarzenegger*, 2009 WL 1844989, at *5 (N.D. Cal. Jun. 26, 2009) (reduction in

8   provider wage would lead some providers to leave jobs causing irreparable injuries); *cf. also*

9   *Mayer v. Wing*, 922 F.Supp. 902, 905, 909 (S.D.N.Y. 1996) ("reduc[tion] or terminati[on of]

10  home care services"); *Crabtree*, 2008 WL 5330506, at *30 (M.D. Tenn. Dec. 19, 2008)

11  ("institutionalization will cause Plaintiffs to suffer injury to their mental and physical health,

12  including a shortened life, and even death for some Plaintiffs"); *Long v. Benson*, 2008 WL

13  4571903, at *2 (N.D. Fla. Oct. 14, 2008) (similar).

14      The injury to providers in the form of reduced wages also establishes irreparable injury to

15  justify a preliminary injunction because of the harm that results and because the loss of income

16  to providers could not be recovered.  *See Dominguez v. Schwarzenegger*, 596 F.3d 1087, 1097-

17  98 (9th Cir. 2010) (Eleventh Amendment immunity); *California Pharmacists Ass'n v. Maxwell-*

18  *Joley*, 563 F.3d 847, 850-52 (9th Cir. 2009) (hereinafter "*California Pharmacists I*").

19      **C.      The Balance of Equities and Public Interest Favor Plaintiffs.**

20      The risk of illness and injury to low-income individuals deprived of home care services

21  outweighs Defendants' purely fiscal interest in making the reductions – even at times of budget

22  crisis – particularly when there are no adequate remedies other than an injunction.  *See*

23  *Dominguez*, 596 F.3d at 1098 (enjoining CA home-care cuts: "individuals' interests in sufficient

24  access to health care trump the State's interest in balancing its budget"); *Independent Living Ctr.*

25  *II*, 572 F.3d at 659 ("A budget crisis does not excuse ongoing violations of federal law";

26  *California Pharmacists I*, 563 F.3d at 852-53; *see also V.L.*, 669 F.Supp.2d at 1122.  Washington

27  State's immediate budgetary needs do not trump the harms that will befall Plaintiffs if the

MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 13

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1    reductions in service take effect on January 1, 2011.

2        An injunction to safeguard essential Medicaid benefits serves the public interest.  *See*

3    *California Pharmacists Ass'n v. Maxwell-Jolley*, 596 F.3d 1098, 1114-15 (9th Cir. 2010)

4    (hereinafter "*California Pharmacists II*") (health care supports preserved despite state fiscal

5    crisis); *Dominguez*, 596 F.3d at 1098 (public interest favors injunction of cuts to home care

6    payments).  In a case involving home care cuts, "the public interest weighs heavily in favor of

7    granting relief.  'It would be tragic, not only from the standpoint of the individuals involved but

8    also from the standpoint of society, were poor, elderly, disabled people to be wrongfully

9    deprived of essential benefits for any period of time.'"  *V.L.*, 669 F.Supp.2d at 1122, quoting

10   *Lopez,* 713 F.2d at 1437.  The equities weigh in favor of a TRO and preliminary injunction.

11       **D.    Plaintiffs Are Likely to Succeed on the Merits of their Claims.**

12           **1.    The Personal Care Services Reduction Violates the Medicaid Act's
             Reasonable Standards, Sufficiency, Comparability, Free Choice, and
13           Amendment Requirements.**

14       Medicaid is a cooperative federal-state program that allows states to receive federal

15   financial assistance for medical assistance to low-income individuals.  42 U.S.C. § 1396 *et seq*.

16   Participation is voluntary, but when a state chooses to participate, it must comply with the

17   Medicaid Act and its implementing regulations.  42 U.S.C. § 1396; *Alexander v. Choate,* 469

18   U.S. 287, 289 n.1 (1985); *see also Lankford v. Sherman*, 451 F.3d 496, 510 (8th Cir. 2006).[46]

19           **a.    Reduction of Services Below Assessed  Need, by an Arbitrary,
             Budget-Driven Number, Violates Medicaid's Reasonable
20           Standards Requirement.**

21       The Medicaid Act requires that all participating states employ "reasonable standards …

22   for determining … the extent of medical assistance under the plan which … are consistent with

23   the objectives of this subchapter."  42 U.S.C. § 1396a(a)(17); *see also Wisconsin Dep't of Health

24   & Fam. Serv. v. Blumer*, 534 U.S. 473, 479 (2002); *Schweiker v. Gray Panthers*, 453 U.S. 34,

25   _____

26   [46] As set forth in the Complaint, many of plaintiffs' Medicaid claims are brought pursuant to 42 U.S.C. § 1983.  As
     the Ninth Circuit held in *Independent Living Center of Southern California, Inc. v. Shewry*, 543 F.3d 1050 (9th Cir.
     2008), *cert. denied sub nom. Maxwell-Jolly v. Independent Living Center of S. California*, 129 S.Ct. 2828 (2009)
27   (hereinafter "*Independent Living Center I*"), all of the Medicaid provisions at issue are also enforceable directly
     under the Supremacy Clause.

MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 14

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1    36-37 (1981).[47]  The primary objectives of the Medicaid program are to provide medical

2    assistance to individuals whose income and resources are insufficient to meet the costs of

3    necessary medical services and to furnish "rehabilitation and other services to help such …

4    individuals attain and retain capability for independence or self care."  42 U.S.C. § 1396-1.

5         When state Medicaid rules deny coverage of services on an arbitrary or irrational basis,

6    courts have enjoined or invalidated them as contrary to the reasonable standards requirement.

7    *See Lankford v. Sherman*, 451 F.3d 496, 511-13 (8th Cir. 2006) (optional medical equipment

8    benefit); *Weaver v. Reagan*, 886 F.2d 194, 196-200 (8th Cir. 1989) (AZT coverage based on

9    FDA approved uses); *Allen v. Mansour*, 681 F.Supp. 1232, 1233-34, 1238 (E.D. Mich. 1986)

10   (state medical necessity criteria arbitrary when unsupported by expert opinion or scientific data);

11   *see also Hern v. Beye*, 57 F.3d 906, 910-11 (10th Cir. 1995); *Preterm, Inc., v. Dukakis*, 591 F.2d

12   121, 131 (1st Cir. 1979); *White v. Beal,* 555 F.2d at 1150-51 & n.3.

13        Courts enjoined similar budget-driven cuts as a violation of reasonable standards.

14   Reduction of Medicaid home care services based on beneficiaries' numerical scores, that "were

15   not designed as a measure of eligibility or need for [home care] services "cannot reasonably be

16   used for this purpose."  *V.L.*, 669 F.Supp.2d at 1117.  Modification of qualifying impairments for

17   adult day services, without explanation of "how these changes are linked to the individual's

18   circumstances, particular need for ADHC services or their risk of institutionalization" are not

19   permitted.  *Cota v. Maxwell-Jolly*, 688 F.Supp.2d 980, 992 (N.D. Cal. 2010).

20        Here, Washington's budget-based reduction of home care hours violates the reasonable

21   standards mandate.  The hours reduction is based on budgetary objectives.  That undercuts the

22   integrity of the CARE system's scientific, individualized assessments, care plans and hours

23   authorization that are minimally adequate to meet the essential needs of home care recipients.

24   *See supra*.  Defendants are seeking to reduce beneficiaries' hours *below* assessed need, without

25

26   _____

     [47] This requirement applies to waiver programs as well as those under a state plan.  As the federal Centers for
     Medicare and Medicaid Services ("CMS") has recognized in a related context, "[o]nce in [a 1915(c)] waiver, an
27   enrolled individual enjoys protection against arbitrary acts or inappropriate restrictions . . . .".  Brenneke Dec., Ex.
     14 (CMS *Olmsted* Update).

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

1   change of their circumstances, and without any reassessment.  The resulting hours allocations

2   will be "arbitrary," and without "any logic or reasoning."  Reed Dec. ¶42; *see also* Black Dec.

3   ¶¶30-31 (guarantee gap between need and services); Dapper Dec. ¶13 (separate hours

4   authorization from needs assessment).  This reduction employs an unreasonable standard to

5   determine the extent of medical assistance in violation of § 1396a(a)(17).

        **b.**    **The Reduction in Personal Care Service Hours Below Levels
Adequate to Accomplish the Purpose of the Program Violates
the Sufficiency Requirement.**

8         Medicaid's "sufficiency" requirement mandates that "[e]ach service must be sufficient in

9   amount, duration, and scope to reasonably achieve its purpose."  42 C.F.R. § 440.230(b).  When

10  a state has committed to provide a Medicaid service, the sufficiency requirement ensures that it

11  adequately fulfills that obligation.  To determine whether the service is sufficient, courts consider

12  whether the level of service achieves the specific program's purposes.  *Curtis v. Taylor*, 625 F.2d

13  645, 651 (5th Cir. 1980).  Where it does not, it is invalid.  *Mitchell v. Johnson*, 701 F.2d 337,

14  347-51 (5th Cir. 1983) (reduction of services and annual dental checkups to every three years;

15  *Lankford*, 451 F.3d at 511-13 (equipment, but not other equipment necessary to assist in

16  breathing); *see also Weaver v. Reagen*, 886 F.2d 194, 197-200 (8th Cir. 1989) (failure to cover

17  AZT prescription); *Charpentier v. Belshe*, 1994 WL 792591, at *5 (E.D. Cal. Dec. 21, 1994)

18  (limiting reimbursement to no more than 20% of Medicare's reasonable charge).

19        Here, the reduced in-home hours will no longer be sufficient to fulfill the purpose of the

20  State's in-home personal care services programs to enable individuals to remain safely in their

21  homes, rather than be forced into less integrated settings.  *See*, *e.g.*, RCW 74.39.005(3), (4).[48]

---

[48] *See also*, RCW 74.39A.007 (expressing legislative intent that "[l]ong-term care services administered by the department of social and health services include a balanced array of health, social, and supportive services that promote individual choice, dignity, and the highest practicable level of independence"); *id.*, 74.39.005(2) (purpose to "[e]nsure that functional ability shall be the determining factor in defining long-term care service needs and that these needs will be determined by a uniform system for comprehensively assessing functional disability").  As CMS has recognized, the purpose of a 1915(c) waiver is "to serve as a community alternative to institutionalization and ensure the health and welfare of the individuals who enroll."  Brenneke Dec., Ex. 14 (CMS Olmstead Update No. 4); Brenneke Dec., Ex. 7 (Washington HBCS Waiver Application).  "The goal of this waiver is to support participants in their own homes or in residential facilities rather than in a nursing facility or other more restrictive settings. The objective of the waiver is to develop and implement supports and services to successfully maintain individuals in their homes and communities."); 42 U.S.C. §1396 (purposes of Medicaid program include providing rehabilitation and other services to help individuals attain and retain capability for independence and self care).

MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 16

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

The CARE Tool authorizes the hours that individuals need in order to fulfill the purposes of that program and remain safely at home.  *See supra*.  Reduction of hours to "well below" the "minimum number of hours identified by the CARE tool as essential to maintain a safe living situation . . . will mean that the Washington in-home personal care services program will no longer fulfill the fundamental purpose of home and community-based care, because the authorized hours will not be sufficient to permit consumers to remain safely in their homes." Reed Dec. ¶¶44-45; *see also* Black Dec. ¶32 (reduction will "undercut[] the very purpose of the system").  The sufficiency claims are likely to succeed: "The services currently provided through [California's home care program] have already been determined by social workers to be necessary to permit elderly and disabled individuals to remain safely in their homes.  Thus, the elimination of these services will likely leave affected individuals without a level of service sufficient to achieve the purpose of the program."  *V.L.*, 669 F.Supp.2d at 1118.

> **c.**     **An Across-the-Board Reduction in Services without Individual Need Redeterminations Violates the Comparability Requirement of the Medicaid Act.**

The "comparability" provision of the Medicaid Act, 42 U.S.C. § 1396a(a)(10)(B), mandates "comparable services when individuals have comparable needs," and it is violated "when some recipients are treated differently from other recipients where each has the same level of need." *Jenkins v. Washington State DSHS*, 157 P.3d 388, 392 (Wash. 2007); *see also Hodgson v. Bd. of Comm'rs, Hennepin*, 614 F.2d 601, 608 (8th Cir. 1980); 42 C.F.R. § 440.240.

In *Jenkins*, the State imposed an across-the-board reduction upon the hours of in-home care beneficiaries whose caregivers lived with them. 157 P.3d at 392.  This violated the comparability requirement because it "reduce[d] a recipient's benefits based on a consideration other than the recipient's actual need."  *Id.* at 401; *see also White v. Beal*, 555 F.2d 1146, 1148-49 (3d Cir. 1977) (eyeglasses for disease but not refractive error); *Conlan v. Bonta*, 102 Cal.App.4th 745, 753-54 (2002) (some beneficiaries incurring unreimbursed expenses); *Jeneski v. Myers*, 163 Cal.App.3d 18, 33-34 (1984) (restrictions of drugs palliative for some but medically necessary for others).

MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 17

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1    Courts have enjoined benefit reductions based on factors other than individual needs to

2    avoid comparability violations . *See V.L.*, 669 F.Supp.2d at 1115 (personal care services); *see*

3    *also Cota*, 688 F.Supp.2d at 993 (adult day services).  Here, there is no dispute that the reduction

4    is based on a budgetary figure, not an individualized assessment of needs.  *Jenkins* is directly on

5    point, and the reduction violates the comparability requirement.

        **d.**      **The Reduction in Personal Care Services Will Effectively**
6                      **Eliminate Or Render Inadequate Home-Based Services for**
                  **Most Individuals, in Violation of Medicaid's Free Choice**
7                      **Requirement.**

8    DSHS provides personal care services through COPES and other Medicaid programs

9    pursuant to waivers under Section 1915(c) and/or Section 1915(d), 42 U.S.C. §1396n.  These

10    waivers are conditioned upon DSHS assurances that individuals likely to require the level of care

11    provided in a hospital, nursing facility, or other specified institution "are informed of the feasible

12    alternatives" to institutional care and have individual choice.  42 U.S.C. §§1396n(c)(2)(C);

13    1396n(d)(2)(C); *see also* 42 U.S.C. §§1396n(c)(1); 1396n(d)(2)(A).  Regulations require "the

14    recipient or his or her legal representative will be—(1) Informed of any feasible alternatives

15    available under the waiver; and (2) Given the choice of either institutional or home and

16    community based services."  42 C.F.R. §441.302(d); *see also* 42 C.F.R. §§441.353(d), 303(d).

17    These "free choice" requirements are "constructed in such a way as to stress . . . two

18    explicitly identified rights - (a) the right to be informed of alternatives to traditional, long-term

19    institutional care, and (b) the right to *choose* among those alternatives."  *Ball v. Rogers*, 492 F.3d

20    1094, 1107 (9th Cir. 2007).  They "mandat[e] that participating states keep each eligible

21    Medicaid client apprised of these non-institutional care options and afford each the opportunity

22    to choose how to live."  *Id.* at 1111 (emphasis omitted).  "[R]ecipients must not be forced to

23    choose between adequate health care and institutionalization."  *Ball v. Biedess*, *Ball v. Biedess*,

24    2004 WL 2566262, at *6-7; (D. Ariz. Aug. 13, 2004).[49]

---

25    [49] Under the free choice mandate, "the feasibility of alternatives should not be determined by budgetary constraints.
26    Feasibility must be determined by the recipient's needs and treatment plan, and not solely by the funds available to
service that plan." *Benjamin H*, 1999 WL 34783552, *14.  Indeed, federal "legislators were adamant that 'the
27    determination of which long-term care options are feasible in a particular instance should be based on *an*
*individual's* needs, as determined by an evaluation, *and not short-term costs savings*.'"  *Ball*, 492 F.3d at 1114.

1   Defendants' planned implementation of hours reductions violates this free choice

2   mandate in two ways.  First, home-based services that are inadequate to meet recipients' needs,

3   as they will be here, do not constitute a "feasible alternative" to institutionalization, and so

4   violate the free choice provisions.  *See Ball*, 492 F.3d at 1100 (low wages caused provider

5   shortage, decreased quality of care, state failed to avoid service gaps); *Ball v. Rodgers*, 2009 WL

6   1395423, at *6 (D. Ariz. Apr. 24, 2009) (requiring specific steps to prevent gaps in service so

7   recipients would have "an actual choice between in-home and institutional care"); *Cramer v.*

8   *Chiles*, 33 F. Supp.2d 1342 (S.D. Fla. 1999) ("no real choice" when beneficiary must choose

9   between home-based option that may not meet or uncertain placement in institution).

10   Second, Defendants reduced Plaintiffs' hours authorizations, and effectively eliminated

11   the viability of home-based care for many, but failed to inform beneficiaries of other community-

12   based long term care alternatives available under the waiver or the option to obtain the necessary

13   care in an institutional setting without gaps in service.  Defendants must inform recipients of

14   their options before making such a change to afford them a meaningful and free choice.

15           e.     **The Reduction in Personal Care Services Without Obtaining**
                 **Federal Approval of Plan and Waiver Amendments Violates**

16                    **the Medicaid Act.**

17   When a State makes material changes in its operation of the Medicaid program, it must

18   submit a plan amendment to CMS for determination as to whether the amendment complies with

19   federal requirements, and may not implement that plan amendment until CMS approves it.  42

20   CFR §§ 430.12, 430.20, 447.256.  Similar obligations apply as conditions of Medicaid waiver

21   programs.  Brenneke Dec., Exs. 7-13 (Medicaid waiver applications, at Section 8).

22   Implementation of a plan amendment without CMS approval is unlawful, and should be

23   enjoined.  *See Oregon Ass'n of Homes for the Aging, Inc. v. Oregon*, 5 F.3d 1239, 1241, 1244

24   (9th Cir. 1993); *Exeter Memorial Hosp. Ass'n v. Belshe*, 145 F.3d 1106, 1108-09 (9th Cir. 1998);

25   *California Ass'n of Rural Health Clinics v. Maxwell-Jolly*, __ F.Supp.2d __, 2010 WL 4069467,

26   at *12-14 (Oct. 18, 2010).  So should implementation of unapproved waiver amendments.

27   The allocation of home care hours to each recipient is not discretionary.  Rather, in the

MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 19

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1    State Plan and each home care waiver program, Defendants certify that Washington uses the

2    CARE tool to develop an individualized care plan, which includes the determination of the

3    number of personal care hours needed and do not reference state budget issues.[50]  By introducing

4    budget cuts as a basis for determining home care hours, as opposed to the individualized CARE

5    assessments, the State has made a significant change not reflected in the State Plan or waivers.

6    Defendants' reduction of in home services to levels *below* assessed need also materially modify

7    the State Plan and waiver provisions that require home care hours to be based solely on

8    assessments of need.[51]

9          Defendants have not submitted to CMS any plan or waiver amendments regarding these

10   changes in DSHS's processes for determining each recipient's home care hours, or awaited CMS

11   approval before implementing them.  This violates the requirement that the State and refrain

12   from implementing such changes before CMS approval.

13           **2.      The Reduction in Personal Care Hours Risks Unjustified
                 Institutionalization in Violation of Title II of the ADA and Section 504
14               of the Rehabilitation Act.**

15          Defendant's actions violate the Americans with Disabilities Act ("ADA") and Section

16   504 of the Rehabilitation Act ("Section 504") which prohibit discrimination on the basis of

17   disability and unjustified institutionalization.  *Olmstead v. L.C.*, 527 U.S. 581, 119 S.Ct. 2176,

18   114 L.Ed.2d 540 (1999);  *Townsend v. Quasim*, 328 F.3d 511 (9th Cir. 2003).  *See also*, 42

19   U.S.C. § 12132; 29 U.S.C. § 794(a); 28 CFR § 35.130(b)(7)("reasonable accommodation"

20   mandate) and 28 CFR § 35.130(d)(the integration mandate).  In enacting the ADA in 1990,

21   [50] *See* Brenneke Dec., Exs. 6 (State Plan, at 11), Exs. 7-13 (Waiver plans at Appx. D(d)); Ex. 7 (COPES Waiver,
     Appx. I) ("CARE . . . assigns base hours"); Ex. 8 (MNIH Waiver, Appx. I) (same); Exs. 9-11 (Core Waiver, Basic
22   Waiver, and Basic Plus Waiver, at Appx. C-3) ("maximum hours of personal care received are determined by the
     approved department assessment").  The functions, elements and scoring mechanisms of the CARE tool are
23   provided for with specificity, WAC 388-106-6125, 388-106-0130, 388-106-0135, 388-106-0140, 388-440-0001, and
     do not permit Defendants to change a beneficiary's home care hours for purely budgetary reasons.
24   [51] *E.g.*, Brenneke Dec., Ex. 6 (State Plan), at 11 (providing that DSHS will establish and follow "individualized plan
     of care" for personal care services that is based on "independent assessment . . . developed by a person-centered
25   process in consultation with the individual" and "other appropriate individuals," and that this plan of care
     "[i]dentifies the State plan HCBS necessary for the individual, and furnishes . . . all HCBS which the individual
26   needs");  *see also id.*, Ex. 7 (COPES Waiver, Appx. D(d)-(e)) (describing how individual care plan, including home
     care hours, is determined by needs assessment); Ex. 8 (MNIH Waiver, Appx. D(d)-(e)) (same); Exs. 9-13 (Basic
27   Waiver, Basic Plus Waiver, Community Protection Waiver, Core Waiver, and New Freedom Waiver, at Appx. D(d))
     (same).

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1    "Congress declared that 'segregation' of persons with disabilities is a 'for[m] of discrimination'

2    and that such discrimination persists in the area of 'institutionalization.'" *Townsend v. Quasim*,

3    328 F.3d 511, 516; 42 U.S.C. § 12101(a).

4        Title II of the ADA provides that "no qualified individual with a disability shall, by

5    reason of such disability, be excluded from participation in or be denied the benefits of the

6    services, programs, or activities of a public entity, or be subjected to discrimination by any such

7    entity." 42 U.S.C. § 12132.  *See Weinreich v. Los Angeles County Metro. Transp. Auth.*, 114

8    F.3d 976, 978 (9th Cir. 1997).  Here, Plaintiffs are qualified individuals with disabilities who live

9    independently in their own homes with the Medicaid personal care assistance awarded based on

10   individualized CARE assessments of their unmet needs.  The reductions violate the ADA's

11   integration mandate by requiring people who live at home to make do with less than they need or

12   move out of their homes to get full LTC services less integrated settings.

13       ADA regulations require provision of services in the most integrated setting possible[52]:

14   "A public entity shall administer services, programs, and activities in the most integrated setting

15   appropriate to the needs of qualified persons with disabilities." 28 C.F.R. § 35.130(d).

16       In *Olmstead*, the Court applied these integration and anti-isolation principles, holding that

17   the ADA prohibits "[u]njustified isolation of the disabled." *Olmstead*, 527 U.S. at 597.  The

18   Court reasoned that unnecessary institutional placement "perpetuates unwarranted assumptions

19   that persons so isolated are incapable or unworthy of participating in community life," and

20   "severely diminishes the everyday life activities of individuals, including family relations, social

21   contacts, work options, economic independence, educational advancement, and cultural

22   enrichment."  *Id.* at 600-01 (citations omitted).  To establish an *Olmstead* claim, a plaintiff must

23   show (1) the state's treatment professionals have determined that community-based services are

24   appropriate, (2) the disabled individual does not oppose such community-based treatment, and

25

---

26   [52] "The 'most integrated setting' is defined as 'a setting that enables individuals with disabilities to interact with
non-disabled persons to the fullest extent possible.'" *Brantley v. Maxwell-Jolly*, 2009 WL 2941519, at *6 (N.D.Cal.
Sept. 10, 2009) (citing 28 C.F.R. pt. 35 app. A; *Olmstead*, 527 U.S. at 592).  This mandate "serves one of the
27   principal purposes of Title II of the ADA: ending the isolation and segregation of disabled persons." *Arc of Wash.
State Inc. v. Braddock*, 427 F.3d 615, 618 (9th Cir. 2005); *see also Brantley*, 2009 WL 2941519 at *6.

---

1   (3) the provision of community-based services can be reasonably accommodated, taking into

2   account the resources available to the state and the needs of other individuals with disabilities.[53]

3   527 U.S. at 587.  Plaintiffs meet these standards and want to stay home.

4          Plaintiffs who already reside at home or in community settings are entitled to ADA

5   integration mandate protection to prevent state actions that give rise to a risk of unnecessary

6   institutionalization.  *See Fisher v. Oklahoma Health Care Auth.,* 335 F.3d 1175, 1181-82 (10th

7   Cir.2003) (imposition of cap on prescription medications risked premature entry to nursing

8   homes); *Ball v. Rodgers*, 2009 WL 1395423 at *5 (D. Ariz. Apr. 24, 2009) (failure to provide

9   needed services threatened institutionalization); *Mental Disability Law Clinic v. Hogan*, 2008

10  WL 4104460 at * 15 (E.D.N.Y. Aug.28, 2008) ("[E]ven the risk of unjustified segregation may

11  be sufficient under *Olmstead*" ); *M.A.C. v. Betit*, 284 F.Supp.2d 1298, 1309 (D. Utah 2003) (risk

12  of institutionalization); *Makin ex rel. Russell v. Hawaii*, 114 F.Supp.2d 1017 (D. Haw. 1999).

13  *V.L*, 669 F.Supp.2d at 1119-20; (reductions and terminations of home care services placed

14  Medicaid beneficiaries at serious risk of institutionalization) *see also Cota*, 688 F.Supp.2d at

15  994-95; *Crabtree*, 2008 WL 5330506, at *25 (M.D. Tenn. Dec. 19, 2008) (enjoining state from

16  reducing home health care services).  Plaintiffs have demonstrated the same serious threat here

17  and shown a likely ADA violation.

18          **E.    Defendants have violated the Plaintiffs' Procedural Due Process Rights.**

19          The Due Process Clause of the Fourteenth Amendment prohibits states from denying,

20  reducing or terminating Medicaid services without providing meaningful notice *prior* to

21  termination or reduction of Medicaid benefits, continued benefits pending a pre-termination

22  hearing, and a fair and impartial pre-termination hearing. *Goldberg v. Kelly*, 397 U.S. 254, 267-

23  68, 90 S.Ct. at 1020. Specifically, the recipient must have "timely and adequate notice detailing

24  the reasons for a proposed termination…" *id*. *See, also, Mathews v. Eldridge*, 424 U.S. at 334-

25

26  ---

[53] The Ninth Circuit has also analyzed the integration mandate claim under the more general test applicable to ADA
    claims brought under Title II.  *See Townsend v. Quasim,* 328 F.3d 511 (9th Cir. 2003) (citing *Duvall v. County of*
27  *Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001)); *Brantley*, 2009 WL 2941519 at *7.  Plaintiffs prevail under either
    formulation.

MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 22

**MACDONALD HOAGUE & BAYLESS**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1   335 (extent of due process); *Perry v. Chen*, 985 F.Supp. 1197, 1202 (D. Ariz. 1996)[54].

2   The regulations implementing the Medicaid Act prescribe procedures for notice and an

3   opportunity for a fair hearing prior to reduction of services. *See* 42 C.F.R. § 431.200, 201; 42

4   C.F.R. § 431.211 (elements of "notice"). Medicaid beneficiaries have a right to continued

5   benefits until they are found ineligible. 42 C.F.R. §435.930(b), §431.230(a). Notice must be

6   adequate and complete.[55] 42 C.F.R. § 431.211.

7   Here, DSHS's client notice simply lists the current hours, hours effective January 1,

8   2011, and the difference. It maintains "[t]here are no appeal rights for this change through the

9   Office of Administrative Hearings because this is a service change directed by the governor and

10   applies to the entire program." Brenneke Dec Ex. 1A. 42 C.F.R. § 431.220(b) provides an

11   "agency need not grant a hearing if the sole issue is a Federal or State law requiring an automatic

12   change adversely affecting some or all recipients." That provision does not apply; however,

13   because DSHS had *discretion* over how to implement the Governor's directive, the budget cuts

14   to the Department, and cuts to the personal care program, and the due process violations arise

15   from those decisions.[56] Timely, advance and adequate notice is required even when assistance is

[54] Notice is required to protect claimants against proposed agency action "resting on incorrect or misleading factual premises or on misapplication of rules to policies of the facts of particular cases." *Goldberg v. Kelly*, 397 U.S. at 268, 90 S.Ct. at 1020. Where the recipient has a "brutal need" for the benefit at issue, courts have required agencies go to greater length, incurring higher costs and accepting inconveniences, to reduce the risk of error. *See Baker v. State*, 191 P.3d 1005, 1010 (Alaska 2008). Due process requires that beneficiaries be provided a meaningful opportunity to understand, review, and challenge the state agency's action. *Id.* at 1011.

[55] Notice is defined as "a written statement that meets the requirements of § 431.210." *Id.* Section 431.210 requires: (a) a statement of what action the State intends to take; (b) the reasons for the intended action; (c) the specific regulation or law that supports the change; (d) an explanation of the right to a hearing; (e) an explanation of the circumstances under which Medicaid is continued pending hearing. The State must mail a notice at least ten days before the date of the action. 42 C.F.R. § 431.211. The agency must grant an opportunity to be heard to a recipient who requests it because he or she believes the agency has taken an action erroneously. 42 C.F.R. § 431.220(a)(2). When the recipient requests a hearing, the agency may not terminate or reduce services until a decision is rendered after the hearing unless the agency "promptly informs the recipient in writing that services are to be terminated or reduced pending the hearing decision." 42 C.F.R. § 431.232 (emphasis added). Finally, the hearing must cover "[a]gency decisions regarding the type or amount of services." 42 C.F.R. § 431.241 (emphasis added).

[56] When implementation of a law entails interpretation or discretion by the state agency, the Medicaid state agency must follow all notice requirements and recipients have a right to challenge the agency's action in a fair hearing. *Claus v. Smith*, 519 F. Supp. 829, 833 (N.D. Ind. 1981). Due process requires a pre-termination fair hearing when recipients "have challenged proposed terminations as resting on incorrect or misleading factual premises or on misapplication of rules or policies to the facts of particular cases." *Goldberg v. Kelly*, 397 U.S. at 264. In this case, DSHS misapplied its rules or policies by summarily reducing benefits below needs, as defined in individual care assessments, failing to follow federal and state law requiring continued services unless and until the Plaintiffs were

MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 23

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1    terminated by law to a class of persons.  *Elder v. Beal*, 609 F.2d 695, 696 (3rd Cir. 1979).[57]

2           For a notice to be legally "adequate" it cannot be inaccurate or misleading on its face.

3    DSHS's notice to Plaintiffs is just that.  It fails to inform Plaintiffs of individual reasons for

4    reductions of benefits or provide for individual assessments, fails to explain alternative Medicaid

5    services availability, says "there are no appeal rights," and provides no rights to continued

6    benefits pending appeal, all of which are required.  42 C.F.R. § 431.210.

7           Nothing in federal or state law permits Defendant to deprive Plaintiffs of their due

8    process rights to challenge the reduction of their Medicaid in-home personal care services.

9    Recipients' also qualify for, and have an ongoing entitlement to, Medicaid nursing facility

10   services or service in ICF/MRs, which they waived in reliance on the CARE/ISP plans'

11   authorization of in-home personal care assistance.  *See, supra*; *see, e.g*, Brenneke Dec., Ex. 16.

12   Nursing facility services are mandatory under the Medicaid Act.  42 U.S.C. § 1396d(a)(4)(A).

13   The right to ongoing and seamless long term care service benefits continue unless an

14   individualized reassessment determines Plaintiffs are no longer eligible.

15                                   **VI.    CONCLUSION**

16          For all the foregoing reasons, Plaintiffs request that this Court issue a temporary

17   restraining order and order to show cause why a preliminary injunction should not issue,

18   enjoining Defendants from implementing the ten percent reduction in in-home personal care

19   service hours set to take effect on January 1, 2011.

20          DATED this 23rd day of December, 2010.

21   MacDONALD HOAGUE & BAYLESS              ALTSHULER BERZON

22
23   By:  _/s/ Andrea Brenneke_____      By:  _/s/ Stacy Leyton_____
           Andrea Brenneke, WSBA # 22027              Stacey Leyton, CABA #203827
24         Attorneys for Plaintiffs                   *pro hac vice* Attorneys for Plaintiffs

25   reassessed and found ineligible.  These are not required or automatic changes, and the exception to the fair hearing
     rule does not apply.
26   [57] Procedural protections are required even when a state terminates an optional Medicaid program for expressly
     lawful reasons.  *Cramer v. Chiles*, 33 F.Supp.2d 1342, 1352 (S.D.Fla. 1999).  *Cramer* involved converting
27   participants from one kind of Medicaid program into another.  In that case, the court found there was a required
     statutory basis for pre-termination notice and opportunity for hearing.  *Id.* at 1352; 42 U.S.C. § 1396a(a)(3).

MOTION FOR TEMPORARY RESTRAINING ORDER AND              **MacDONALD HOAGUE & BAYLESS**
PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 24                705 Second Avenue, Suite 1500
                                                               Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961