THE HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| M.R. et al., | | |
| Plaintiffs, | No. C10-2052Z | |
| vs. | | |
| SUSAN DREYFUS, et al., | ORDER | |
| Defendants. | | |

THIS MATTER comes before the Court on plaintiffs' motion for a temporary restraining order and a preliminary injunction, docket no. 11. Having reviewed all papers filed in support of, and in opposition to, plaintiffs' motion, and having considered the oral arguments of counsel, the Court entered a Minute Order, docket no. 73, denying the motion for a temporary restraining order and deferring the motion for a preliminary injunction. This Order explains the Court's reasons for denying the requested temporary restraining order.

**Background**

Many of the issues now before the Court have been previously litigated.  *See Freeman v. Wash. Dep't of Soc. & Health Servs.*, 2010 WL 3720285 (W.D. Wash.).  In *Freeman*, the plaintiffs unsuccessfully challenged reductions made in 2009 to the number of base hours for in-home "personal care services" allotted to certain individuals in connection with the Medicaid program.  In this action, plaintiffs seek to enjoin deeper cuts to these base hours, alleging that, if the planned reductions take effect on January 1, 2011, the level of available personal care services will fall below the minimum amount necessary for individuals to remain safely in their homes and, as a result, some plaintiffs will be (or already have been) forced to move to nursing facilities or other institutions.  Plaintiffs assert that the intended decreases in base hours violate the Medicaid Act, the Americans with Disabilities Act, and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.  The Court concludes that plaintiffs have not made a sufficient showing of irreparable injury or likelihood of success on the merits to warrant the extraordinary remedy of a temporary restraining order.

Under the Medicaid Act, also known as Title XIX of the Social Security Act, 42 U.S.C. §§ 1396a-1396w, the federal government provides monetary assistance to participating States, which then contribute the remaining resources necessary to furnish medical care and other services to qualified individuals.  If a State elects to participate in Medicaid – which all fifty do – it must operate its program in conformity

with applicable federal laws.  *Alexander v. Choate*, 469 U.S. 287, 289 n.1 (1985).  The

federal government administers Medicaid through the Centers for Medicare and

Medicaid Services ("CMS").  42 C.F.R. § 400.200.  Washington's Medicaid program

is managed by the Department of Social and Health Services ("DSHS").

RCW 74.04.050.

Under the Medicaid program, each participating State must submit, and have

approved by CMS, a state plan for the provision of "medical assistance."  *See* 42

C.F.R. § 430.10.  Only some categories of "medical assistance," such as inpatient and

outpatient hospital care, are mandatory for participating States, while others, such as

in-home "personal care services," are optional.  *See* 42 U.S.C. §§ 1396d(a) &

1396a(a)(10)(A).  Washington has elected to provide "personal care services," which

are defined by the Medicaid Act as services that are

> furnished to an individual who is not an inpatient or resident of a
> hospital, nursing facility, intermediate care facility for the mentally
> retarded, or institution for mental disease that are (A) authorized for the
> individual by a physician or in accordance with a plan of treatment or
> (at the option of the State) otherwise authorized for the individual in
> accordance with a service plan approved by the State, (B) provided by an
> individual who is qualified to provide such services and who is not a
> member of the individual's family, and (C) furnished in a home or other
> location.

42 U.S.C. § 1396d(a)(24).  DSHS has further divided personal care services into two

types of activities for which beneficiaries might require physical or verbal assistance,

namely activities of daily living ("ADLs") and instrumental activities of daily living

("IADLs").  WAC 388-106-0010.  ADLs include basic personal tasks like bathing,

dressing, eating, and toilet use, while IADLs consist of functions performed around the home or community, for example, shopping, meal preparation, and housekeeping.  *Id.*

In administering Washington's long-term personal care services program, DSHS uses a system known as the Comprehensive Assessment and Reporting Evaluation ("CARE").  WAC 388-106-0065.  CARE takes into account five criteria, namely (i) cognitive performance score; (ii) clinical complexity; (iii) mood/behavior and behavior point score; (iv) ADL score; and (v) exceptional care.  WAC 388-106-0125.  Based on the results of CARE, DSHS places the beneficiary into one of seventeen acuity classifications.  *Id.*  DSHS has assigned each acuity classification a specific number of base hours of personal care services.  *Id.*  Beneficiaries with the most severe functional disabilities are assigned to the category with the highest number of base hours.

In September 2010, Washington Governor Christine Gregoire issued Executive Order 10-04, which directed each State agency to reduce expenditures to compensate for a projected budget shortfall in the 2011 fiscal period.  Exs. 2-3 to Brenneke Decl. (docket no. 12).  In response to the Governor's Executive Order, DSHS announced plans to reduce in-home personal care service base hours by an average of ten percent,[1] effective January 1, 2011.  *Id.* at Ex. 4.  DSHS sent written notifications to all beneficiaries of these services on December 6, 2010.  *Id.* at Ex. 1 at 2-3.  This litigation ensued shortly thereafter.  Among the plaintiffs in this case are disabled and

---

[1] This figure reflects the difference in the average numbers of base hours across all acuity categories for 2010 (161.2 hours) and 2011 (144.4 hours).  When the decrease for each acuity group is separately considered, the range of values is between 6.3% (Group E Medium) and 18.8% (Group B Low).

elderly individuals who are currently receiving, or within the recent past received, in-home personal care services through Washington's Medicaid program.  Also named as plaintiffs in this action are two nonprofit associations and a union that represents personal care service providers.[2]

## Discussion

### A.  Standard for a Temporary Restraining Order

Preliminary injunctive relief requires a party to demonstrate (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) a balance of equities tipping in favor of relief; and (4) a weighing of public interest that supports an injunction.  _Stormans, Inc. v. Selecky_, 586 F.3d 1109, 1127 (9th Cir. 2009).  Courts employ a substantially identical analysis when addressing a motion for a temporary restraining order.  _Stuhlbarg Int'l Sales Co. v. John D. Brush & Co._, 240 F.3d 832, 839 n.7 (9th Cir. 2001).  A temporary restraining order, as with any preliminary injunctive relief, is "an extraordinary remedy never awarded as of right."  _See_ _Winter v. Natural Res. Def. Council, Inc._, 129 S. Ct. 365, 376 (2008).

### B.  Irreparable Injury

In predicting that the anticipated reductions in base hours of personal care services will cause a deterioration in health and institutionalization of beneficiaries,

---

[2] The parties have not briefed whether and to what extent these organizations have standing, and the Court declines to address these issues sua sponte.  Even assuming these entities have standing and can demonstrate some injury independent of the alleged harm to the individual plaintiffs, they still would not be entitled to injunctive relief at this stage of the proceedings because they have not demonstrated a likelihood of success on the merits of the various claims in this case.

plaintiffs have taken the position that DSHS has never awarded more than the

minimum time necessary for recipients to safely remain in their homes and that the

scheduled cuts in base hours will result in individuals having less assistance than they

absolutely require.  Plaintiffs, however, have failed to establish a correlation between

the base hours at issue and the amount of services needed to avoid injury or

institutionalization.

The current method for calculating the number of personal care service hours a

beneficiary will receive was implemented in 2004.  At that time, in response to a

legislative directive and based on studies conducted during preceding years, _see_ Moss

Decl. at ¶¶ 3 & 5 (docket no. 68), DSHS promulgated regulations outlining the five

criteria of CARE, pursuant to which an adult needing personal care services is

assigned to a particular category that is associated with a specific number of base

hours.  For example, in 2004, an individual assessed as falling within "Group E High"

would have had 420 base hours.  WAC 388-72A-0087 (2004).  An individual's base

hours are then adjusted, either up or down, in accordance with several factors,

including informal supports, multiple clients in the same household, and the

characteristics of the living environment, for example, offsite laundry facilities or

wood used as a sole source of heat.  WAC 388-106-0130(2)-(4) (2010).  The result of

this computation is "the maximum number of hours that can be used to develop [a]

plan of care."  Emergency Rule 388-106-0130(6), Wash. St. Reg. 10-22-066 (Oct. 29,

2010).

Although the CARE classification process, whereby a beneficiary is placed into one of the seventeen categories enumerated in WAC 388-106-0125, involves an individualized assessment, the number of base hours allotted to each of the seventeen categories is not linked with individual need.  Rather, the categories reflect the relative acuity of individuals, with beneficiaries in classifications that receive more base hours having more need for personal care services than those in categories associated with lower numbers of base hours.  Moss Decl. at ¶¶ 3 & 4 (docket no. 68).  When CARE was implemented in 2004, the base hours were allocated among the fourteen original acuity levels in a "budget-neutral" manner, dividing the then-available resources between the various categories of recipients.  *See* Leitch Decl. at ¶ 7 (docket no. 67); *see also* Moss Decl. at ¶ 4 ("CARE does not measure how many hours a person 'needs,' but instead determines what a person's share of available resources should be based upon the individual's level of acuity compared to other recipients"); *compare* WAC 388-72A-0087 (2004) (recodified in 2005 as WAC 388-106-0125).  The base hours remained constant from 2004 until 2008, when three additional classifications were created.  *See* WAC 388-106-0125 (2008).

In 2009, the base hours for each category were reduced, with the largest percentage decreases applied to the classifications associated with the least acuity. *See* Emergency Rule 388-106-0125, Wash. St. Reg. 09-14-046 (July 1, 2009).  For example, the change for "Group E High" was under one percent, while "Group A Low" experienced a downward adjustment of roughly ten percent.  In 2010, some of

these base hours were restored, using the same principle in reverse, *i.e.*, the categories with the greatest acuity were placed as closely as possible to pre-existing levels, while other classifications did not regain as much ground.  This methodology is consistent with explicit legislative instructions:

> The personal care services benefit shall be provided to the extent funding is available according to the assessed level of functional disability.  Any reductions in services made necessary for funding reasons should be accomplished in a manner that assures that priority for maintaining services is given to persons with the greatest need as determined by the assessment of functional disability.

RCW 74.09.520(4).  Based on this statutory language and the regulations involved, the Court concludes that CARE assesses only relative need for personal care services, not absolute or minimum requirements, and that the base hours assigned to each category enumerated in WAC 388-106-0125 correlate with legislative appropriations, as opposed to individual need.

In arguing to the contrary, plaintiffs rely heavily on the declaration of Charles Reed,[3] who describes "the CARE tool" as "generat[ing] an automated base number of in-home personal care hours that a consumer is entitled to receive to meet their unmet needs for care.  This number represents the minimum number of personal care hours that are necessary in order to meet the individually-assessed needs of the client and to permit the client to remain safely at home."  Reed Decl. at ¶ 30 (docket no. 18).  Plaintiffs also rely on the declaration of Penny Black, who states that "[t]he CARE

---

[3] In his declaration, Mr. Reed has indicated that, after serving as both an Assistant Secretary and Deputy Secretary of DSHS, he retired from DSHS in July 2000.  Reed Decl. at ¶¶ 3 & 6 (docket no. 18).  Thus, Mr. Reed's tenure with DSHS expired before CARE was implemented in 2004.

assessment tool produces an accurate measure of essential need. . . .  [It] is designed to, has proven effective to, and is used by [DSHS] to measure the unmet needs that must minimally be met in order to support a client in his or her home without compromising health or safety."  Black Decl. at ¶ 28 (docket no. 19).[4]  Mr. Reed's and Ms. Black's explanations do not appear to be aimed at CARE itself, but rather at a computerized or otherwise automated system or "tool" that incorporates all of the steps outlined in Washington's long-term care services regulations.

The "CARE tool" about which Mr. Reed and Ms. Black have testified by declaration does not appear to be equivalent to the Comprehensive Assessment Reporting Evaluation or CARE referenced in WAC 388-106-0125.  CARE does not itself generate either a minimum or a maximum number of hours; it merely classifies an individual into one of seventeen groups, as a result of which base hours are identified.  The base hours are then, outside of CARE, adjusted either up or down depending on factors external to the individual.  To conclude that CARE sets a minimum (or maximum) number of hours would ignore the additional computations required by WAC 388-106-0130.  Moreover, to treat the figure calculated pursuant to

---

[4] According to her declaration, from 2000 until 2005, Ms. Black held the position of Director of the Home and Community Services Administration within the Aging and Disability Services Administration of DSHS.  Black Decl. at ¶ 4 (docket no. 19).  While still employed by DSHS in that capacity, Ms. Black provided a declaration to the Washington State Court of Appeals in connection with DSHS's motion for an emergency stay in an unrelated case.  *See* Black Decl. (Apr. 11, 2005), attached to Work Decl. (docket no. 71).  In this earlier declaration, Ms. Black averred that, "[f]ollowing the assessment, eligible individuals are classified into fourteen groups that reflect the intensity of care that is needed.  This classification results in a baseline determination of the number of hours of in-home care [DSHS] *may be able to fund.*"  *Id.* at ¶ 10 (emphasis added).  Ms. Black's previous explanation, which linked the numbers of base hours to available resources and not to individual needs, appears to contradict her current position.

WAC 388-106-0125 and WAC 388-106-0130 as a minimum, rather than a maximum, disregards the express wording of the latter regulation.

The various declarations of personal care services beneficiaries that plaintiffs have submitted in connection with their motion do not convince the Court otherwise. When asked during oral argument which declarations most strongly support plaintiffs' contention that the proposed reductions will result in irreparable injury, plaintiffs' counsel referred the Court to the declarations of Donna Hayes, Jeanine Starr, James Braddock, S.J., and Sean Walsh.[5]  A review of these declarations indicates that plaintiffs' predictions are based largely on speculation.

For example, Ms. Starr is a service provider for plaintiff J.B.  Starr Decl. at ¶ 2 (docket no. 34).  Ms. Starr predicts that as a result of the budget reductions, which will reduce J.B.'s monthly personal care service hours from 82 to 68, J.B. "will _likely_ be admitted to a nursing home."  _Id._ at ¶¶ 16, 26 (emphasis added).  Similarly, Sean Walsh is the clinical operations and long term care manager at Elderhealth NW, a provider of personal care services.  Walsh Decl. at ¶ 2 (docket no. 25).  Mr. Walsh testifies that several of Elderhealth's clients face the prospect of "several months of slow decline rather than requiring _immediate_ hospitalization or institutionalization" as a result of the proposed budget cuts.  _Id._ at ¶¶ 14-17 (emphasis added).  Neither

---

[5] Plaintiffs' counsel also mentioned individuals with the initials J.H. and J.B.  After reviewing the docket, the Court has been unable to locate any specific declarations from these plaintiffs.  The Court presumes that counsel was referring to the declarations filed by Donna Hayes in support of J.H. (docket no. 47) and Jeanine Starr in support of J.B. (docket no. 34).

Ms. Starr's nor Mr. Walsh's declarations quantify the level of personal care services needed to avoid such grim prospects and they offer no concrete sense of immediacy.

The various declarations also reflect the fact that the decision to move into a nursing home is complicated by a host of external factors, and is not simply a function of the number of personal care service hours made available under Washington's Medicaid program.  For example, Donna Hayes was a service provider for plaintiff J.H.  _See_ Hayes Decl. at ¶¶ 4, 7-8 (docket no. 47).  In December, J.H. was forced to move to a nursing home when Ms. Hayes decided that they could no longer make their living arrangements work financially on J.H.'s reduced Medicaid hours.  _Id._ at ¶ 8.  The decision to move J.H. to a nursing home was ultimately complicated by his living situation and his joint financial situation with Ms. Hayes.

Similarly, S.J. testifies that she will be forced to move to a nursing home in January 2011 because her service provider, James Braddock, will need to pursue other means of earning income if S.J.'s hours are reduced.  S.J. Decl. at ¶ 25 (docket no. 27).  Although Mr. Braddock opines that the number of personal care service hours in S.J.'s reduced schedule will be insufficient to meet her minimum needs, his decision to resign as her care provider appears to have ultimately been the result of his own financial considerations, not S.J.'s needs.  Braddock Decl. at ¶¶ 9, 27 (docket no. 28).  S.J. believes that she will likely end up in a nursing home if she is unable to locate a new service provider on short notice.  S.J. Decl. at ¶¶ 27, 33 (docket no. 27).

The Court has carefully reviewed all of the declarations submitted by plaintiffs, with special attention paid to those cited by counsel during oral argument, and the Court is not persuaded that any of the declarations support a conclusion that the number of personal care service hours provided by DSHS constitute the minimum level necessary to permit beneficiaries to remain safely in their homes.

Plaintiffs also argue that DSHS has admitted that the planned reductions will result in otherwise unnecessary institutionalization as the level of personal care services drop below the minimum required to preserve the health and safety of beneficiaries.  In support of this contention, plaintiffs cite to what appears to be an internal DSHS document concerning proposals for implementation of the Governor's budget cuts.  Ex. 6 to Brenneke Decl. (docket no. 12-8).  Plaintiffs quote the following language:  "In some cases, a safe in-home plan of care will not be possible and clients may need to go to community residential or nursing facility settings." _Id._ at 6.  DSHS responds that this statement is not an admission, but rather is internal dialogue that is typical of any large-scale decision-making process.  _See_ Moss Decl. at ¶ 8 (docket no. 68) ("This statement was made by a mid-level DSHS manager and was intended to portray a worst case scenario regarding potential impact on the 45,000 population of recipients.").  The Court declines to construe the document submitted by plaintiffs, which has no identified author, and which does not reference any factual support for its predictions, as a judicial admission by DSHS that implementation of the 2011 reductions will increase the rate of institutionalization.

Finally, even if the decreases in base hours might leave some plaintiffs without sufficient personal care services to safely remain in their homes, plaintiffs have not shown that they lack an adequate administrative remedy.  DSHS staff are authorized by regulation to request an exception to a rule ("ETR") for individual cases satisfying certain criteria.  WAC 388-440-0001.  In the notice sent to beneficiaries in December 2010, DSHS indicated that the reductions scheduled to take effect on January 1, 2011, affected only "CARE generated hours," and would not decrease any additional hours previously authorized via an ETR.  _See_ Ex. 10 to Response (docket no. 66-2 at 9).  The notice also advised beneficiaries that requests for ETRs would be reviewed "using the established ETR request procedure."  _Id._  Plaintiffs complain that the ETR process is insufficient because it must be initiated by DSHS staff.  During oral argument, however, counsel for DSHS explained that a beneficiary may simply ask a case manager for an ETR, and that ETR requests, which are processed by a central committee convening twice a week, experience both a quick turnaround and a high rate of approval.  Moreover, any out-of-home placement automatically requires the case manager to evaluate whether an ETR is appropriate.  The Court is persuaded that plaintiffs' discounting of the ETR procedure, and its ability to avoid the disastrous consequences that plaintiffs predict, is not supported by the current record.

In sum, plaintiffs have not shown that the base hours identified in WAC 388-106-0125 are in any way coextensive or correlated with minimum values.  Indeed, plaintiffs have not identified, and counsel conceded at oral argument that she is not

aware of, any individual who, as a result of the 2009 reductions in base hours, was institutionalized or otherwise injured.  *Compare* Moss Decl. at ¶ 8 (docket no. 68) ("When personal care hours were reduced for all recipients effective July 1, 2009, the negative consequences predicted by plaintiffs did not occur.  Health and safety were not compromised, and people were not forced into nursing homes due to lack of personal care services.").  This dearth of evidence is inconsistent with plaintiffs' contention that the base hours reflect quantities absolutely necessary for individuals to continue to stay in their homes.  The subsequent increases in base hours that took effect in 2010 also contradict plaintiffs' position.  Plaintiffs point to no assessment of individual needs that triggered the rise in base hours.  Instead, the record suggests that the 2010 increases resulted merely from a budget surplus, negating any link between the numbers of base hours and what is "necessary in order to meet the individually-assessed needs of the client and to permit the client to remain safely at home."  Reed Decl. at ¶ 30 (docket no. 18).  Because plaintiffs have not sufficiently established that base hours bear a direct relationship to the minimum amount of personal care services required for individuals to remain safely in their homes, plaintiffs have failed to show the irreparable injury necessary to justify the extraordinary remedy of a temporary restraining order.

///

///

///

ORDER - 14

**C.**     **Likelihood of Success on the Merits**

**1.**     **Medicaid Act Claims**

The Court does not write on a clean slate.  Cuts in Medicaid funding have been a frequent topic of litigation as States struggle to deal with these financially lean times. Here, plaintiff raises five claims under Medicaid, arguing that the State's 2011 reduction violates Medicaid's (1) reasonable standards requirement; (2) sufficiency requirement; (3) comparability requirement; (4) free choice requirement; and (5) requirement that the State obtain federal approval for any modifications to its state plan.

**a.**     **Reasonable Standards Requirement**

The Medicaid Act requires state plans to have "reasonable standards . . . for determining . . . the extent of medical assistance under the plan which . . . are consistent with the objectives of [Medicaid]."  42 U.S.C. § 1396a(a)(17).  Plaintiffs contend that DSHS's reduction in personal care services is unreasonable because the different acuity classifications in CARE reflect the minimum hours necessary to permit beneficiaries to remain safely in their homes.  Plaintiffs have not shown that CARE determines the actual minimum personal care service needs of individual beneficiaries, and they have not established that the State's proposed downward adjustment will result in an unreasonable reduction below the absolute minimum level of care necessary to preserve each beneficiary's health and safety.[6]  Consequently,

---

[6] Plaintiffs argue that, even if the Court concludes that the base hours authorized by WAC 388-106-0125 do not represent the minimum number of hours needed to preserve an individual's health and

plaintiffs have not shown a likelihood of success on the merits of their reasonable

standards claim.[7]

### b.      Sufficiency Requirement

Medicaid regulations also require that "[e]ach service must be sufficient in

amount, duration, and scope to reasonably achieve its purpose."  42 C.F.R.

§ 440.230(b).  The levels of services are sufficient if they meet the purposes of the

specific program.  _Curtis v. Taylor_, 625 F.2d 645, 651 (5th Cir. 1980).  Plaintiffs

contend that the planned budget reduction violates Medicaid's sufficiency requirement

because DSHS will no longer provide enough personal care service hours for

---

safety in a non-institutional setting, at some point, a reduction in services must logically fall below a
beneficiary's level of need.  Reply at 9 (docket no. 69).  Plaintiffs further contend that _any_ reduction in
services based on an arbitrary, budget-driven figure is per se unreasonable, otherwise the State could
reduce available funding for personal care services by seventy-five percent or more, thereby defeating
the purpose of the program.  _Id._  Although the Court acknowledges that a limit must exist, below
which the State could not reasonably reduce funding for personal care services without running afoul
of Medicaid's reasonable standards requirement, the Court is not persuaded by the present record that
the proposed 2011 reductions approach such lower threshold.

[7] Plaintiffs cite several cases for the proposition that a reduction in Medicaid services without
consideration of the needs of individual beneficiaries is unreasonable.  _See Lankford v. Sherman_, 451
F.3d 496 (8th Cir. 2006); _V.L. v. Wagner_, 669 F. Supp. 2d 1106 (N.D. Cal. 2009).  But those cases
involved the complete elimination of programs, or the wholesale elimination of categories of
eligibility.  For example, in _Lankford_, the State of Missouri passed a law that eliminated optional
coverage for Medicaid recipients for durable medical equipment ("DME").  451 F.3d at 501.  The
Missouri agency administering Medicaid then passed emergency regulations that reinstated the right of
recipients to some, but not all, of the medically necessary DME devices.  _Id._  The Eighth Circuit held
that the reinstatement of eligibility as to only a portion of the DME devices was unreasonable because
the regulation did not provide any mechanism for individuals to obtain non-covered DME devices.  _Id._
at 513.  Similarly, in _Wagner_, the State of California passed a law that eliminated some beneficiaries'
eligibility for all covered services.  669 F. Supp. 2d at 1117.  The law also eliminated categories of
eligibility for other recipients.  _Id._  Conversely, here, none of the beneficiaries are losing eligibility for
in-home personal care services or categories of care.  DSHS is merely exercising its broad discretion
to modify the extent of medical assistance in light of scarce resources.  _Beal v. Doe_, 432 U.S. 438, 444
(1977).  Moreover, unlike in _Lankford_, plaintiffs here have an available ETR process that provides a
mechanism to address any gap in services that are necessary to maintain health or safety.  _See_ WAC
388-440-0001.

beneficiaries to remain safely in their homes.  As with the reasonable standards requirement, however, plaintiffs have not shown that CARE represents a minimum standard of care.

Moreover, whether the available personal care service hours after the reduction are sufficient to meet the program's purposes must be examined in the context of the substantial discretion States are afforded to choose the proper mix of amount, scope, and duration limitations on Medicaid coverage.  _Alexander_, 469 U.S. at 303.  As noted by the Supreme Court:

> [M]edicaid programs do not guarantee that each recipient will receive the level of health care precisely tailored to his or her particular needs.  Instead, the benefit provided through Medicaid is a particular package of health care services . . . .  That package of services has the general aim of assuring that individuals will receive necessary medical care, but the benefit provided remains the individual services offered – not "adequate health care."

_Id._  In this case, DSHS will continue to provide a substantial number of in-home personal care service hours following the proposed 2011 reductions.  Indeed, the record reflects that Washington is a leading State in the number of personal care service hours provided to qualifying recipients, and plaintiff has not shown that the reductions will prevent the State from offering a package of services that has the general aim of providing necessary medical care.[8]  Steve Eiken, et al., _Medicaid Long-_

---

[8] Most States that provide optional personal care services under Medicaid have imposed limits on available services based on cost or hours.  Allen J. LeBlanc, M. Christine Tonner, & Charlene Harrington, _State Medicaid Programs Offering Personal Care Services_, 22 Health Care Financing Rev. 1, 162 (Summer 2001).  As all Medicaid plans are approved by CMS, the variation in federally approved State limitations on the availability of personal care services is indicative of the discretion afforded to the States in crafting personal care programs.

*Term Care Expenditures in FY 2009* (Thomson Reuters 2010) (Ex. 6 to Resp. (docket no. 66-1)); LeBlanc, et al., *supra* n.8 (Ex. 7 to Resp. (docket no. 66-1)).

In light of the broad discretion granted to States to craft a manageable Medicaid plan, plaintiffs have not shown that the proposed 2011 reductions fail to satisfy the purpose of Washington's program, namely providing disabled individuals with assistance with their ADLs and IADLs.  WAC 388-106-0010.  Consequently, on the record before the Court, plaintiffs have not shown a likelihood of success on the merits of their sufficiency claim.

### c.    **Comparability Requirement**

Medicaid requires States to provide "comparable services when individuals have comparable needs."  42 U.S.C. § 1396a(a)(10)(B).  The comparability requirement is violated when beneficiaries with the same level of need are treated differently.  *Jenkins v. Wash. Dep't of Health & Human Servs.*, 160 Wn.2d 287, 157 P.3d 388 (2007).   In *Jenkins*, a number of Medicaid beneficiaries sought to enjoin DSHS from enforcing a regulation that reduced a beneficiary's maximum authorized personal care service hours by fifteen percent if the beneficiary happened to live with his or her care provider.  *Id.* at 290.  Individuals who did not live with their care providers did not receive a reduction.  *Id.*  The fifteen percent reduction applied automatically, and did not require DSHS to evaluate a beneficiary's individual circumstances.  *Id.* at 292.  The Washington Supreme Court concluded that the State had violated the comparability requirement because the rule treated beneficiaries in the

same classification differently.  *Id.* at 300 ("[N]o reduction is justified unless an

individual determination is made supporting that *reclassification*." (emphasis added)).[9]

Here, plaintiffs contend that DSHS's proposed reduction would violate the

comparability requirement because it does not take into consideration beneficiaries'

individualized needs.  Plaintiffs do not contend, however, that the planned reductions

treat individuals with comparable needs differently.  To the contrary, the proposed

reductions treat all similarly-situated beneficiaries identically.[10]  All individuals in the

same classification face the same reduction.  Plaintiffs have not shown likely success

on the merits of their comparability claim under the Medicaid Act.

### d.    Free Choice Requirement

Medicaid also requires that beneficiaries be "informed of the feasible

alternatives" to institutional care, and have individual choice.  The Ninth Circuit has

held that parties do not have free choice where the purported alternatives to

institutional care are inadequate to meet their needs.  *See Ball v. Rodgers*, 492 F.3d

---

[9] *Jenkins* cannot be read to require that DSHS treat individuals in different CARE classifications similarly because DSHS has already determined through CARE that the individuals in the different classifications are not comparable.  Moreover, the Court notes that DSHS is required by statute to give priority in any funding reduction to individuals classified in the highest need category, so the legislature has already contemplated that individuals should be treated differently depending on the acuity of their medical condition.  *See* RCW 74.09.520(4).

[10] To the extent that plaintiffs argue *Jenkins* requires an individual assessment of need following any reduction in services, plaintiffs appear to call into question the entire CARE system.  As noted by the dissent in *Jenkins*, the number of base hours in WAC 388-106-0125 "is *not* a number of hours that an individual has been specifically assessed to require – the base number is a nonspecific, interim allocation associated with the classification group."  160 Wn.2d at 314 (Fairhurst, J., dissenting) (emphasis in original).  Consequently, an individualized assessment of need following a reduction in hours would be meaningless because the initial allocation of hours was not a function of need in the first instance.  Plaintiffs do not, however, argue that the entire CARE system is inconsistent with Medicaid, and the Court declines to address the issue in the abstract.

1094, 1107 (9th Cir. 2007).  Plaintiffs argue that they lack free choice because the

reduced hours of personal care service will necessarily be insufficient to provide a

genuine alternative to institutional care.  As with their other Medicaid claims, plaintiffs

have failed to make an adequate showing that CARE reflects the minimum number of

personal care service hours necessary to maintain adequate in-home care, and as such,

they have not shown a likelihood of success on the merits of their free choice claim.

### e.  **Federal Approval Requirement**

Plaintiffs' final contention under the Medicaid Act is that DSHS's proposed

reductions in personal care service hours require federal approval by CMS.  Federal

approval is not required because Washington's Medicaid plan does not describe a

minimum number of personal care service hours or, for that matter, a method of

calculating personal care service hours.  _See_ Ex. 6 to Brenneke Decl. (docket no. 12).

As such, the planned reductions do not amend the state plan or trigger the need for

federal approval.  _See Freeman_, 2010 WL 3720285 at *9  ("Because [Washington's]

state Medicaid plan does not indicate the number of hours or the methodology to be

used in determining the number of hours to be provided to recipients, any modification

to that methodology need not be reflected in an amendment to the state plan.").

Plaintiffs have failed to show a likelihood of success on the merits of this claim.[11]

---

[11] In _Freeman_, Judge Bryan noted that the State sought retroactive approval of the 2009 reductions
from CMS after the plaintiffs filed suit in that case.  2010 WL 3720285 at *10.  Here, plaintiffs
contend that the State's retroactive request for approval in _Freeman_ constitutes an admission that any
reduction in personal care services requires federal approval.  Reply at 12 (docket no. 69).  The Court
is not persuaded by this argument.  The State's decision to make a retroactive request for approval of
the 2009 reductions can also be viewed as a reasonable response to the lawsuit filed by the plaintiffs in

2.      **Americans with Disabilities Act Claims**

The Americans with Disabilities Act ("ADA") precludes public entities from administering programs in ways that have the effect of segregating disabled individuals from the general community.  *Olmstead v. L.C. ex rel Zimring*, 527 U.S. 581 (1999).  The ADA's "integration mandate" requires that persons with disabilities receive services in the most integrated setting appropriate to their needs.  *Cota v. Maxwell-Jolly*, 688 F. Supp. 2d 980, 994 (N.D. Cal. 2010) (citing *Olmstead*, 527 U.S. at 597).  To analyze whether a State's actions violate the ADA's integration mandate, the Court must apply the following three-prong test:  (1) whether the State's treatment professionals have determined that community placement is appropriate; (2) whether the affected persons do not oppose such treatment; and (3) whether the placement can be reasonably accommodated, "*taking into account the resources available to the State and the needs of others with . . . disabilities*."  *Olmstead*, 527 U.S. at 607 (emphasis added).

The Ninth Circuit clarified the scope of the ADA's integration mandate in *Arc of Wash. State, Inc. v. Braddock*, 427 F.3d 615 (9th Cir. 2005).  In that case, the plaintiffs alleged that the State of Washington's cap on the number of individuals who could participate in its community care programs violated the ADA.  *Id.* at 617.  The Ninth Circuit rejected the plaintiffs' contention, holding that so long as a State is

---

*Freeman*, who alleged that the State had failed to obtain required federal approval.  Moreover, if the Court accepted plaintiffs' argument, it would create a disincentive for the State to seek approval in the future out of fear that the request for approval would be deemed an admission that federal approval was necessary.  *Cf.* Fed. R. Evid. 407.

genuinely and effectively in the process of deinstitutionalizing disabled persons with an even hand, the court would not interfere.  _Id._ at 620.  Based on the record in that case, the Ninth Circuit found that Washington had a genuine commitment to deinstitutionalization, and declined to find an ADA violation.  _Id._ at 621.

In contrast, in a prior case, the Ninth Circuit concluded that a State violates the ADA's integration mandate when the State categorically refuses to provide a process for deinstitutionalization for an entire class of individuals.  _Townsend v. Quasim_, 328 F.3d 511 (9th Cir. 2003).  In _Townsend_, the Ninth Circuit held that a State program that provided community-based care for persons falling below a certain income level but not for disabled individuals with higher incomes, violated the ADA's integration mandate by discriminating against a category of disabled persons.  _Id._ at 514.  Unlike in _Arc of Washington_, in _Townsend_, all Medicaid-eligible disabled persons did not have the opportunity to participate in the program once space became available.  _Id._

In the present case, plaintiffs contend that DSHS's proposed 2011 reductions will violate the ADA's integration mandate by forcing individuals to either forego needed care or move to a nursing home.  The ADA, however, does not require the "immediate, state-wide deinstitutionalization of all eligible . . . disabled persons, nor that a State's plan be always and in all cases successful."  _Sanchez v. Johnson_, 416 F.3d 1051, 1067-68 (9th Cir. 2005).  Plaintiffs have failed to present facts that support their contention that DSHS's proposed reductions pose a real and immediate threat of mass institutionalization.  Moreover, this case does not involve the type of wholesale

denial of benefits to an entire class of disabled individuals that was at issue in

_Townsend_.  To the contrary, the evidence produced by DSHS demonstrates that

Washington has a genuine and effective commitment to deinstitutionalization.  _See_ _Arc_

_of Washington_, 427 F.3d at 621.  Over the last decade, the number of institutionalized

disabled individuals in Washington has steadily declined.  Leitch Decl. at ¶ 2 (docket

no. 67); Moss Decl. at ¶ 2 (docket no. 68).  As in the _Arc of Washington_ case, the

Court sees no basis for intervening under these circumstances.  Plaintiffs therefore

have not shown a likelihood of success on the merits of their ADA claim.

### 3.   **Due Process**

Plaintiffs' final argument is that DSHS's arbitrary, budget-driven service

reductions violate the Due Process Clause of the Fourteenth Amendment to the United

States Constitution.  Plaintiffs contend that the Due Process Clause entitles them to

notice and an opportunity for a hearing prior to the reduction of any benefits.

Plaintiffs have not, however, analyzed the issue under constitutional standards, but

rather rely solely on regulatory notice requirements.  Under Medicaid regulations,

certain actions require notice and an opportunity to be heard, _see_, _e.g._, 42 C.F.R.

§ 431.200, but recipients are not entitled to a hearing if the sole issue is a state law

requiring an automatic change affecting some or all recipients.[12]  42 C.F.R.

---

[12] Plaintiffs cite _Ryan v. Dreyfus_, 2009 WL 2914139 (W.D. Wash.) for the proposition that failure to provide notice and hearing rights upon termination of Medicaid benefits is a violation of the Due Process Clause.  In _Ryan_, DSHS terminated a number of Medicaid beneficiaries' rights to receive skilled nursing services through the Adult Day Health ("ADH") program.  _Id._ at * 1.  DSHS conceded that the plaintiffs were entitled to notice and hearing rights because it had already determined that the beneficiaries required ADH services as a medical necessity.  _Id._ at *2-3; _see also_ 42 C.F.R.

§ 431.220(b).  The limitation on the hearing requirement arises out of the practical

consideration that, absent some factual dispute about an individual's right to benefits, a

hearing would serve little, if any purpose.  *See* *Rosen v. Goetz*, 410 F.3d 919, 926 (6th

Cir. 2005); *Benton v. Rhodes*, 586 F.2d 1, 3 (6th Cir. 1978) ("[M]atters of law and

policy are not subject to any hearing requirements under the applicable regulations,

whether the hearing be pre- or post-termination.").

Plaintiffs contend that 42 C.F.R. § 431.220(b) does not apply to eliminate their

right to a hearing, relying heavily on *Claus v. Smith*, 519 F. Supp. 829 (N.D. Ind.

1981), for the proposition that when an agency has discretion on how to implement a

budget cut under Medicaid, the blanket elimination of hearing rights does not apply.

In *Claus*, the court considered an Indiana statute that imposed a co-payment

requirement on all Medicaid beneficiaries.  519 F. Supp. at 831.  The statute also

granted the Indiana Department of Public Welfare the sole discretion to exempt

individuals from the co-payment requirement for hardship.  *Id.*  The court concluded

that since the statute vested the State agency with the sole discretion to exempt

individuals from compliance with the co-payment requirement, beneficiaries were

entitled to notice and hearing rights.  *Id.* at 833.  In *Claus*, the right to an exemption for

hardship necessarily raised a factual dispute that gave rise to a hearing requirement.

Conversely, in this case, DSHS has proposed an across-the-board reduction in personal

§ 435.930(b) (requiring State agencies to continue to provide Medicaid services regularly to all
eligible individuals until they are found to be ineligible).  *Ryan* is inapposite because the present case
does not involve a termination, without notice, of services for which plaintiffs were eligible.  Instead,
DSHS merely reduced the level of personal care services in an equivalent fashion as to similarly-
situated beneficiaries.

care services – purely a question of policy that would not be proper for consideration in a hearing.  Moreover, DSHS did not have discretion on how to impose the 2011 reductions in personal care services; by statute, DSHS is obligated to give preference to beneficiaries with the greatest need when implementing budget reductions.  *See* RCW 74.09.520(4).  Accordingly, plaintiffs have not shown a likelihood of success on the merits of their due process claim.

**D.**  **Balance of Equities and Public Interest**

Given, on the one hand, the speculative nature of the harm that plaintiffs allege will result in the absence of a temporary restraining order and, on the other hand, the fiscal consequences of an injunction to the State, the balance of equities weighs against granting the relief that plaintiffs seek.  Because spending must be curbed before the end of the current fiscal year, any delay in implementing the reductions at issue will result in either greater decreases at a later time to reach the same financial goals or cuts to other programs.  Moss Decl. at ¶ 10 (docket no. 68).  DSHS has conducted a comprehensive review to determine how best to accomplish the fiscal goals, and it has applied its expertise in weighing the competing interests of the various clients it serves.  The Court is in no position to substitute its judgment for that of DSHS concerning which programs will be least affected by budget curtailments.  The Court, however, observes that the personal care services at issue do not encompass the types of skilled or clinical services generally associated with acute or critical medical attention and do not appear to warrant being treated as somehow sacred or untouchable

in connection with the difficult choices DSHS must make.  The Court concludes that the public interest would not be served by forcing DSHS to target perhaps more vulnerable individuals or programs while the merits of plaintiffs' claims in this matter are resolved.

**Conclusion**

For the foregoing reasons, the Court has denied plaintiffs' motion for a temporary restraining order, docket no. 11.

IT IS SO ORDERED.

The Clerk is directed to send a copy of this Order to all counsel of record.

DATED this 5th day of January, 2011.

Thomas S. Zilly
United States District Judge