1
2
3
4
5
6

Honorable Thomas S. Zilly

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

8

M.R., S.J., C.B., D.W., A.B., M.B., An.B, J.B., K.S., T.M., A.R., M.J.B., J.H., H.C., THE ARC OF WASHINGTON, SERVICE EMPLOYEES INTERNATIONAL UNION HEALTHCARE 775NW and PUGET SOUND ALLIANCE FOR RETIRED AMERICANS,

Plaintiffs,

v.

SUSAN DREYFUS, in her professional capacity as Secretary of Washington State Department of Social and Health Services and WASHINGTON STATE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, a Department of the State of Washington,

Defendants.

No. 2:10-cv-02052-TSZ

MOTION FOR PRELIMINARY INJUNCTION

Preliminary Injunction:
    Friday, January 28, 2011

**ORAL ARGUMENT REQUESTED**

9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) -

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1

## I.      INTRODUCTION

2       Plaintiffs move for a preliminary injunction that enjoins the State from implementing

3   emergency regulation WSR 11-02-041 which, effective January 1, 2011 until the Ninth Circuit's

4   order of January 14, 2011, reduced the in-home personal care service hours provided to elderly

5   and disabled Medicaid beneficiaries by an average of ten percent.  These reductions of basic and

6   essential services that enable people with disabilities to remain in their homes violate due

7   process, the integration mandate of the Americans with Disabilities Act and Rehabilitation Act

8   (collectively "ADA"), and certain key Medicaid Act provisions.  Unless this Court grants an

9   injunction, individuals with disabilities will suffer irreversible health declines and loss of

10  integration into the community before this Court can decide the merits of Plaintiffs' challenge.

11      Plaintiffs and prospective members of the Plaintiff Class ("Plaintiffs" or "beneficiaries")

12  have severe disabilities that render them eligible for mandatory Medicaid services in nursing

13  homes or comparable institutions for individuals with developmental disabilities.  They have

14  waived their right to institutional care and instead receive less costly in-home personal care

15  services such as assistance with eating, toileting, mobility, and bathing.  Providing these services

16  at home rather than in institutions fulfills the State's ADA obligations and saves the State money.

17      Without a preliminary injunction, Plaintiffs will suffer irreparable injuries from the

18  reduction of their personal care hours to levels 6-24% below that which the State authorized

19  through individualized assessments and individual care plans to meet their needs.  And without

20  adequate notice and hearing protections, beneficiaries will be forced to go without adequate

21  long-term care services and won't know their right to request additional hours through the

22  Exception to Rule ("ETR") process or reassessment, or to obtain replacement Medicaid services.

23

## II.      ISSUE PRESENTED

24      Should this Court preserve the status quo by preliminarily enjoining implementation of

25  emergency regulation WSR 11-02-041, which reduces Medicaid in-home personal care services

26  by an average of ten percent, pending a final determination of the merits of this case?

27

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 1

10099.1 dl226303

III.     EVIDENCE RELIED UPON

Plaintiffs rely on their Amended Complaint, declarations filed in support of the TRO, and the declarations accompanying this motion, all of which are listed in Appendix A.

IV.     SUMMARY OF FACTS

A.     Washington's Personal Care Services Programs

All of the individual Plaintiffs and members of the Plaintiff Class are adult Medicaid beneficiaries with severe disabilities who receive in-home personal care services through programs administered by Defendants.  Beneficiaries all choose to live at home and in the community, often with family or friends, instead of in institutions like nursing homes or community-based residential settings, where they could receive Medicaid Long Term Care (LTC) services.[1]  Beneficiaries' disabilities include paralysis and other physical disabilities; cognitive impairments such as dementia or Alzheimer's; chronic conditions arising out of traumatic brain or spinal cord injuries, Multiple Sclerosis, Muscular Dystrophy, or Diabetes; and developmental disabilities such as Downs Syndrome.  Reed Decl. (Dkt. 18) ¶11.

Approximately 15,000 beneficiaries receive in-home personal care services under the State Medicaid Plan and almost 30,000 through various Medicaid waiver programs.  RCW 74.39A.030; Reed Decl. (Dkt. 18) ¶¶19-20.  Based on individualized assessment of needs and through approved plans of care to meet those needs, these programs provide personal care services and assistance in basic activities of daily living (ADLs) and instrumental ADLs: eating, bathing, toileting, mobility, catheter and bowel care, turning and repositioning, passive range of motion, dressing, medication management, essential shopping, and housework.[2]

---

[1] Defendants administer other Medicaid programs to provide personal care services in a range of institutional settings, such as nursing homes and intermediate care facilities for developmentally disabled individuals (ICF-MRs), as well as community-based residential settings such as Adult Family Homes, Boarding Homes, and Assisted Living Facilities.  *See* RCW 74.09.520, 74.39A.005; WAC 388-106-0015, 388-106-0030; Reed Decl. (Dkt. 18) ¶¶10, 12, 39; Black Decl. (Dkt. 19) ¶6.

[2] *See, e.g.,* A.H. Decl. (Dkt. 54) ¶¶6a, c-e; C.B. Decl. (Dkt. 29) ¶¶11a-c, g; D.W. Decl. (Dkt. 31) ¶¶11-12, 13d-h; Jane B. Decl. (Dkt. 33)  ¶10a-d; K.S. Decl. (Dkt. 36)  ¶¶8-11; Portelance Decl. (Dkt. 43) ¶3; N.N.A. Decl. (Dkt. 57) ¶3; S.J. Decl. (Dkt. 27)  ¶8a-e; Albott Decl. (Dkt. 37)¶¶8-10; Allington Decl. (Dkt. 52) ¶¶13a-h, j-m; Braddock Decl. (Dkt. 28) ¶¶10, 18a-e; Chatwin Decl. (Dkt. 48) ¶¶14a-e; Davis Decl. (Dkt. 30) ¶¶16a, c, e; Dockstader Decl. (Dkt. 42) ¶¶10a-k; Faatoafe Decl. (Dkt. 56) ¶¶9-10, 12a-g; Flint Decl. (Dkt. 53) ¶¶10, 12a-g; Frederick Decl. (Dkt. 40) ¶¶11a-g; Guin Decl. (Dkt. 55) ¶¶13a-f, 17, 18 a-g; Hayes Decl. (Dkt. 47) ¶¶13d-f; Hays

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

1    Without in-home personal care services, beneficiaries would be at serious and imminent

2    risk of institutionalization.  DSHS individually assessed and certified that all 30,000 waiver

3    program beneficiaries qualify for (and without in-home services would need) nursing facility or

4    ICF-MR care; most of the State Plan program beneficiaries have such severe disabilities that

5    they, too, meet functional eligibility criteria entitling them to nursing facility care.  *See* WAC

6    388-106-0310(4), 388-106-0510(4), 388-845-0030(2); Reed Decl. (Dkt. 18) ¶19.[3]

7    The purpose of these personal care programs includes "ensur[ing] that services are

8    provided in the most independent living situation consistent with individual needs" and enabling

9    individuals with disabilities to remain in their homes rather than institutions.  RCW

10   74.39.005(1)-(4), 74.39A.007; WAC 388-106-0015 ("programs … are designed to help you

11   remain in the community … an alternative to nursing home care").  Washington seeks a

12   "balanced" LTC system and prioritizes less expensive in-home personal care over institutional

13   care based on consumer preferences, the integration mandate of federal law, and cost

14   effectiveness.  Reed Decl. (Dkt. 18) ¶¶10-23, 33-36.  In past years, Washington employed

15   strategies "focused on getting as many people as possible out of nursing homes," succeeded in

16   reducing the nursing facility caseload from approximately 24,000 (projected) to 11,000, and now

17   spends more serving a larger in-home and community-based population with higher acuity levels

18   and personal care needs than most other states.  Reed Decl. (Dkt. 18) ¶¶10, 21 & Ex. 1 (Dkt. 18-

19   1) at 5, Ex. 2 (Dkt. 18-2), Ex. 3 (Dkt. 18-3); Moss Decl. (Dkt. 68) ¶4.

20   **B.    Authorization of Personal Care Service Hours**

21   Since approximately 2004, DSHS has utilized the centralized, automated Comprehensive

22   Assessment Reporting Evaluation (CARE) tool for all elements required to authorize LTC

23   services: to assess individual functional acuity and needs, authorize in-home personal care hours

24

25   Decl. (Dkt. 39) ¶¶15a-e, g-h; Ivonav Decl. (Dkt. 58) ¶¶13 a-e, g, j-k; Leamy Decl. (Dkt. 46) ¶4; Maxson Decl. (Dkt.
     26) ¶¶6-8e, 8e-f, g-h; McIntosh Decl. (Dkt. 32) ¶¶8-9c, e; Paolino Decl. (Dkt. 45) ¶¶12, 14a, c-j, m; Partridge Decl.

26   (Dkt. 35) ¶¶5a-d, 9a-b, d-e, i; Starr Decl. (Dkt. 34) ¶¶6-7, 13-14, 20-21.
     [3] *See, e.g.,* C.B. Decl. (Dkt. 29) ¶16, Allington Decl. (Dkt. 52) ¶8, Jane B. Decl. (Dkt. 33) ¶7, Chatwin

27   Decl. (Dkt. 48) ¶8, Davis Decl. (Dkt. 30) ¶10, Flint Decl. (Dkt. 53) ¶7, Frederick Decl. (Dkt. 40) ¶6, Guin Decl.
     (Dkt. 55) ¶9, Hays Decl. (Dkt. 39) ¶8, Ivonav (Dkt. 58) ¶8, Maxson Decl. (Dkt. 26) ¶13, Paolino Decl. (Dkt. 45) ¶8.

10099.1 dl226303

1    to meet those individually assessed needs, determine eligibility for services, and generate and

2    approve a care plan with qualified providers.  Reed Decl. (Dkt. 18) ¶¶26-28, 32; Black Decl.

3    (Dkt. 19) ¶¶5-21; Moss Decl. (Dkt. 68) ¶5; WAC 388-106-0045, 388-106-0070.  Prior to 2004,

4    DSHS authorized personal care hours through a more subjective individualized needs

5    assessment.  Black Decl. (Dkt. 19) ¶¶6, 20-21; Moss Decl. (Dkt. 68) ¶5; Leitch Decl. (Dkt. 67)

6    ¶7.  In the year DSHS transitioned to the CARE tool, the budget necessary to meet the needs of

7    the existing caseload was already forecast and set; the assessment methods and allocation of

8    resources within the caseload changed to more consistently and fairly authorize hours based

9    upon the individual CARE assessments of functional acuity, scientific prediction of client needs,

10   and assessment of individual unmet needs.  Black Decl. (Dkt. 19) ¶20-21; Moss Decl. (Dkt. 68)

11   ¶5 (some recipients' hours increased, others decreased); *see also* Reed Decl. Ex. 1 (Dkt. 18-1) at

12   7 (caseload forecasting process), *id.* Ex. 2 (Dkt. 18-2) at 5 (same); Rolf Decl ¶¶6-8, 11-13.

13          The CARE tool relies upon in-person evaluations and information from all sources to

14   determine a beneficiary's needs; it is based upon standardized screening tools that have been

15   proven to increase the accuracy and reliability of clinical assessments.  Black Decl. (Dkt. 19)

16   ¶¶7-12, 18, 20-21, 25 & Ex. 2 (Dkt. 19-2), Ex. 3 (Dkt. 19-3).  This system uses the results of

17   individualized assessments of cognitive performance, clinical complexity, mood/behavior

18   symptoms, and Activities of Daily Living to classify beneficiaries into seventeen different acuity

19   and need-based categories with common characteristics predictive of common needs and

20   resource use.  WAC 388-106-0085, 388-106-0125; Black Decl. (Dkt. 19) ¶18-21, 7-8; Def. Resp.

21   TRO, Ex. 5 (Dkt. 66-1) at 3, 11.[4]  Each category is assigned a "base assistance level in hours of

22   care" based on this formula.  *Jenkins v. Washington State DSHS*, 157 P.3d 388, 389 (Wash.

23   2007); WAC 388-106-0125, 388-106-1230 (1).  The CARE tool's in-home algorithm then

24   ─────────────────────

25          [4] The base hours authorizations by category are derived from statistical analysis of the relationship between
     care time and multiple clinical variables, and time studies, that have been tested, refined, and incorporated into the
     CARE Tool itself.  Reed Decl. (Dkt. 18)¶29 & Ex. 1 (Dkt. 18-1) at 6; Black Decl. (Dkt. 19) ¶¶20, 21; Def. Resp.

26   TRO Ex. 5 (Dkt. 66-1) at 3 (goal of CARE tool was "to develop a resident classification system that assesses
     resident care needs and resource use and bases payments on the degree of use."); *id.* ("The purpose of the time study

27   was to determine resources use when specific care needs were identified."); *id*. at 10-13; 4th Brenneke Decl. Ex. 4 at
     23:1-11 (purpose of time study was to determine if CARE authorization would meet client needs).

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 4

1   *deducts* from the base level hours to adjust for beneficiary needs that can be met through other

2   resources (such as "informal supports") and circumstances such as when more than one

3   beneficiary resides in a household, and *adds* hours based on living environment considerations

4   and accessibility of laundry, shopping and wood.  *Jenkins*, 157 P.3d at 389; WAC 388-106-0055,

5   388-106-0125, 388-106-0130; Reed Decl. (Dkt. 18) ¶30; Black Decl. (Dkt. 19) ¶¶10, 13 & Ex. 2

6   (Dkt. 19-2) at 175-176.  Through these calculations, the automated CARE tool generates the

7   statutory "maximum" number of in-home personal care hours that can be used to develop a plan

8   of care. WAC 388-106-0130(8).  In most cases, the CARE tool's results are a "reliable measure

9   of actual unmet need" and the "minimum level of necessary support that takes into account all

10  the needs of the beneficiary as well as the existing level of supports the beneficiary already

11  enjoys."  Black Decl. (Dkt. 19) ¶¶26, 28.

12          Before authorization of personal care hours, however, the CARE tool results must be

13  translated into a care plan (or Individual Service Plan for the developmentally disabled) through

14  which the beneficiary has the opportunity to choose and consent to receive a certain number of

15  authorized service hours from particular, approved providers, with summaries of the tasks they

16  are to perform.  In developing the plan of care, "The Department must take into account cost

17  effectiveness, *client health and safety*, and program limits in determining how hours can be used

18  *to meet your identified needs*."  WAC 388-106-0130(8) (emphasis added), 388-106-0103(9).

19  When "the amount of hours for the person's classification group [is] not enough to address the

20  individual's current circumstances," case managers can use the Exception To Rule ("ETR")

21  process to authorize personal care hours above the "maximum."  Leitch Decl. (Dkt. 67) ¶4; WAC

22  388-440-0001; *see also* Black Decl. Ex. 2 (Dkt. 19-2) at 175.[5]

23          Only after all of these steps – the CARE assessment, eligibility, consent for services and

---

[5] For example, two beneficiaries are both categorized as "D Medium High," with 240 base hours prior to
the 2011 cuts.  For one, taking into account informal supports and the other individual characteristics, the CARE
tool generated maximum hours of 212 or 215, which were accepted and incorporated into a plan of care.  Allington
Decl. Ex. 1 (Dkt. 52-1), Ex. 2B (Dkt. 52-3) at 2, Ex. 2C (Dkt. 52-4) at 21.  In contrast, Plaintiff A.R.'s CARE
assessment generated a maximum number of 157, which was then increased by 165 hours through an ETR, to result
in an authorization of 323 hours.  Frederick Decl. Ex. 1A (Dkt. 40-1) at 1, Ex. 2 (Dkt. 40-3), Ex. 3 (Dkt. 40-4), Ex. 4
(Dkt. 40-5).  With the 2011 cuts, both will have their hours cut significantly.

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 5

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1    approval of a plan of care, with chosen qualified providers – may the Department authorize LTC

2    services.  WAC 388-106-0045.  Beneficiaries have the freedom to choose their preferred type of

3    long-term care services (in-home, community residential settings, or institutional settings), select

4    qualified providers, and agree to receive a certain number of authorized hours as set forth in the

5    individualized care plan in exchange for waiving their right to mandatory Medicaid services such

6    as nursing home care.  WAC 388-106-0030, 388-106-0050(1)-(2), 388-106-0130(8), 388-106-

7    0140, 388-106-0300(12), 388-106-0355; Reed Decl. (Dkt. 18) ¶¶12, 35, 38-40; Black Decl. (Dkt.

8    19) ¶¶10, 14, 16-17; Brenneke Decl. Ex. 16 (Dkt. 17-6) (choice form).  If beneficiaries disagree

9    with the terms of the CARE assessment and care plan, they may appeal and continue receiving

10   previously authorized services while that appeal is pending.  WAC 388-106-1305; 388-458-

11   0040; Frederick Decl. Ex. 2 (Dkt. 40-3); Black Decl. (Dkt. 19) ¶¶9-10, 14-15.

12   **C.    Reductions of Personal Care Hours Based on Budget**

13            In late September 2010, in response to an executive order mandating state agency

14   appropriations reductions of 6.287 percent, Defendants proposed to reduce Medicaid in-home

15   personal care service hours by an average of ten percent.  Brenneke Decl. Ex. 1 (Dkt. 12-1) at 2.

16   This reduction was in addition to an average four percent decrease in 2009 and some additional

17   targeted reductions.  Brenneke Decl. Ex. 4 (Dkt. 12-8) at 6, Ex. 5 (Dkt. 12-9) at 1; Black Decl.

18   (Dkt. 19) ¶29.  Defendants' plan for the reductions stated that, "[w]ith reduced hours, in-home

19   clients will need to choose which tasks their employees spend their time on and there may not be

20   enough time to complete all tasks"; at the higher percentage reductions needed tasks might not

21   be completed on a regular basis; clients would have longer time periods without paid care; and,

22   "[i]n some cases, a safe in-home plan of care will not be possible and clients may need to go to

23   community residential or nursing facility settings."  Brenneke Decl. Ex. 4 (Dkt. 12-8) at 6; *see*

24   *also id.*, Ex. 5 (Dkt. 12-9) at 1.[6]

25

26            [6] DSHS made these statements in the Agency Plan for 6.287 Percent GF-S Allotment Reduction submitted
     by the Division of Developmental Disabilities (a division of DSHS) to the State's Office of Financial Management
     (OFM).  Brenneke Decl. Ex. 4 (Dkt. 12-8) at 6-7.  This Court's order denying a TRO declined to construe the
27   Agency Plan as a judicial admission and construed it as part of "internal dialogue" within DSHS.  TRO Order (Dkt.
     76) at 12:17, 12:24.  However, the Agency Plan should be given weight as an admission of a party-opponent, *see*

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1    On November 30, 2010, Defendants issued a management bulletin with the Department's

2    plan to implement the service reductions; it directed form letters be sent to beneficiaries and

3    providers the week of December 6, 2010 that stated there were "no appeal rights for this

4    change." Brenneke Decl. Ex. 1 (Dkt. 12-2), Ex. 1A (Dkt. 12-2), Ex. 1B (Dkt. 12-3). Defendants

5    imposed the hours cuts unilaterally and without individualized reassessments, by "amending" the

6    previously agreed upon care plans that had been generated through the individualized CARE

7    assessment process to meet beneficiaries' needs for personal care services at home and reducing

8    the previously authorized in-home personal care hours by a set number of hours driven by budget

9    imperative and calculated according to the beneficiaries' "base hour" category from their last

10   CARE assessment. Brenneke Decl. Ex. 1 (Dkt. 12-1) at 1-2.

11   **D.      Procedural Background**

12   Plaintiffs filed this action on December 21, 2010, and two days later filed a motion for a

13   temporary restraining order ("TRO") and order to show cause why a preliminary injunction

14   should not issue, along with a motion for class certification. Dkt. 1, 11, 62. On December 28

15   Defendants filed a response to Plaintiffs' TRO motion, and Plaintiffs filed a reply the next day.

16   Dkt. 66, 69. The Court held a hearing on December 30, denied Plaintiffs' TRO motion that same

17   day, and filed a written decision setting forth its reasoning on January 5, 2011. Dkt. 73, 76. A

18   hearing on the preliminary injunction and class certification was set for January 14.

19   On January 6, 2011, Plaintiffs filed a notice of appeal from the denial of the TRO. Dkt.

20   78. This Court stayed proceedings pending the Ninth Circuit's disposition of that appeal. Dkt.

21   80. On January 10 Plaintiffs filed an emergency motion for an injunction pending appeal in the

22   Ninth Circuit. Following expedited briefing, the Ninth Circuit granted Plaintiffs' motion based

23

24   Fed. R. Evid. 801(d)(2), that provides compelling evidence that some beneficiaries will be institutionalized as a
     result of these cuts. The Agency Plan sets forth DSHS's official views about the impacts these cuts will have. The
25   Agency Plan is a published document provided by DSHS to OFM and is publicly available on OFM's website. *See*
     http://www.ofm.wa.gov/reductions/default.asp#agency_plans (follow link to "Division of Development
26   Disabilities," under "Social & Health Services, Department of"). The same is true for the Agency Plan for 6.287
     Percent GF-S Allotment Reduction submitted by DSHS's Long Term Care division, which states, "[i]f the reduction
27   results in an unsafe plan of care, some clients may need to go to community residential or nursing facility settings."
     Brenneke Decl. Ex. 5 (Dkt. 12-9) at 1 (available at http://www.ofm.wa.gov/reductions/300-050-DSHS-LTC.pdf).

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 7

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1  on the "irreparable injury" that already was occurring and would continue to occur:

2      Appellants' motion for a stay prohibiting the State of Washington from implementing
       emergency regulation WSR 11-02-041 is granted pending the district court ruling on
3      appellants' motion for preliminary injunction. . . . No other relief is available that will
       remedy the irreparable injury which continues to occur pending such hearing.
4

5  4th Brenneke Decl. Ex. 5 at 2.  Defendants' motion for reconsideration of that order and

6  Plaintiffs' motion for contempt sanctions were both denied on January 20, 2011.  Dkt. 92.

7                          **V.      ARGUMENT**

8      **A.      Plaintiffs Meet the Legal Standard for a Preliminary Injunction.**

9      Plaintiffs seek a preliminary injunction that will preserve the status quo.  *See GoTo.Com,*

10 *Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) (*status quo ante litem* is "last

11 uncontested status which preceded the pending controversy").  "A plaintiff seeking a preliminary

12 injunction must establish that he is [1] likely to succeed on the merits, [2] that he is likely to

13 suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in

14 his favor, and [4] that an injunction is in the public interest." *American Trucking Ass'ns v. City of*

15 *Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Natural Res. Def. Council*

16 *Inc.*, 129 U.S. 365, 374 (2008)).[7]  Where plaintiffs have made a strong showing of irreparable

17
    _____

18      [7] The Court noted in its TRO Order that the parties had not briefed whether the associational plaintiffs have
    standing.  TRO Order (Dkt. 76) at 5 n.2.  The Court need not reach this issue, however, if it concludes that any one
19  of the individual named plaintiffs has standing.  *See, e.g., Rumsfeld v. Forum for Academic & Institutional Rights,*
    *Inc.*, 547 U.S. 47, 53 n.2 (2006); *Fleming v. Pickford*, 581 F.3d 922, 924 n.3 (9th Cir. 2009) *Bates v. United Parcel*
20  *Serv.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc).  In any event, the associational plaintiffs have standing because
    "(a) [their] members would otherwise have standing to sue in their own right; (b) the interests [they] seek[] to
21  protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires
    the participation of individual members in the lawsuit." *Hunt v. Washington Apple Adv. Comm'n*, 432 U.S. 333, 343
22  (1977).  Plaintiffs Arc of Washington State and Puget Sound Alliance for Retired Americans have members with
    standing to sue in their own right as beneficiaries of personal care services who will suffer direct injuries from the
23  hours cuts.  Elliot Decl. (Dkt. 50) ¶¶2, 10; Stern Decl. (Dkt. 51) ¶8.  Plaintiff SEIU Healthcare 775NW's  members
    have standing to sue both as providers who will lose jobs and hours of work due to the hours reductions, Glickman
24  Decl. (Dkt. 49) ¶¶7-8; *see Independent Living Center of Southern California, Inc. v. Shewry*, 543 F.3d at 1065, and
    in some cases as direct beneficiaries, because some members serve as guardians or have power of attorney over
25  family members who receive personal care services and could sue on behalf of those family members, Glickman
    Decl. (Dkt. 49) ¶8.  The germaneness requirement is satisfied because the organizations' "litigation goals [are]
26  pertinent to [their] special expertise and the grounds that bring [their] membership together." *Humane Soc'y of the*
    *United States v. Hodel*, 840 F.2d 45, 56 (D.C. Cir. 1988).  *See* Elliot Decl. (Dkt. 50) ¶¶3, 5; Stern Decl. (Dkt. 51)
27  ¶¶5-7; Glickman Decl. (Dkt. 49) ¶¶5, 9, 12.  Finally, the participation of individual members is not necessary in suits
    such as the present case that seek only prospective injunctive relief, rather than damages.  *United Food &*
    *Commercial Workers v. Brown Group, Inc.*, 517 U.S. 544, 554 (1996).  Moreover, the instant case is brought as a

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 8

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1   harm and that the injunction is in the public interest, a lesser showing of likelihood of success is

2   needed, and vice versa.  *See Humane Soc. of U.S. v. Gutierrez*, 527 F.3d at 789; *Golden Gate*

3   *Restaurant Association v. San Francisco*, 512 F.3d at 1112 (9th Cir. 2008); *Alliance for Wild*

4   *Rockies v. Cottrell*, 622 F.3d 1045, 1049-53 (9th Cir. 2010).  Plaintiffs meet this test and class-

5   wide injunctive relief is proper.[8]

6   **B.      The Reduction in Personal Care Services Will Cause Irreparable Injury.**

7   **1.      The Reduction in Personal Care Services Will Cause Deterioration of
              Health, Physical Injury, and Institutionalization.**

8

9           The Ninth Circuit expressly concluded that "irreparable injury . . . continues to occur"

10   while the cuts remain in place.  4th Brenneke Decl. Ex. 5 at 2.  Applying the same standard to

11   substantially the same record, this Court should reach the same result.[9]  Plaintiffs have and will

12   suffer imminent and irreparable injury, including deterioration of health, physical injury, and

13   institutionalization, if the hours reductions are not enjoined.  Although Plaintiffs believe that this

14   Court erred in concluding otherwise when it denied Plaintiffs' TRO motion, Plaintiffs now

15   present 26 additional declarations that describe with particularity the harm suffered as a result of

16   the reductions and address some of the concerns expressed by the Court in its TRO ruling.[10]

17           Initially, this Court seems to have assumed that Plaintiffs could prove irreparable injury

18   only by demonstrating "that base hours bear a direct relationship to the minimum amount of

19   personal care services required for individuals to remain safely in their homes."  TRO Order

20

21   class action seeking prospective injunctive relief, pursuant to Federal Rule of Civil Procedure 23(b)(2), which, by
     definition, does not require individual involvement.

22       [8] Although Plaintiffs have filed a motion for class certification in an abundance of caution, "[d]istrict courts
     are empowered to grant preliminary injunctions regardless of whether the class has been certified."  *Brantley v.*
     *Maxwell-Jolly*, 656 F.Supp.2d 1161, 1178 n.14 (N.D. Cal. 2009) (quotation marks omitted); *accord V.L. v. Wagner*,

23   669 F.Supp.2d 1106, 1114 n.6 (N.D. Cal. 2009).  Indeed, this is what the Ninth Circuit did here.  However, if this
     Court disagrees, it should certify the classes for the reasons set forth in Plaintiffs' Motion for Class Certification

24       [9] The Ninth Circuit applied the same standard for irreparable injury that applies to this motion for
     preliminary injunction.  *See* 4th Brenneke Decl. Ex. 5 at 1-2 (Ninth Circuit treated Plaintiffs' appeal as "tantamount"

25   to an appeal from a denial of a preliminary injunction); *Stuhlberg Int'l Sales Cov. v. John D. Brush & Co.*, 240 F.3d
     832, 839 n.7 (9th Cir. 2001) (TRO and preliminary injunction standards are "substantially identical").

26       [10] Many of these new declarations were originally filed with the Ninth Circuit on January 14, immediately
     before the hours reductions were enjoined.  For that reason, they follow Ninth Circuit formatting rules and in some

27   cases respond directly to evidence introduced by Defendants in the Ninth Circuit, which may not currently be before
     this Court.  Given the tight time frames, Plaintiffs were unable to obtain new signatures on reformatted declarations.

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 9

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

(Dkt. 76) at 14:17-19.  Although Plaintiffs have proved that this is true, *see infra* at 18-23, that is not the proper standard.  The reduction or loss of needed medical benefits for low-income disabled or elderly individuals constitutes irreparable injury justifying prospective equitable relief.  *See Beltran v. Myers*, 677 F.2d 1317, 1322 (9th Cir. 1982) (showing that enforcement of a state's Medicaid rule "*may* deny [plaintiffs] needed medical care" is "sufficient" to show irreparable injury (emphasis added)); *see also Independent Living Ctr. v. Maxwell-Jolley*, 572 F.3d 644, 658 (9th Cir. 2009) ("needed medical care"), *cert. granted on other issue*, 2011 WL 134272 (U.S. Jan. 18, 2011); *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983) (disability benefits); *V.L.,*, 669 F.Supp.2d at 1121-22 (in-home care services); *Mayer v. Wing*, 922 F.Supp. 902, 905, 909 (S.D.N.Y. 1996) (same).  Irreparable injury results not only from termination, but also from reductions, in home care services.  *See V.L.*, 669 F.Supp.2d at 1109; *Mayer*, 922 F.Supp. at 904, 909.  Any argument that the home care services at issue here do not constitute "needed medical care" is belied by the fact that most beneficiaries are eligible for nursing home admission, which is a mandatory Medicaid benefit, and receive home care services in lieu of the nursing home placements for which they are eligible.  *See also* RCW 74.09.520(1)(l) (personal care services are "medical assistance").

Plaintiffs also suggest that the Court erroneously characterized numerous witnesses' evidence-based predictions of future harm as "speculation."  TRO Order (Dkt. 76) at 10:11.  "[S]pecific, predictive judgments" are not necessarily "speculative," and are invariably necessary when prospective relief is sought.  *Winter*, 129 S.Ct. at 378.  When seeking to enjoin an action that has not yet occurred, Plaintiffs are only required to show "that irreparable injury is *likely*"— not certain, and not immediate—in the absence of a preliminary injunction.  *Winter,* 129 S.Ct. at 375 (emphasis in original); *see* Wright & Miller, Fed. Pract. & Proc. § 2948.1 & n. 11 (2010) ("injury need not . . . be certain to occur; a strong threat of irreparable injury before trial is an adequate basis"; citing cases).  The Court seems to have misapplied this standard.  *See, e.g.,* TRO Order (Dkt. 76) at 10:10-15 (characterizing fact-based testimony that nursing home admission was "likely" as "speculation").

MACDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

1    Plaintiffs have established the likelihood of irreparable injury through Defendants' own

2    admissions as well as 59 declarations from former state officials, experts, service providers, and

3    beneficiaries with specific information about personal care recipients in Washington, the need

4    for the in-home personal care services beneficiaries receive, and the likely consequences of

5    reductions of those services, including serious risk of injury, illness, and/or institutionalization.

6    Beneficiaries already are suffering actual injuries of the type predicted as a result of the

7    implementation of hours cuts only two weeks ago.  For example, J.P. already is experiencing

8    skin breakdown that could lead to infection and hospitalization because her provider no longer

9    has sufficient time to clean between her legs during the 1.5 (rather than two) hours she now has

10   to prepare her for bed each day.  J.P. also risks other infections and sores because her catheter is

11   not being changed daily and she is not being moved enough; she must also attend medical

12   appointments without accompaniment of a provider, which is harmful in light of J.P.'s inability

13   to remember symptoms and doctor's instructions.  Anderson-Webb Decl. ¶¶17b, 25a-c.

14   Plaintiff K.S. is suffering adverse impact to her mental health, and because she cannot

15   remove her compression stockings all weekend when she is without a provider, is experiencing

16   sores on her legs that may develop into cellulitis requiring hospitalization.  2nd K.S. Decl. ¶4.

17   Plaintiffs J.B., A.B., An.B. and M.B. no longer receive daily baths, risking rashes, skin problems

18   and worse due to incontinence.  2nd Jane B. Decl. ¶¶5-7.  Their mother can no longer run

19   necessary errands without bringing them along, which makes it impossible at times to buy

20   groceries or fill prescriptions because M.B.'s Oppositional Defiant Disorder causes him to be

21   uncontrollable and erratic in public.  *Id.* ¶¶5-7.[11]  A.R.'s weekend provider refused to work a

22

23   [11] This is additional evidence that supplements the declarations originally presented to the Court with
     respect to these Plaintiffs.  The original evidence showed that the reduction of 67 collective hours of care for four
24   sibling Plaintiffs with physical and cognitive disabilities, whose adoptive mother's physical disability limits her
     ability to provide much of the care they need, would present a significant risk of institutionalization.  This Court
25   criticized one declarant for failing to "quantify" the absolute minimum number of hours needed and "offer[ing] no
     concrete sense of immediacy," TRO Order (Dkt. 76) at 10:12-16, 11:1-2, but apparently failed to note two other
26   declarations that explain very specifically the gaps in care that will result, needs that will go unmet, and reasons for
     concern about institutionalization.  Jane B. Decl. (Dkt. 33) ¶¶10, 23a-c (reduced hours will likely cause skin
27   breakdowns and behavioral issues presenting institutionalization risk); Partridge Decl. (Dkt. 35) ¶¶5-6, 9, 12-13, 25,
     27 (services that will not be performed and health problems that will result).  *See also* Starr Decl. (Dkt. 34) ¶¶6-27.

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1    short shift on Sundays; therefore, A.R. had to stay in bed for the entire day, placing her at risk for

2    bed sores, because her 84-year-old mother is unable to get her out of bed.  2nd Frederick Decl.

3    ¶¶5-6.  *See also* 2nd Bowman Decl. ¶7, 9 (health has deteriorated due to reduced provider hours,

4    and increased stress because provider will likely quit for job with more hours).

5         Other beneficiaries already have been institutionalized or are at immediate risk of

6    institutionalization because, as a result of the hours reductions, their care plans now are unsafe or

7    their providers must seek additional employment and cannot continue to provide uncompensated

8    hours of personal care service.  For example, 92-year-old H.C. had Alzheimer's, heart disease,

9    and osteoarthritis that made him susceptible to falling.  In a declaration presented to the Court in

10   December, H.C.'s provider explained that reduction of H.C.'s hours from 116 to 100 would be

11   insufficient to assist with meal preparation, toileting and incontinence care, mobility, bathing,

12   oxygen and medication management, and predicted that H.C. would likely enter a nursing home

13   within a matter of months.  Chatwin Decl. (Dkt. 48) ¶¶2, 5-6, 11-14, 20-21.  In an updated

14   declaration filed with the Ninth Circuit on January 14, H.C.'s son explained that he "cannot care

15   for H.C. on the hours DSHS allotted for 2011" and "the arbitrary cuts to H.C.'s home care

16   services have made keeping him at home impossible."  2nd Chatwin Decl. ¶12.  He explained

17   that as a result of the hours reductions, H.C. would be moving into an institutional care facility

18   within the month, as soon as all paperwork was completed.  *Id.* ¶¶8, 12.[12]  Similarly, Plaintiff

19   M.J.B.'s provider inquired about openings at a nursing home after learning of the reductions, and

20   planned to commit her as soon as there was an opening because she could not continue to

21   provide the amount of care needed by M.J.B. on the reduced hours. 2nd Paolino Decl. ¶¶5-6.[13]

22   The Franklin Hills Health and Rehabilitation Center has admitted two clients to its long term

23   care facilities this month as a result of the hours reductions.  Wujick Decl. ¶¶4-6.[14]  Other

24   _____

25   [12] Counsel has since learned that H.C. passed away on Saturday, January 15, 2011, before the move to a
     nursing home could be accomplished.  4th Brenneke Decl. ¶3.

26       [13] M.J.B. has just been notified that she will receive additional personal care hours through an ETR, an
     exception to the hours cut policy, and through that exception she will be able to remain safely at home.

27       [14] Both men have paraplegia and had lived independently at home prior to the hours reductions.  *Id.*  As a
     result of the hours reductions, they were left at home for longer periods of time; one developed bed sores because he
     was not turned enough and the other lay in bed without being cleaned after wetting himself.  *Id.*  Both are intact

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) -
12

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1    beneficiaries are likely to move to nursing homes or group residential settings because the

2    reduced hours will not provide for their needs.[15]  Former state officials and experts find that the

3    magnitude of these cuts to below assessed need puts beneficiaries at risk of institutionalization.

4    *See* Black Decl. (Dkt. 19) ¶¶33-34, Reed Decl. (Dkt. 18) ¶¶46-47, LaPlante Decl.(Dkt. 22) ¶¶21-

5    22, J ¶¶12-13, Dapper Decl. (Dkt. 20) ¶17.

6         This Court apparently discounted much of the evidence concerning actual or imminent

7    institutionalization based on its finding that the decision to move a beneficiary into a nursing

8    home is often bound up with the beneficiary and/or provider's financial or living situation.  TRO

9    Order (Dkt. 76) at 11:4-24.  But this fails to take into account that the care plans that were

10   unilaterally "amended" by DSHS to implement these hours cuts specifically rely upon factors

11   related to the beneficiary and provider's financial and living situations, and providers' agreement

12   to provide certain numbers of hours toward delineated care tasks (and beneficiaries' agreement

13   to waive nursing home care) were based on those circumstances.  As such, it is foreseeable that

14   the unilateral "amendment" of the care plans would disrupt the balanced and considered

15   agreements between providers and beneficiaries, most of whom were already are on the edge and

16   making due by meeting only the minimal needs of the beneficiaries, and result in some

17   _____

18   mentally and are very depressed about having to give up their independence, but the nursing home cannot discharge
     them because the hours reductions have made it unsafe for them to remain at home.  *Id.*

19        [15] For example, Plaintiff S.J. has muscular dystrophy, cannot move independently, and is totally dependent
     on her provider for all activities, including eating, toileting, transfers, and mobility.  S.J. Decl. (Dkt. 27) ¶8.

20   Although Plaintiff S.J.'s live-in provider has agreed to stay on temporarily on an emergency basis and provide the
     free care necessitated by the hours reduction in the short term so that no harm comes to S.J., he does not intend to
     and cannot provide this free care indefinitely.  2nd Braddock Decl. ¶¶ 4-5, 20.  S.J. and her provider contacted a

21   home care agency to find a replacement provider, but the agency refused the job *because the care plan as written is
     unsafe and allocates inadequate personal care hours to meet S.J.'s needs and enable her to stay safely at home.*  2nd

22   Braddock Decl. ¶¶18-19; 2nd S.J. Decl. ¶9. Similarly, Plaintiff J.H. has already been institutionalized because his
     provider was unable to meet the financial burden of providing the excess hours of uncompensated care that would

23   have been required for J.H.'s safety under the newly reduced hours allocation.  Hayes Decl. (Dkt. 47) ¶8. Although
     the State intimated that there were other disagreements between Plaintiff J.H. and his provider, (12/30/10 TRO Tr.

24   29:4-18), this disagreement was precipitated by the hours reduction and the provider's decision that she could no
     longer provide this free care.  2nd Hayes Decl. ¶5, 11-12; Johnson Decl..  Similarly, the live-in provider for M.A.B,

25   who suffers from multiple mental illnesses, is seeking to place him into an institution because she cannot afford to
     continue to provide the ever-increasing hours of free care that M.A.B. needs in light of the January 2011 hours

26   reductions. Josephsen Decl. ¶¶6-7, 12-15, 18-20.  *See also*  D.W. Decl. (Dkt. 31) ¶¶22b, 25; C.B. Decl. (Dkt. 29)
     ¶35; K.S. Decl. (Dkt. 36) ¶¶17, 21; Albott Decl. (Dkt. 37) ¶13; Jane B. Decl. (Dkt. 33) 9:26-10:4; Davis Decl. (Dkt.

27   30) ¶¶31-32, 36; Dockstader Decl. (Dkt. 42) ¶19; Faatoafe Decl. (Dkt. 56) ¶24; Frederick Decl. (Dkt. 40) ¶¶22-24;
     McIntosh Decl. (Dkt. 32) ¶20-21; Morrow Decl. (Dkt. 38) ¶6.

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 13

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1    providers' inability or unwillingness to provide even more charity care to fill the gap caused by

2    the hours cuts.  In each and every case presented, the hours cut proximately caused the likely

3    negative results of institutionalization and irreparable injury.  For many years, the State has

4    laudably allowed seriously disabled individuals to live in their own homes rather than institutions

5    (saving the State substantial sums) by paying for just enough personal care hours that providers

6    could also afford to offer many hours of uncompensated care, including 24/7 supervision needed

7    by many beneficiaries.  These last hours reductions have made that impossible for individual and

8    agency providers alike.  *See, e.g.*, Walsh Decl. ¶¶14-15, 17.[16]

9        Serious and irreparable harm will befall beneficiaries if the hours reductions are not

10   enjoined.  The hours reductions mean that beneficiaries will receive fewer essential services,[17]

11   receive assistance less frequently,[18] and be left unattended for longer stretches of time.[19]

12       The reductions of services necessary to eat, toilet, move, bathe, dress and take medication

13   likely will lead to injury, illness, health decline, and institutionalization in beneficiaries already

14   found eligible for round-the-clock nursing home care.  For example, a former case manager for

15   Seattle's Aging and Disability Services who currently directs an agency that supplies providers

16   to multiple clients predicted that the reductions "will result in hundreds or thousands of cases of

17   . . . hospitalizations, as well as increases in preventable injury and death."  Walsh Decl. (Dkt. 25)

18   ¶12.  Mr. Walsh specifically determined that, at his agency, "approximately 5% of our clients

19   will likely have *immediate*, serious, adverse outcomes such as hospitalization, emergency room

20

21      [16] *See also* Maxson Decl. (Dkt. 26) ¶¶5, 11, 22-26; S.J. Decl. (Dkt. 27) ¶¶24-26, 29; Braddock Decl. (Dkt. 28) ¶¶9,27,30,32; D.W. Decl. (Dkt. 31) ¶21; Hays Decl. (Dkt. 39) ¶¶5-6, 29; Paolino Decl. (Dkt.45) ¶¶14, 24; 2nd Paolino Decl. ¶¶6-7; Hayes Decl. (Dkt. 47) ¶¶4, 7-8; Allington Decl. (Dkt. 52) ¶¶16-18; Flint Decl. (Dkt. 53) ¶¶12, 16-17; A.H. Decl. (Dkt. 54) ¶12; Guin Decl. (Dkt. 55) ¶¶27-33; Ivonav Decl. (Dkt. 58) ¶¶6, 15, 23-26; 2nd Chatwin Decl. ¶¶8-10, 12.

22
23      [17] C.B. Decl. (Dkt. 29) ¶26; D.W. Decl. (Dkt. 31) ¶22; Jane B. Decl. (Dkt. 33) ¶24; K.S. Decl. (Dkt. 36) ¶15; ¶18, Dockstader Decl. (Dkt. 42) ¶15; McIntosh Decl. (Dkt. 32) ¶16; Morrow Decl. (Dkt. 38) ¶6; Partridge Decl. (Dkt. 35) ¶13; Starr Decl. (Dkt. 34) ¶¶25, 26.

24
25      [18] A.H. Decl. (Dkt. 54) ¶12; C.B. Decl. (Dkt. 29) ¶26; Ivonav Decl. (Dkt. 58) ¶24; D.W. Decl. (Dkt. 31) ¶22b; K.S. Decl. (Dkt. 36) ¶15; N.N.A. (Dkt. 57) ¶6; Albott Decl. (Dkt. 37) ¶¶12-13; Davis Decl. (Dkt. 30) ¶26; Frederick Decl. (Dkt. 40) ¶18; Flint Decl. (Dkt. 53) ¶¶16-17; Guin Decl.(Dkt. 55) ¶29; Hays Decl. (Dkt. 39) ¶25; McIntosh Decl. (Dkt. 32) ¶16; Morrow Decl. (Dkt. 38) ¶6.

26
27      [19] K.S. Decl. (Dkt. 36) ¶15; A.H. Decl. (Dkt. 54) ¶12; C.B. Decl. (Dkt. 29) ¶23; D.V.S. Decl. (Dkt. 59) ¶16; D.W. Decl. (Dkt. 31) ¶22b; N.N.A. (Dkt. 57) ¶6; Davis Decl. (Dkt. 30) ¶26; Flint Decl. (Dkt. 53) ¶16; Guin Decl.(Dkt. 55) ¶29; Ivonav Decl. (Dkt. 58) ¶24; McIntosh Decl. (Dkt. 32) ¶16; Starr Decl. (Dkt. 34) ¶24.

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) -
14

10099.1 dl226303

1  visits, and *imminent* institutionalization."  Walsh Decl. (Dkt. 25) ¶13 (emphasis added).

2  Plaintiffs respectfully suggest that this Court failed to appreciate the significance of this

3  testimony, or of Mr. Walsh's statement that other clients face "several months of slow decline

4  rather than requiring *immediate* hospitalization or institutionalization."  TRO Order (Dkt. 76) at

5  10:18-11:2 (emphasis in original).  This "slow decline" of health – which may well be

6  irreversible – is itself an imminent and irreparable injury, even if hospitalization or

7  institutionalization may not occur for several months.[20]  *See also* Pritchard Decl. ¶7 (former

8  director of agency; personal care hours already insufficient to meet many clients' minimum

9  needs and "reduction of even 30 minutes a day for individuals who already have just barely

10  enough services to meet their minimal needs will make a major difference"; caregivers "will now

11  be unable to finish cooking, obtain needed medications or supervise client self administration of

12  medications, [or] give clients needed baths").  Uncontroverted expert evidence establishes that

13  unmet needs in activities of daily living "cannot be tolerated for long" and have "immediate and

14  serious consequences" such as injury, deterioration of health, and even death.  Gardner Decl.

15  (Dkt 21) ¶¶11-18; LaPlante Decl. (Dkt. 22) ¶¶7, 10.

16      Beneficiaries and their providers described the likely results of the reductions in great

17  detail:  without adequate toileting help or incontinence care, beneficiaries risk skin tearing,

18  infections and bowel obstructions;[21] missing necessary medication or taking improper doses;[22]

19  choking or going hungry without sufficient assistance eating;[23] and being unable to maintain the

20

21      [20] Similarly, former DSHS officials and experts familiar with Washington's in-home care system predict
22  that the reductions will place beneficiaries "at immediate risk of serious health deterioration and even death," Reed
   Decl. (Dkt. 18) ¶44, and cause "many" beneficiaries to "experience immediate and substantial harm" including
23  "more medical emergencies and hospitalizations," which will cause "serious and irreparable harm to their physical
   and mental health condition," Black Decl. (Dkt. 19) ¶33, because the specific cuts at issue here reduce services to a
24  level below that required for beneficiaries "to live safely and healthily," LaPlante Decl. (Dkt. 22) ¶22.
        [21] Flint (Dkt. 53) ¶16 (going to the bathroom without assistance will lead to sitting in "her own mess" and
25  potentially "another bladder infection" at which point they may have to remove her kidney), Guin Decl.(Dkt. 55)
   ¶30 (not changing pull-ups regularly will cause infections.), Leamy Decl. (Dkt. 46) ¶4 (improper incontinence care
26  can lead to skin infections), A.H. Decl. (Dkt. 54) ¶12; Partridge Decl.(Dkt. 35) ¶13a.
        [22] McIntosh Decl. (Dkt. 32) ¶16d; D.V.S. Decl. (Dkt. 59) ¶¶7d, 16b; D.W. Decl. (Dkt. 31) ¶¶22a, 22c;
   N.N.A. (Dkt. 57) ¶6; Guin Decl.(Dkt. 55) ¶31; Partridge Decl. (Dkt. 35) ¶13d.
27        [23] D.W. Decl. (Dkt. 31) ¶13f; S.J. Decl. (Dkt. 27) ¶8e; Braddock Decl. (Dkt. 28) ¶18b; Jane B. Decl. (Dkt.
   33) ¶24a; Dockstader Decl. (Dkt. 42) ¶10b; McIntosh Decl. (Dkt. 32) ¶9c.

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1   special diets required to avoid exacerbating their medical conditions.[24]  Those with mobility

2   impairments (who will be left alone for longer periods of time) risk falling when unattended,

3   which can lead to serious injuries, hospitalization, and rapid deterioration.[25]  Those who cannot

4   be physically turned as often as needed will suffer bed sores and muscle problems.[26]

5          Defendants cannot dispute that beneficiaries who already were granted increased hours

6   due to an Exception To Rules ("ETR") will suffer irreparable harm as a result of the cuts.  The

7   Department has already determined that they could not live safely at home with the base hours

8   they were originally allotted and granted additional hours "based on the clinical characteristics

9   and specific care needs of the participant." Brenneke Decl. Ex. 7 (Dkt. 13-3) at 113; Leitch Decl.

10  (Dkt. 67) ¶4.  Now the base hours are being cut, reducing the total allocation.  Brenneke Decl.

11  Exs. 1A-1D (Dkts. 12-2 to 12-5).  The new hours authorizations will be below their ETR-

12  assessed minimum need.  For example, the Department previously granted an Exception-to-Rule

13  ("ETR") to Plaintiff A.R., finding that she needed 323 hours, rather than 157 hours, to live safely

14  at home.  Frederick Decl. Exs. 2, 3 (Dkts. 40-3, 40-4).  But now that bare minimum allotment

15  has been reduced by 14, to 309.  *Id.* Ex. 4 (Dkt. 40-5).  Although another ETR request for A.R. is

16  in process, she is currently suffering from the hours reductions.  2nd Frederick Decl. ¶¶5-9.

17         This Court's original finding that no irreparable harm is likely to result from the hours

18  reductions was based heavily on Defendants' assurances that they would use the ETR process to

19  ensure that beneficiaries who really did need additional hours to live safely at home would

20  receive those hours.  TRO Order (Dkt. 76) at 13:1-22.  But beneficiaries were *never notified* that

21  they could request additional hours through the ETR process, have no right to do so, and have no

22  current fair hearing right to contest a denial of such hours under Washington law.  See *infra* at

23

---

24         [24] C.B. Decl. (Dkt. 29) ¶26a; Davis Decl. (Dkt. 30) ¶26a; Guin Decl.(Dkt. 55) ¶30.
           [25] *E.g.,* Leamy Decl. (Dkt. 46) ¶5 ("I have often seen this situation before: when elderly people are left
25  alone, they fall, break a bone, catch pneumonia and die."); K.S. Decl. (Dkt. 36) ¶15; McIntosh Decl. (Dkt. 32)
    ¶¶16a-b; A.H. Decl. (Dkt. 54) ¶11; D.V.S. Decl. (Dkt. 59) ¶¶16a; N.N.A. (Dkt. 57) ¶6; Chatwin Decl. (Dkt. 48)
26  ¶¶14d, 23; Davis Decl. (Dkt. 30) ¶26a; Guin Decl.(Dkt. 55) ¶¶30-31; Ivonav Decl. (Dkt. 58) ¶24; S.J. Decl. (Dkt.
    27)¶8c; Maxson Decl. (Dkt. 26) ¶¶8g, 26; Portelance Decl. (Dkt. 43) ¶6.
           [26] Portelance Decl. (Dkt. 43) ¶5; Jane B. Decl. (Dkt. 33) ¶23a; Faatoafe Decl. (Dkt. 56) ¶17-21; Maxson
27  Decl. (Dkt. 26) ¶26.

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) -
16

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1    25-26 & nn.43-44.  As such, the ETR process cannot be relied upon to prevent this irreparable

2    harm.  Even in cases of imminent placement in an adult family home or nursing home,

3    Defendants neither invoked the ETR process nor notified Plaintiffs of the possibility.[27]  And

4    when providers or beneficiaries learned of the ETR process through counsel in this case and

5    requested an ETR, some case managers refused to initiate the ETR process, many stating that

6    ETRs are not available with respect to the challenged hours reductions.[28]  One of the named

7    Plaintiffs previously requested and now has been granted an ETR, but this followed notice of her

8    involvement in the case.  *See* 2nd Paolino Decl. ¶4.

9         This Court also determined the 2011 reductions would not cause irreparable harm based

10   on a finding that the 2009 reductions did not cause such harm.  TRO Order (Dkt. 76) at 13:24-

11   14:10.  However, the 2009 reductions were much smaller than those at issue here, and were

12   partially restored in 2010.  *See* Emergency Regulations WSR 09-14-046, 10-14-055 (amending

13   WAC 388-106-0125) (found at http://www.dshs.wa.gov/msa/rpau/recentlyadoptedrules.html).

14   Plus, the effects are cumulative. For example, the E High classification lost 4 base hours in 2009

15   and will lose 23 more in 2011, while C Medium lost 8 base hours in 2009 and will lose 18 more

16   in 2011.  *See id.*  Individual declarations bear out this difference in scale and the cumulative

17   effect.  *Compare*, *e.g.*, S.J. Decl. (Dkt. 27) ¶21 (S.J. lost 6 hours in 2009), *with id.* ¶17 (lost

18   another 17 hours in 2011).[29]  In the *Freeman* case, a Department official filed a declaration

19   noting that in 2009 the state legislature considered but rejected higher reductions, because four

20   percent "was thought to [be] small enough to allow in-home care recipients to continue to live in

21   their own homes while maintaining their health and safety."  3rd Brenneke Decl. Ex. 4 ¶12.[30]

22

23        [27] 2nd K.S. Decl. ¶3; 2nd Paolino Decl. ¶4; 2nd Maxson Decl. ¶17; Ages Decl. ¶4; 2nd Allington Decl. ¶4;
     Bergstrom Decl. ¶8; 2nd Guin Decl. ¶4; Anderson-Webb Decl. ¶29; Hayes Decl. (Dkt. 47) ¶8, Maxson Decl. (Dkt.
24   26) ¶11, S.J. (Dkt. 27) ¶25, Braddock (Dkt. 28) ¶27.
          [28] 2nd Flint Decl. ¶4; 2nd Allington Decl. ¶4; Perkins Decl. ¶8; 2nd Bowman Decl. ¶3-5; *cf.* Ages Decl. ¶4;
25   2nd Guin Decl. ¶8, Bergstrom Decl. ¶¶6-8.
          [29] *See also* Frederick Decl. (Dkt. 40) ¶16 (A.R. lost 3 hours in 2009, 1 of which was restored), *with id.* ¶15
26   (lost another 14 hours in 2011); Faatoafe Decl. (Dkt. 56) ¶7 (Z.J. lost 8 hours in 2009), *with id.* (lost another 26
     hours in 2011); Braddock Decl. (Dkt. 28) ¶¶8,25; Dockstader (Dkt. 42) ¶6, Allington Decl. (Dkt. 52) ¶6
27        [30] *Freeman* is also distinguishable because there the plaintiffs all made clear that their providers would
     continue to provide the same levels of care; no allegation that the individual beneficiary plaintiffs would be harmed

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 17

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1  The impact of that much smaller cut can shed little light on what is likely to occur in 2011.  2nd

2  LaPlante Decl. ¶8 ("In my professional opinion, the difference in the magnitude of these cuts,

3  and the fact that the 2011 cuts will be in addition to the 2009 cuts, would make any . . .

4  conclusion [that experience with the 2009 cuts show that the 2011 cuts will cause no harm]

5  speculative.")  Nor is there any evidence that Defendants tracked the effects of the 2009

6  reduction upon individuals.  In contrast, evidence of the cumulative effect of the 2009 and 2011

7  cuts demonstrates that beneficiaries are at serious risk of health decline and institutionalization.

8          **2.      Current Levels of Personal Care Services Authorizations Are Needed
                     By Beneficiaries.**

9          The Washington Supreme Court has characterized the CARE tool as "assess[ing]"

10 individual recipients "*to require* and receive *a certain number of care hours*."  *Jenkins*, 157 P.3d

11 at 393 (emphasis added); *see also id.* at 393 (invalidating across-the-board reduction for

12 beneficiaries who lived with caregivers because "DSHS decided on *individualized*

13 *determinations* of public assistance benefits" but then "refus[ed] to consider *the[ir] individual*

14 *needs*"); *ibid.* ("DSHS may use the CARE assessment program to initially classify, rate, and

15 determine a recipient's *level of need*"); *ibid.* (recipients are "assessed *an amount needed* for meal

16 preparation, housekeeping, and shopping"); *id.* at 391 ("initial assessment of each recipient's

17 *hours of need*") (emphasis added in all cases).  This Court's previous conclusion that the State's

18 CARE tool "assesses only *relative* need for personal care services," and that base hours

19 "correlate with legislative appropriations, as opposed to individual need," TRO Order (Dkt. 76)

20 at 8:10-15 (emphasis added), conflicts with that authoritative construction of Washington law,

21 which Plaintiffs apologize for not pointing out to this Court in the TRO briefing.[31]

22         The State's Medicaid Plan and waivers also make clear that the CARE tool authorizes

23 hours based on need.  The State Plan provides that a beneficiary's individualized care plan

24 "*[i]dentifies the State plan HCBS [home and community based care] necessary for the*

26 _____
   or face institutionalization due to a reduction in services was either *made* or *rejected*.  Work Decl. Ex. 2 at 19:15-24
27 (*Freeman v. DSHS,* No.C09-5616 RJB (Trial Order) (W.D. Wash. Sep. 17, 2010)).
          [31] *Freeman* did not address whether the CARE system authorizes hours based on individual need.

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) -
18

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1   *individual*, and furnishes . . . all HCBS *which the individual needs*."  Brenneke Decl. Ex. 6 Part 1

2   (Dkt. 13-1) Supp. 4 to Att. 3-1A at 11 (emphasis added).  State waivers describe the hours

3   authorization process similarly.  *See*, *e.g.*, *id*. Ex. 7 (Dkt. 13-3) at 3 (individual assessment and

4   plan of care "tailored to [each applicant's] individual needs"); *id*. Ex. 7 Part 1 (Dkt. 13-3) at 112

5   (CARE system identifies needs and develops care plan under process that ensures "the plan

6   meets [beneficiaries'] needs"); *id.* Ex. 9 Part 3 (Dkt. 14-3) Appendix D at 5, 7 (assessment tool

7   identifies and measures needs).  And a DSHS settlement and order notes that an ISP "is the same

8   as 'Plan of Care' and means the written document which DDD uses to document the health and

9   welfare needs identified in the comprehensive needs assessment and to identify the services

10  intended to meet those needs."  4th Brenneke Decl. Ex. 8 at 2, 3.[32]  *See also* WAC 388-828-

11  1020.

12         The declarations of Penny Black and Charles Reed further demonstrate that the CARE

13  system authorizes the hours needed to permit each individual to remain safely at home, based on

14  scientific time studies that connect tasks with hours of service and resource allocation

15  algorithms.  Reed Decl. (Dkt 18) ¶¶29-30, 46; Black Decl. (Dkt. 19) ¶¶14, 26, 28; *see also* 4th

16  Brenneke Decl. Ex. 4 at 23:1-11; Rolf Decl. ¶¶8-13.  It is not the case that these experts were

17  discussing something "outside" the current CARE system, TRO Order (Dkt. 76) at 9:5-19,

18  simply because the regulations characterize the initial base hours authorization as a "maximum"

19  that may be reduced when there are other mechanisms for meeting beneficiaries' needs.[33]

20

21         [32] Federal law requires that state Medicaid plans "provide such methods and procedures relating to the
    utilization of, and the payment for, care and services available under the plan … as may be necessary to safeguard
    against unnecessary utilization of such care and services . . . ."  42 U.S.C. §1396a(a)(30)(A).  For cases discussing

22  this provision, *see*, *e.g.*, *Prestera Center for Mental Health Services, Inc. v. Lawton*, 111 F.Supp.2d 768, 776
    (S.D.W.Va. 2000) (discussing legislative history); *Allen v. Mansour*, 681 F.Supp. 1232, 1239 (E.D.Mich. 1986)

23  (same).  Thus, if the State had been authorizing *more* hours than beneficiaries need, it might have been in violation
    of this assurance.  *See also* 42 U.S.C. §1396a(a)(33)(A) (requiring states to ensure appropriateness of care and

24  services); *id.*, §1396a(a)(37) (requiring review of claims); 42 C.F.R. §§ 456.22 (requiring procedures for ongoing
    evaluation of need for and quality and timeliness of services); *id.*, §456.23 (similar).  *See also* Ex. 3rd Brenneke

25  Decl. Ex. 5 at 9, 23, 33 (CMS instructed State prior to CARE system implementation that it could not limit waiver
    services based on available funding, and that "laws and policies should be implemented recognizing the need to

26  fully fund the waiver services CAP participants are assessed to need.").

        [33] The statements in the declaration filed by Penny Black in the instant case that the hours ultimately

27  authorized by the CARE system are only those minimally necessary do not conflict with her earlier declaration that
    the "classification results in a baseline determination of the number of hours of in-home care [DSHS] *may be able to*

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

1    Defendants' argument that the CARE system authorizes hours based on available budget

2    resources is also undermined by the fact that, as this Court found, the base hours allocations for

3    acuity categories have remained consistent, other than the addition of three classifications that

4    more accurately measured acuity or need, until budget-based reductions in 2009 and 2011.  TRO

5    Order (Dkt. 76) at 7:17-19; 3rd Brenneke Decl. Ex. 1; Rolf Decl. ¶¶14-17, 20-24; Logan-von

6    Wahlde Decl. ¶6; *compare also* 2nd Brenneke Decl. Ex. C (Dkt. 70-3), *with* Brenneke Decl. Ex.

7    1 (Dkt. 12-1) at 1-2.  If Defendants' characterization were correct, then base hours should have

8    changed each budget year, increasing or decreasing based on the available budgetary resources.[34]

9    In fact, in defending the CARE system against other challenges, Defendants themselves

10   have characterized it as evaluating individual "need."  *See*, *e.g.*, 3rd Brenneke Decl. Ex. 3 at 22-

11   23 ("In contrast [to physicians], the Department regularly assesses the *need* for personal care

12   services . . . , and it does so using a sophisticated assessment instrument."); *id.* at 24 ("[T]he

13   Department spent extensive time . . . reviewing Samantha's *specific care needs* related to 19

14   ADLs and IADLs . . ." and a physician's recommendation need not "alter[] the Department's far

15   more thorough assessment of Samantha's *needs*.") (emphasis added each time); *see also id.* Ex. 2

16   at 14 (State's *Olmstead* plan; annual assessments "identify the needs of clients"); 4th Brenneke

17   Decl. Ex. 9 at 18 (reporting that DSHS staff including Defendants' declarants "stated[] the rates

18   ─────────────────────

19   *fund*."  TRO Order (Dkt. 76) at 9 n. 4.  The next sentence in Ms. Black's prior declaration explains, "Application of the shared living rule is one of several reductions that may be applied to the baseline determination of hours."  Work

20   Decl. Ex. 1 (Dkt. 71) Black Decl. ¶10.  Thus, her statement is consistent with the way the CARE tool works and her subsequent declarations:  the Department only funds the *unmet* needs following adjustments within the CARE tool itself, and so the Department may fund *fewer* hours than the base if reductions for informal supports or other factors

21   related to need are appropriate.  The other reason why it is appropriate to characterize the system as authorizing "maximum" hours is because beneficiaries are not required to utilize all of the hours that are authorized.

22   [34] While Defendants have argued that *average* hours have increased over time, Plaintiffs showed that was attributable to increased acuity and the invalidation of an unlawful services reduction, not changes in base hours.

23   2nd Brenneke Decl. Ex. B (Dkt. 70-2) at 7; 2nd LaPlante Decl. ¶¶5-7; *Jenkins*, 157 P.3d at 392.  Increasing acuity means that people who in the past would have received long-term care services *in nursing homes* are instead now

24   receiving those services *at home*.  In fact, Defendants' own evidence shows that between 2004 and 2007 acuity increased at a higher rate than average hours.  *Compare* 2nd Brenneke Decl. Ex. B (Dkt. 70-2) at 7 (showing 8.7% increase in ADLs between 2004 and 2007), *with* Def. Resp. TRO Ex. 12 (Dkt. 66-2) (showing 6.9% increase in

25   average hours during same time period).  Moreover, because authorization of hours prior to 2004 was based on individual needs assessments, it is of no moment that the adoption of the CARE system was supposed to be budget

26   neutral.  The State moved from a more subjective system to a more objective system; some individuals (who had been assessed to need too few hours) received more hours as a result, and some (who had been awarded too many

27   hours) had their hours reduced.

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 20

10099.1 dl226303

1    are based on specific personal care needs"); Logan-von Wahlde Decl. ¶4.  In contrast to

2    Defendants' characterization, the Department's own description of the purposes of the time study

3    demonstrates that the CARE system seeks to measure individual needs.  *See* 4th Brenneke Decl.

4    Ex. 4 at 23:1-11 (Deposition testimony of Bea-Alise Rector; purpose of time study was to

5    determine whether "the classification groups make clinical sense; do the base hours make

6    clinical sense based on the case manager's knowledge of trying to meet a client's needs in the in-

7    home setting; . . . did the overall calculation [including reductions for informal supports], was it

8    enough, too much, not enough to meet the client's needs at the end of that process"); Logan-von

9    Wahlde Decl. Ex. 3 at 3 (Department's time study; "The purpose of the time study was to

10   determine resources use when specific care needs were identified."); *id.* ("The goal is to develop

11   a resident classification system that assesses resident care needs and resource use and bases

12   payments on the degree of use."); *id.* Ex. 5 (Department publication; "CARE will be more

13   comprehensive and more objective [than prior system] in measuring client's care needs. . . .

14   CARE includes a new client-focused payment system that: Better reflects time and resources

15   needed to provide care; Considers and accounts for unscheduled task hours, cognitive needs, and

16   informal support system; and Improves the reliability and consistency of the assessment.").

17         The Department similarly describes the CARE tool as seeking to assess unmet

18   individualized needs in the CARE Assessor's Manual and in documentation regarding CARE

19   eligibility and rates.  *See* Black Decl. Ex. 2 (Dkt. 19-2) at 8 ("The CARE tool assists assessors to

20   gather definitive information on a client's . . . needs, which must be addressed in an

21   individualized care plan."); *see also id.*, Ex. 1 at 2 (Department rulemaking statement; "Case

22   managers individually assess each client related to assistance needed as well as any informal

23   supports available").[35]

24   _____

25         [35] *See also id.* Ex. 2 at 173 ("[T]he hours for in-home care generated by CARE will determine the
     maximum payment to meet the client's care plan needs."); 4th Brenneke Decl. Ex. 3 at I-1 (CARE "is an automated
     system used to collect demographic data, assess functional needs and abilities, health, and medical information,

26   determine eligibility for services, develop a care plan, and authorize services for clients on or requesting long-term
     care services"); *id.* at V-3 (as part of CARE, base hours are adjusted "based on a percentage of unmet needs for
     selected ADLs and IADLs"); *id.* at V-2 to V-4 (charts showing how base hours are adjusted based on the presence or

27   absence of informal supports tailoring hours allocations to client's needs).

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) -
21

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

1    When the Department implemented the CARE tool to assess developmentally disabled

2    personal care recipients, develop Individual Service Plans ("ISPs"), and manage their care, that

3    was done based upon the Department's agreement to engage in individualized assessments and

4    allocations of hours to meet their individual care needs.  *See* 4th Brenneke Decl. Ex. 7 at 2-3

5    (report prepared on behalf of DDD; "The SIS was designed to directly assess the support needs

6    of individuals with developmental disabilities across several critical domains of every day

7    community life and functioning"; other assessment tools "do not measure the level, amount, and

8    frequency of the supports that are necessary to assist a person day-by-day").[36]  The regulations

9    for the personal care services programs serving individuals with developmental disabilities also

10   makes clear that hours are authorized to meet clients' assessed individual needs.  *See* WAC 388-

11   828-1020 ("'Individual support plan' or 'ISP' is a document that authorizes and identifies the

12   DDD paid services to meet a client's assessed needs.").[37]

13   Finally, even if it *were* the case (which it is not) that the CARE system does not

14   determine individual need, Defendants have never contested Plaintiffs' showing that, as a factual

15   matter, only minimally necessary hours are authorized.  In fact, the evidence Defendants

16   supplied that ETRs increase CARE tool hours authorizations above the maximum in order to

17   meet minimal needs in exceptional individual circumstances supports the conclusion that

18   individual beneficiary needs, health and safety drive the authorization standard, and that this

19   standard is usually met through the CARE assessment and planning process.  Defendants

20   implicitly suggest that the State has been authorizing *more* hours than beneficiaries need – so

21   _____

22   [36] *See also* 4th Brenneke Decl. Ex. 6 at Federal Medicaid Program 3, Conclusion 3, and Conclusions and Recommendations 1 (joint legislative committee audit noting that federal government determined state agency was not meeting Medicaid guidelines and recommending development of assessment process for developmentally

23   disabled clients); Ex. 8 at 7 (DSHS settlement agreement and order; services "authorized to meet the assessed need of each HCBS waiver participant" must be documented in ISP).

24   [37] *See also id.*, 388-828-1060 ("The purpose of the DDD assessment is to provide a comprehensive assessment process that: . . . (3) Identifies a level of service and/or number of hours that is used to support the

25   assessed needs of clients who have been authorized by DDD to receive:  (a) Medicaid personal care services or DDD HCBS waiver personal care per chapter 388-106 WAC."); *id.*, 388-828-8000 ("The purpose of the individual

26   support plan module is to crate a written plan that includes ... DDD paid services you are authorized to receive: (a) If you are enrolled in a DDD waiver, the ISP must address all the health and welfare needs identified in your ICF/MR level of care assessment and the supports used to meet your assessed needs; or (b) If you are not enrolled in a DDD

27   waiver, DDD is only required to address the DDD paid services you are approved to receive.").

1    that there is room to cut those hours without inflicting harm – but present no evidence to support

2    the notion that the State has been authorizing *unnecessary* hours because of available funding

3    before now.

4    ### C.    The Balance of Equities and Public Interest Favor Plaintiffs.

5    The risk of illness and injury to Plaintiffs and other low-income individuals deprived of

6    home care services outweighs Defendants' purely fiscal interest in making the reductions:

7    State budgetary concerns cannot . . . be the conclusive factor in decisions regarding
     Medicaid.  A budget crisis does not excuse ongoing violations of federal law, particularly
8    when there are no adequate remedies available other than an injunction. . . . State
     budgetary considerations do not . . . , in social welfare cases, constitute a critical public
9    interest that would be injured by the grant of preliminary relief.  In contrast, there is a
     robust public interest in safeguarding access to health care for those eligible for
10   Medicaid, whom Congress has recognized as the most needy in the country.

11   *Independent Living Ctr.*, 572 F.3d at 659 (internal quotations omitted); *see also Dominguez v.*

12   *Schwarzenegger*, 596 F.3d 1087, 1098 (9th Cir. 2010) ("individuals' interests in sufficient access

13   to health care trump the State's interest in balancing its budget"); *California Pharmacists Ass'n*

14   *v. Maxwell-Jolly*, 563 F.3d at 852-53.[38]

15   Plaintiffs respectfully suggest that this Court did not correctly apply this Ninth

16   Circuit authority on the proper weight to be given human and health care needs as

17   opposed to state fiscal concerns when it held that the balance of equities weighed against

18   a TRO.  TRO Order (Dkt. 76) at 25:9-26:5.  That holding was apparently driven by the

19   Court's conclusion that the services at issue were not critical and its deference to

20   Defendants' decisions regarding how to reduce spending. *Id.* at 25:20-25.  Such

21   deference, however, is not appropriate.  In the Ninth Circuit cases concerning California,

22   cited above, where the budget crisis was certainly no less severe, there were similarly

23   clients of other health and human service programs.

24   This Court's conclusion seems to have rested on the erroneous premise that any

25   delay in implementing the reductions at issue "will result in either greater decreases at a

26

27   ───────────────

[38] It is doubtful that the reductions will save the State money, given the cost of institutionalization and loss
of state revenue.  Reed Decl. (Dkt. 18) ¶¶20, 23; LaPlante Decl. (Dkt. 22) ¶20; Lucia Decl. (Dkt. 23) ¶¶5, 13.

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1 later time to reach the same financial goals or cuts to other programs."  TRO Order (Dkt.

2 76) at 25:15-17.  This is not necessarily the case.  Nothing prevents the State from

3 reducing funding outside of DSHS or raising revenue.[39]  Even if cuts within DSHS were

4 necessary, such cuts could be made in ways that would not increase institutionalization.[40]

### D.   Plaintiffs are Likely to Succeed on the Merits of Their Claims.

#### 1.   Defendants' Inadequate Notice and Failure To Provide a Hearing Violate the Due Process Clause and the Medicaid Act.

The notices DSHS mailed to inform beneficiaries of the planned hours reductions did not comply with Due Process or the Medicaid Act because they failed to inform beneficiaries that (1) additional personal care hours could be awarded through the Exception to Rule ("ETR") process if the reduced hours were insufficient to meet their health and safety needs;[41] (2) additional in-home personal care hours could be awarded through the CARE reassessment process due to changed circumstances caused by the hours reductions (such as changes in living situations or provider willingness to provide informal support) or deteriorated health condition; and (3) there are other Medicaid benefits for which beneficiaries are eligible in lieu of in-home care, including community-based residential care facilities and nursing homes.  *See* Brenneke Decl. Ex. 1A (Dkt. 12-2) ("Notice").  The Notice also unlawfully told beneficiaries they could not appeal the reductions and were not entitled to a hearing.  *Id.*  This Court's order denying Plaintiffs' TRO failed to address deficiencies in the Notice itself (perhaps because the Court mistakenly believed that the Notices informed beneficiaries of the ETR process when the Notices did not), and found

[39] Although RCW 43.88.110(7) requires the governor to make "across-the-board reductions in allotments" if she "projects a cash deficit in a particular fund or account," nothing prevents the legislature from adjusting allocations or raising additional revenue to compensate for a projected deficit and avoid such reductions.  In any event, state law concerning state budgets cannot trump the federal requirements Plaintiffs seek to enforce.  *See, e.g.*, *Hutto v. Finney*, 437 U.S. 678 (1978) (attorneys' fees); *Industrial Truck Ass'n, Inc. v. Henry*, 125 F.3d 1305, 1309 (9th Cir. 1997) (state law must give way "where state law stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress").

[40] *See, e.g.*, 3rd Brenneke Decl. Ex. 6 at 3.9 (unimplemented proposal to close certain DSHS Division of Developmental Disabilities-run residential habilitation centers and move more clients to home and community-based services would have saved State a net total of $116,138,316 from FY 2010 to FY 2018).

[41] The ETR process "grant[s] additional hours beyond those authorized under the regular assessment process" when "the amount of hours for the person's classification group [is] not … enough to address the individual's current circumstances."  Leitch Decl. (Dkt. 67) ¶4; WAC 388-440-0001; *see also* WAC 388-106-0130(8).

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 24

**MACDONALD HOAGUE & BAYLESS**
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1    that beneficiaries are not entitled to hearings because they cannot not raise factual challenges to

2    the hours reductions, despite the fact that ETRs and re-assessment require factual determinations.

3        States may not reduce Medicaid services without providing meaningful notice prior to the

4    reduction, continued benefits pending a pre-reduction hearing, and a fair and impartial hearing.

5    *Goldberg v. Kelly*, 397 U.S. 254, 267-68 (1970); *Perry v. Chen*, 985 F.Supp. 1197 (D. Ariz.

6    1996) (applying *Goldberg* to reduction in services); *Washington v. DeBeaugrine*, 658 F.Supp.2d

7    1332, 1335 (N.D. Fla. 2009) (applying *Goldberg* to reduction in optional services).  The extent

8    of the process due is flexible, requiring a balancing of private and government interests.

9    *Matthews v. Eldridge,* 424 U.S. 319, 334-335 (1976).  To the extent Medicaid regulations require

10    notice and hearing,[42] the government already has agreed that private interests outweigh

11    governmental interests,  *Perry*, 985 F.Supp. at 1204, but due process may require more.

12    Hearings must be provided to recipients who request them to challenge a service reduction as

13    factually erroneous and services must be maintained at current levels in the interim.  42 C.F.R.

14    §§431.220, 431.230, 431.241(b).  In addition, "free choice" Medicaid rules governing the

15    personal care services at issue here require that recipients be "(1) Informed of any feasible

16    alternatives available under the waiver; and (2) Given the choice of either institutional or home

17    and community based services."  42 C.F.R. §441.302(d).  State agencies must "continue to

18    furnish Medicaid regularly to all eligible individuals until they are found to be ineligible," 42

19    C.F.R. §435.930(b), and Plaintiffs have a right to ongoing and seamless long term care benefits.

20        Under these standards, the Notices are grossly inadequate.  First, this Court found that

21    "even if the decreases in base hours might leave some plaintiffs without sufficient personal care

22    services to safely remain in their homes," the ETR procedure could be used to obtain additional

23    hours.  TRO Order (Dkt. 76) at 13:1-22.[43]  ***But the Notices did not inform beneficiaries that***

24

25    [42] At least ten days prior to the reduction of any Medicaid service, states must mail written notice with (a) a
26    statement of the State's intended action; (b) the reasons for the intended action; (c) the specific regulation or law that
supports the change; (d) an explanation of the right to a hearing if one is available; and (e) an explanation of the
circumstances under which services will be continued pending hearing.  42 C.F.R. §§ 431.201, 431.210, 431.211.

27    [43] State regulations provide no right to request or be considered for an ETR, no standards that apply, no fair
hearing rights, and no right to continued benefits in the interim.  WAC 388-440-0001(3), 388-426-0005.  To the

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) -
25

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1   ***additional hours could be awarded through the ETR process.***  This Court's belief that the

2   Notices advised beneficiaries about the ETR process, TRO Order (Dkt. 76) at 13:6-12, was

3   mistaken.  It is only the *internal* DSHS staff bulletin, *not* the Notice sent to beneficiaries, that

4   discusses ETR.  *Compare* Brenneke Decl. Exs. 1A-1D (Dkts. 12-2 to 12-5); *with* Brenneke Decl.

5   Ex. 1(Dkt. 12-1); Def. Resp. TRO Ex. 10 (Dkt. 66-2).  Instead, beneficiaries were told "[t]here

6   are no appeal rights for this change" and were advised to contact their case manager only with

7   "questions or concerns" (not to request additional hours). Brenneke Decl. Ex. 1A-1D (Dkt. 12-2

8   to 12-5); Chatwin Decl. Ex. 2 (Dkt. 48-2); Allington Decl. Ex. 1(Dkt. 52-1).  Case managers

9   improperly refused to initiate the ETR and some told beneficiaries that the ETR process is not

10  available to restore these hours reductions.  *See supra* at 17 & nn. 27-28.[44]

11        Second, beneficiaries should have been notified that they could request a reassessment if

12  their circumstances changed as a result of the hours cuts.  The CARE tool reduces base hour

13  allocations when a beneficiary has "informal support[]" (WAC 388-106-0130(b)) such as a live-

14  in provider who is also able to furnish a certain amount of uncompensated care, and those

15  informal hours are included in the care plan and counted with specificity.  Black Decl. (Dkt. 19)

16  ¶13 & Ex. 2 (Dkt. 19-2) at 161-163.  Reassessments are authorized when there is a change in

17  informal supports.  WAC 388-106-0140; WAC 388-106-0130(2).  Many beneficiaries will have

18  such a change in informal supports as a result of the hours reductions, because their providers

19  will no longer be willing or able to continue to provide free care.[45]  For example, H.C.'s

extent Defendants rely on the ETR procedure to satisfy their substantive legal obligations, the ETR procedure cannot
be discretionary or standardless, and must satisfy due process.
        [44] ETRs are authorized only upon request by DSHS staff (not clients).  Black Decl. Ex. 3 (Dkt. 19-3) at 25-
26.  Defendants have asserted that "a beneficiary may simply ask a case manager for an ETR," TRO Order (Dkt. 76)
at 13:12-16, but it is impossible for beneficiaries to ask for something of which they have never been notified.
Moreover, Defendants' counsel represented that "any out-of-home placement automatically requires the case
manager to evaluate whether an ETR is appropriate," TRO Order (Dkt. 76) at 13:18-19, but no ETR process has
been initiated in those cases in which Plaintiffs have been moved into nursing homes or their caregivers have
notified DSHS that they will need to be moved.  Hayes Decl. (Dkt. 47) ¶8; Maxson Decl. (Dkt. 26) ¶11; S.J. Decl.
(Dkt. 27) ¶25; Braddock Decl. (Dkt. 28) ¶27.
        [45] Plaintiffs have shown numerous examples where this will be true, in cases involving individual and
agency providers.  For example, an agency faced with the cumulative impacts of these cuts will no longer pay for its
employees to provide additional "'charity' hours" that has been relied upon by their clients, resulting in substantial
service cuts and increased risk of health deterioration and institutionalization. Walsh Decl. (Dkt. 25) at ¶¶ 14-15.  In
these cases, because the "informal supports" are no longer willing to provide services in the future, the existing

10099.1 dl226303

1    provider, who lived with him, was going to be forced to find another job because of the hours

2    reductions and would have stopped providing uncompensated care.  Chatwin Decl. (Dkt. 48)

3    ¶¶20-21.  He had already registered his father for a nursing home.  2nd Chatwin Decl. ¶3, 8.

4           Beneficiaries are entitled to reassessments if their own health condition changes.  They

5    should have been notified of this, as well, at the time the Department unilaterally "amended" the

6    care plans based upon dated needs assessments.  The Department has a duty to ensure the health

7    and safety of beneficiaries in developing care plans. WAC 388-106-0130 (8). When the

8    Department unilaterally "amends" the care plans, they cannot escape the duty to ensure the

9    amended plan provides for the health and safety of the beneficiaries based upon their current

10   needs for support.  Since the Department did not conduct its own reassessments before making

11   the cuts, beneficiaries at least need to know that they can request a reassessment in such

12   circumstances.  *See, e.g.,* 2nd Maxson Decl. ¶¶4-13, 18 (M.R.'s health condition has deteriorated

13   since her last assessment but case worker has been unresponsive to requests for assistance; hours

14   were insufficient even before January 2011 reductions).

15          Third, the vast majority of beneficiaries meet the criteria for admission to a skilled

16   nursing facility or ICF-MR, which are mandatory Medicaid benefits.  42 U.S.C.

17   §§1396d(a)(44)(A), 1396a(a)(10)(C)(iv).  Beneficiaries' decision not to receive services in a

18   nursing home, or to avail themselves of other Medicaid benefits[46] or alternative community

19   based residential care options, was made in reliance on a care plan setting forth a specific number

20   of personal care hours, which the State has now reduced.[47]  Accordingly, beneficiaries should

21

22   CARE assessment is invalid and a new assessment is required.  *See also* Maxson Decl. (Dkt. 26) ¶¶5, 22; Ivonav
     Decl. (Dkt. 58) ¶¶15, 23-25; Flint Decl. (Dkt. 53) ¶16; A.H. Decl. (Dkt. 54) ¶12; Guin Decl. (Dkt. 55) ¶¶7, 29-31,
23   33, D.V.S. Decl. (Dkt. 59) ¶¶16-18; 2nd Jane B. Decl. ¶¶9-11; 2nd Paolino Decl. ¶7; Perkins Decl. ¶3; Josephsen
     Decl. ¶7-8.

24       [46] Other Medicaid services, such as Adult Day Health, nursing care, or Adult Family Home care for which
     beneficiaries are eligible, should be provided as alternatives to meet beneficiary needs in light of the hours cuts.
25   *See, e.g.*, Maxson Decl. (Dkt. 26) (registered nurse who is provider for daughter sought but received no help finding
     alternative services such as part-time adult family home placement; despite assessment finding household at "risk"
     and decline in daughter's health, hours have been reduced).

26       [47] Maxson Decl. (Dkt. 26) ¶¶5, 10-11, 13; S.J. Decl. (Dkt. 27) ¶¶10-11; Braddock Decl. (Dkt. 28) ¶¶7, 21-
     22; C.B. Decl. (Dkt. 29) ¶¶3, 13-14, 16; Davis Decl. (Dkt. 30) ¶¶6, 10, 21; D.W. Decl. (Dkt. 31) ¶¶3, 15; McIntosh
27   Decl. (Dkt. 32) ¶5; Jane B. Decl. (Dkt. 33) ¶¶4, 7, 14; Starr Decl. (Dkt. 34) ¶¶3, 9, 16; Morrow Decl. (Dkt. 38) ¶5;
     Hays Decl. (Dkt. 39) ¶¶4, 8, 19; Frederick Decl. (Dkt. 40) ¶¶3, 6; Dockstader Decl. (Dkt. 42) ¶5; Paolino Decl. (Dkt.

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) -
27

10099.1 dl226303

1  have been notified of their right to choose among available options they previously declined,

2  including nursing homes and community-based care outside of their homes, *before* their hours

3  were reduced: a new chance to make a "free choice" is required, based on new circumstances.[48]

4  *See* 42 C.F.R. §441.302(d).

5       Defendants' failure to notify beneficiaries of their rights to increased hours through the

6  ETR process, to reassessment based on changed circumstances (including changed

7  circumstances caused by the hours reductions), and to choose a nursing home or community-

8  based residential care facility in light of the hours reduction, violates Due Process and the

9  Medicaid Act.  *See Goldberg*, 397 U.S. at 267-68 (requiring "timely and adequate notice

10  detailing the reasons for a proposed termination, and an effective opportunity to defend"); 42

11  C.F.R. §441.302(d) (must be informed of all "feasible alternatives").  In *Rosen v. Goetz*, 410

12  F.3d 919, 923 (6th Cir. 2005), when a state law eliminated several optional categories of

13  Medicaid eligibility, the state notified beneficiaries of the planned terminations, informed them

14  that they could continue to receive Medicaid if they fell within an eligibility category that was

15  not being eliminated, and allowed them 30 days to supply the information necessary to determine

16  their eligibility for these other categories.  Washington State could and should have done the

17  same: informed beneficiaries that they could request an ETR to add hours necessary to live

18  safely at home, a reassessment for changed circumstances (including changed circumstances

19  caused by the hours reductions), other Medicaid benefits, or nursing home or other residential

20  placement if no safe plan of care could be arranged. The personal interest at stake (health and

21  safety) is extremely important; the additional process would be very valuable to beneficiaries;

22

23  45) ¶¶5, 8, 18; Hayes Decl. (Dkt. 47) ¶¶10-11; Chatwin Decl. (Dkt. 48) ¶¶5, 8, 18; Allington Decl. (Dkt. 52) ¶¶5, 8; Flint Decl. (Dkt. 53) ¶¶4, 7; A.H. Decl. (Dkt. 54) ¶4; Guin Decl. (Dkt. 55) ¶¶6, 9, 15, 22; Faatoafe Decl. (Dkt. 56)

24  ¶¶6, 14; N.N.A. Decl. (Dkt. 57) ¶¶4-5; Ivonav Decl. (Dkt. 58) ¶¶5, 8, 18; D.V.S. Decl. (Dkt. 59) ¶¶4, 9-10. *Compare* Notice, Brenneke Decl. Ex. 1A (Dkt. 12-2); *with* C.B. Decl. Ex. 1B (Dkt. 29-2) at 6 (Service Summary

25  listing hours to which beneficiary is entitled prior to reductions, with signed acknowledgment: "I am aware of all alternatives available to me and I understand that access to 24-hour care is available only in residential settings, including community residential settings.  I agree with the services outlined in this summary.")

26  [48] The fact that Defendants may have previously informed beneficiaries of their right to nursing home or alternate community based services is immaterial; that information must be provided at a meaningful time—in the

27  notice of reduction of services.  *See Baker v. State of Alaska*, 191 P.3d 1005, 1009-10 (Alaska 2008) (agency may not presume that beneficiaries already have certain information, but must provide complete notice).

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 28

1   and the burden (mailing a notice) is low.[49]  *See Matthews*, 424 U.S. at 334-335.

2          Beneficiaries are also entitled to a fair hearing and interim benefits pending a final

3   decision on their request for reassessment or ETR.  This Court originally held that hearings were

4   not required because Medicaid regulations provide that "recipients are not entitled to a hearing if

5   the sole issue is a state law requiring an automatic change affecting some or all recipients."

6   TRO Order (Dkt. 76) at 23:20-24:1 (citing 42 C.F.R. §431.220(b)).  As this Court noted, the

7   "limitation on the hearing requirement arises out of the practical consideration that, absent some

8   factual dispute about an individual's right to benefits, a hearing would serve little . . . purpose."

9   TRO Order (Dkt. 76) at 24:1-3; *see also Rosen*, 410 F.3d at 926.  Here, however, DSHS's

10  decision to unilaterally "amend" 45,000 individualized care plans without individualized

11  reassessments raises myriad factual disputes.  Here, the sole issue is not one of a change in state

12  law: instead, the reassessment and ETR process require factual determinations that may be

13  challenged in a hearing.[50]  As this Court found, "the right to an exemption for hardship

14  necessarily raise[s] a factual dispute that g[i]ve[s] rise to a hearing requirement."  TRO Order

15  (Dkt. 76) at 24:20-21 (citing *Claus v. Smith*, 519 F.Supp. 829, 883 (N.D. Ind. 1981)).  The ETR

16  procedure is an exemption process.  Thus, beneficiaries must be notified that they may request

17  reassessment or ETR, contest the validity of their "amended" care plans at a hearing, and

18  maintain current hour levels in the interim.

19         In short, the hours reductions will jeopardize the health and safety of some beneficiaries

20  to the point that they qualify for increased hours through the ETR process, reduce informal

21  supports available for others such that they are entitled to increased hours under the CARE

22  assessment tool, and lead others to need alternative community-based or institutional residential

23

24          [49] Any financial burden to the State in actually providing the additional services to which beneficiaries
    might be entitled based on reassessment, the ETR process, or nursing home admission is not part of this calculus;
25  consistent with Due Process, the State may not balance its budget by hiding from beneficiaries the fact that they are
    eligible for additional or different Medicaid services.
26          [50] Washington law recognizes that reassessments give rise to factual disputes requiring a fair hearing.
    Beneficiaries have "a right to contest the result of your CARE assessment and/or other eligibility decisions made by
    the department.  The department will notify you in writing of the right to contest a decision and provide you with
27  information on how to request a hearing."  WAC 388-106-1305.  There is no statutory right to appeal ETR denials.

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 29

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1   placement.  Consistent with Due Process and the Medicaid Act, beneficiaries must be notified of

2   these options, and afforded a hearing (with hours maintained pending the hearing) to contest any

3   adverse factual determinations.  Because the Notices were inadequate in all of these respects, the

4   cuts must at the very least be immediately enjoined pending mailing of a new, lawful notice and

5   provision of fair hearing rights with continuing benefits.  *See, e.g., Eder v. Beal,* 609 F.2d 695,

6   701 (3d Cir. 1979) (state must reinstitute terminated Medicaid program until notice consistent

7   with Due Process and Medicaid Act has been sent).

8   ## 2.  The Reduction in Personal Care Hours Violates the ADA.

9   Defendants' actions violate the ADA and Rehabilitation Act, which prohibit unjustified

10   institutionalization and mandate integration of individuals with disabilities into the community to

11   the greatest extent possible.  *See Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581 (1999);

12   *Townsend v. Quasim*, 328 F.3d 511 (9th Cir. 2003); 42 U.S.C. § 12132; 29 U.S.C. § 794(a); 28

13   C.F.R. §§ 35.130(b)(7) (reasonable accommodation mandate), 35.130(d) (integration mandate).

14   Through Title II of the ADA, 42 U.S.C. § 12132, Congress sought to eliminate the

15   "unjustified segregation and isolation" of individuals with disabilities.  *Townsend*, 328 F.3d at

16   516.  The ADA's implementing regulations carry out this purpose by requiring public entities to

17   "administer services, programs, and activities in the most integrated setting appropriate to the

18   needs of qualified persons with disabilities."  28 C.F.R. § 35.130(d).[51]  In *Olmstead*, the

19   Supreme Court construed this integration mandate, interpreting discrimination forbidden under

20   Title II of the ADA to include "unjustified isolation of individuals with disabilities."  527 U.S. at

21   597.

22   To establish an *Olmstead* violation, a plaintiff must show (1) the state's treatment

23   professionals have determined community-based services are appropriate, (2) the disabled

24   individual does not oppose such treatment, and (3) provision of community-based services can

---

[51]  "The 'most integrated setting' is defined as 'a setting that enables individuals with disabilities to interact
with non-disabled persons to the fullest extent possible.'"  *Brantley* 656 F.Supp.2d at 1170 (citing 28 C.F.R. pt. 35
app. A; *Olmstead*, 527 U.S. at 592).  This mandate "serves one of the principal purposes of Title II of the ADA:
ending the isolation and segregation of disabled persons."  *Arc of Wash. State, Inc. v. Braddock*, 427 F.3d 615, 618
(9th Cir. 2005); *see also Brantley*, 656 F.Supp.2d at 1170.

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) -
30

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1   be reasonably accommodated, taking into account the resources available to the state and the

2   needs of other individuals with disabilities.  527 U.S. at 587.  The State's obligation to provide

3   services in the most integrated setting is excused only when it proves that the relief sought would

4   require a "fundamental alteration" of its program.  *Olmstead*, 527 U.S. at 603-4; *see also*

5   *Townsend*, 328 F.3d at 517; *Fisher v. Oklahoma Health Care Authority*, 335 F.3d 1175, 1181

6   (10th Cir. 2003) (integration mandate protects plaintiffs who already reside at home or in

7   community settings).[52]  Plaintiffs establish an *Olmstead* violation where they present evidence

8   showing that the State's actions create "serious risks" of unjustified institutionalization.

9   *Brantley,* 656 F.Supp.2d at 1171.

10          Plaintiffs satisfy these standards.  They are qualified individuals with disabilities who are

11   able to live at home only because they receive in-home personal care services.[53]  The reductions

12   violate the ADA's integration mandate by requiring them to make do with *less* than they need or

13   to move out of their homes to obtain full long-term care services in less integrated settings.

14   Moreover, the relief Plaintiffs seek would not "fundamentally alter" the services at issue; rather,

15   Plaintiffs seek to maintain current service levels.

16          Plaintiffs have presented substantial evidence showing that the cuts at issue here create

17   serious risks of institutionalization.  DSHS's own plan admits as much: "[i]n some cases, a safe

18   in-home plan of care will not be possible and clients may need to go to community residential or

19   nursing facility settings."  Brenneke Decl. Ex. 4 (Dkt. 12-8) at 6; *see also id.* Ex. 5 (Dkt. 12-9) at

20   1.  That conclusion is reinforced by expert analysis, *see, e.g.,* Black Decl. (Dkt. 19) ¶¶33-34,

21   Reed Decl. (Dkt. 18) ¶¶46-47, LaPlante Decl. (Dkt. 22) ¶¶21-22, Walsh Decl. (Dkt. 25) ¶¶12-13,

22   Dapper Decl. (Dkt. 20) ¶17, as well as by many individual declarations establishing a serious and

---

23          [52] ADA regulations require public entities to "make reasonable modifications in policies, practices, or

24   procedures when the modifications are necessary to avoid discrimination on the basis of disability," unless they can
      demonstrate that making the modifications "would fundamentally alter the nature of the service, program, or

25   activity."  28 C.F.R. § 35.130(b)(7).
             [53] DSHS individually assessed and certified that all of the individuals receiving in-home personal care

26   services under waiver programs qualify for nursing facility or intermediate care facility for the mentally retarded
      (ICFMR) levels of care without in-home services; the vast majority of the MPC beneficiaries have such acute

27   disabilities that they, too, meet the functional eligibility criteria entitling them to nursing facility level of care.  *See*
      WAC 388-106-0310(4); 388-106-0510(4); *see also* Reed Decl. (Dkt. 18) ¶19.

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) -
31

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1  in some cases imminent risk of institutionalization. *See supra* at 12-13 & n. 15.[54]  The risk of

2  institutionalization has increased in severity and imminence even since this Court denied

3  Plaintiffs' TRO motion. *See* 2nd Jane B. Decl. ¶14; 2nd Chatwin Decl. ¶¶8, 12

4  (institutionalization this month as soon as paperwork is completed); 2nd Paolino Decl. ¶¶3, 6-7

5  (commitment planned once vacancy opens) and 3rd Paolino Decl ¶¶5-6 (institutionalization now

6  avoided due to ETR); 2nd Hayes Decl. ¶¶3-12 (beneficiary already institutionalized); Anderson-

7  Webb Decl. ¶¶7, 30, 32; Bergstrom Decl. ¶7 (in response to concerns about cuts caseworker said

8  beneficiary should consider institutionalization). *See also* Wujick Decl., pp. 2-3. This risk of

9  institutionalization will not be mitigated by an ETR process if people don't know about it, have

10  no right to access it, and no right to challenge its results. *See supra* at 25-26 & nn. 43-44.

11         This Court's previous rejection of Plaintiffs' ADA claims in the context of the TRO

12  motion was based on erroneous legal standards.  Initially, this Court held Plaintiffs had not

13  shown that the proposed cuts would pose an "immediate threat of mass institutionalization" or

14  involve a "wholesale denial of benefits to an entire class of disabled individuals."  TRO Order

15  (Dkt. 76) at 22:24-23:1.  But as DOJ has explained in other cases involving budget-based

16  cutbacks to Medicaid in-home services,[55] a showing that a denial of services would create a

17  "serious" risk of institutionalization, including a risk of *eventual* institutionalization over time,"

18  establishes an *Olmstead* violation.  Brenneke Decl. Ex. 15 (Dkt. 17-5) at 24-26 (emphasis

19  added).  *Olmstead* claims do not require proof that institutionalization is certain or immediate.

20  *See Fisher*, 335 F.3d at 1181-82, 1184 ("substantial risk" of harm including nursing home entry

21  posed by cap on prescription medications, which would simply cost some plaintiffs $25 to $60

22  _____

23  [54] *See also* Exs. D.W. Decl. (Dkt. 31) ¶¶22b, 25; C.B. Decl. (Dkt. 29) ¶35; K.S. Decl. (Dkt. 36) ¶¶17, 21; Albott Decl. (Dkt. 37) ¶13; Jane B. Decl. (Dkt. 33) ¶¶22, 25; Davis Decl. (Dkt. 30) ¶¶31-32, 36; Dockstader Decl. (Dkt. 42) ¶19; Chatwin Decl. (Dkt. 48) ¶¶2, 5-6, 11-14, 20-21, 25; Faatoafe Decl. (Dkt. 56) ¶24; Frederick Decl. (Dkt. 40) ¶¶22-24; McIntosh Decl. (Dkt. 32) ¶20-21; Morrow Decl. (Dkt. 38) ¶6; Paolino Decl. (Dkt. 45) ¶¶24, 26; Hayes Decl. (Dkt 47) ¶8; M.J.B. Decl. (Dkt. 44) ¶5; Hays Decl. (Dkt. 39) ¶31; S.J. Decl. (Dkt 27) ¶¶25-27; Braddock Decl. (Dkt 28) ¶¶27-31; Maxson Decl. (Dkt 26) ¶¶25, 31; Walsh Decl. (Dkt 25) ¶¶14-17 (agency director discussion of "likely" hospitalization and institutionalization in individual cases).
   [55] The DOJ is entitled to deference in interpreting the integration mandate, which is set forth in its own regulation (28 C.F.R. § 35.130(d)).  *See Olmstead*, 527 U.S. at 597-98; *see also Federal Express Corp v. Holowecki*, 552 U.S. 389, 397 (2008); *Zurich American v. Whittier Properties*, 356 F.3d 1132, 1137 & nn. 25-27 (9th Cir. 2004); *Barden v. City of Sacramento*, 292 F.3d 1073, 1077 (9th Cir. 2002).

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 32

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington 98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1   per month, could establish *Olmstead* violation); Brenneke Decl. Ex. 15 (Dkt. 17-5) at 26 (DOJ

2   brief; no immediate institutionalization was threatened in *Fisher*, but "the evidence showed that

3   many of plaintiffs would remain in their homes 'until their health ha[d] deteriorated' and would

4   '*eventually* end up in a nursing home'") (quoting *Fisher*, 335 F.3d at 1185 (emphasis added by

5   DOJ)).[56]  Plaintiffs have shown such a serious risk here.  *See supra* at 12-13 & n. 15.

6        Plaintiffs respectfully submit that there also is no requirement that "mass

7   institutionalization" be shown.  TRO Order (Dkt. 76) at 22:25.  *Olmstead* itself and numerous

8   other cases involve individual plaintiff claims; the integration mandate protects *individuals* from

9   unnecessary institutionalization.  42 U.S.C. §12132; *Fisher*, 335 F.3d at 1181-82, 84; *Marlo M.*

10  *ex rel. Parris*, 679 F.Supp.2d at 638; *Brantley*, 656 F.Supp.2d at 1171-72.

11       Nor must Plaintiffs show a "wholesale" denial of benefits.  TRO Order (Dkt. 76) at

12  22:25-23:1.  *Fisher*, for example, found a risk of institutionalization due to a cap on prescription

13  drug benefits for recipients of benefits in community-based programs, 335 F.3d at 1181-82—not

14  at all a situation where the state completely terminated benefits to a group of recipients.

15       The two decisions on which this Court previously relied are inapposite, because they

16  rejected efforts to compel the state to *drastically change* existing programs on the ground that

17  they were demanding fundamental alterations of the programs at issue.  In *Sanchez v. Johnson*,

18  416 F.3d 1051, 1063, 1066-68 (9th Cir. 2005), the court rejected on fundamental alteration

19  grounds the plaintiffs' claim seeking "a forty percent increase in the State's budget for

20  developmentally disabled services."  Similarly, in *Arc of Wash.*, 427 F.3d at 617-18, the court

21  rejected on fundamental alteration grounds the plaintiffs' argument that a state must make a

22

23       [56] *See also Marlo M. ex rel. Parris v. Cansler*, 679 F.Supp.2d 635, 638 (E.D.N.C. 2010) ("substantial risk
     of institutionalization"); *G. v. Hawaii*, 676 F.Supp.2d 1046, 1057 (D. Haw. 2009) ("will likely force beneficiaries

24  from an integrated environment into institutional care"); *V.L.*, 669 F.Supp.2d at 1119 ("severe risk of
     institutionalization"); *Ball v. Rodgers*, No. CV 00-67-TUC-EHC, 2009 WL 1395423, at *5 (D. Ariz. Apr. 24, 2009)

25  ("threatened Plaintiffs with institutionalization"); *Mental Disability Law Clinic v. Hogan*, Civ. No. 06-6320, 2008
     WL 4104460, at *15 (E.D.N.Y. Aug. 28, 2008) ("risk of unjustified segregation"); *Nelson v. Milwaukee County*,

26  Civ. No. 04-193, 2006 WL 290510, at *7 (E.D. Wis. Feb. 7, 2006) ("substantially increase[d] the probability" of
     institutionalization); *M.A.C. v. Betit*, 284 F.Supp.2d 1298, 1309 (D. Utah 2003) ("threaten[ed]" institutionalization);

27  *Makin ex rel. Russell v. Hawaii*, 114 F.Supp.2d 1017, 1034 (D. Haw. 1999) ("could potentially force Plaintiffs into
     institutions").

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) -
33

MacDonald Hoague & Bayless
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1    home and community-based waiver program available to every eligible developmentally

2    disabled person rather than capping the participants.

3         Unlike *Sanchez* and *Arc of Washington*, Plaintiffs here do not ask this Court to order the

4    State to expand its home care program or create a new one; rather, Plaintiffs request maintenance

5    of the status quo, and that the State be enjoined from cutting needed services it already provides.

6    A request to retain an existing program is not a "fundamental alteration," since the plaintiff is

7    "not demanding a separate service or one not already provided."  *Fisher*, 335 F.3d at 1183.

8    Moreover, fiscal burdens alone cannot justify failing to implement the integration mandate.  *See*

9    *id.*; *Pennsylvania Prot. & Advocacy, Inc. v. Pa. Dep't of Pub. Welfare*, 402 F.3d 374, 380 (3d

10   Cir. 2005); *Townsend*, 328 F.3d at 520.  Plaintiffs are likely to succeed on their ADA claims.

11       **3.       Plaintiffs Are Likely To Succeed on Their Medicaid Claims.**

12       Medicaid is a cooperative federal-state program that allows states to receive federal

13   financial assistance for medical assistance to low-income individuals.  42 U.S.C. § 1396 *et seq*.

14   Participating states must comply with the Medicaid Act and its implementing regulations.  42

15   U.S.C. § 1396; *Alexander v. Choate,* 469 U.S. 287, 289 n.1 (1985); *see also Lankford v.*

16   *Sherman*, 451 F.3d 496, 510 (8th Cir. 2006).

17       **a.       Reasonable Standards**

18       The Medicaid Act requires that participating states employ "reasonable standards … for

19   determining … the extent of medical assistance under the plan which … are consistent with the

20   objectives of this subchapter."  42 U.S.C. § 1396a(a)(17).  The primary objectives of Medicaid

21   are to provide medical assistance to individuals who cannot afford the costs of necessary medical

22   services and to furnish "rehabilitation and other services to help such … individuals attain and

23   retain capability for independence or self care."  42 U.S.C. § 1396-1.

24       When state Medicaid rules deny or reduce services based on factors other than a

25   reasonable measure of need, courts invalidate them as contrary to the reasonable standards

26   requirement.  *See Lankford*, 451 F.3d at 511-13 (optional medical equipment benefit); *Weaver v.*

27   *Reagan*, 886 F.2d 194, 196-200 (8th Cir. 1989) (AZT coverage based on FDA approved uses);

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 34

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1    *Allen*, 681 F.Supp. at 1233-34, 1238 (state medical necessity criteria arbitrary when unsupported

2    by expert opinion or scientific data); *see also Hern v. Beye*, 57 F.3d 906, 910-11 (10th Cir.

3    1995); *Preterm, Inc., v. Dukakis*, 591 F.2d 121, 131 (1st Cir. 1979); *White v. Beal*, 555 F.2d

4    1146, 1150-51 & n.3 (3d Cir. 1977).

5           Courts have enjoined budget-driven cuts to services like those at issue here as in violation

6    of reasonable standards.  *See V.L.*, 669 F.Supp.2d at 1117 (reduction of Medicaid home care

7    services based on beneficiaries' numerical scores "not designed as a measure of eligibility or

8    need for [home care] services"); *Cota v. Maxwell-Jolly*, 688 F.Supp.2d 980, 992 (N.D. Cal.

9    2010) (modification of qualifying impairments for adult day services, without explanation of

10   "how these changes are linked to the individual's circumstances, particular need for ADHC

11   services or their risk of institutionalization").

12          The reduced services authorizations that will result from the ten percent cut, driven by

13   budgetary needs and without consideration of individual circumstances, will not fulfill the

14   requirement that reasonable standards determine the extent of services.  Washington's budget-

15   based reduction of home care hours without any reassessment or change in circumstances

16   undercuts the integrity of the CARE system's scientific, individualized assessments, care plans

17   and hours authorizations.  *See supra* at 3-6; *see also* Reed Decl. (Dkt. 18) ¶42 (resulting hours

18   allocations will be "arbitrary" and without "any logic or reasoning"); Black Decl. (Dkt. 19) ¶¶30-

19   31 (will guarantee gap between need and services); Dapper Decl. (Dkt. 20) ¶13 (will separate

20   hours authorization from needs assessment).

21          This Court's previous determination that Plaintiffs were unlikely to succeed on this claim

22   rested in part on the Court's conclusion that the reduction would not cause services to fall below

23   minimum personal care service needs.  TRO Order (Dkt. 76) at 15:19-24.  That finding was

24   erroneous, *see supra* at 18-23, but in any event, this claim does not depend on whether services

25   will fall below the minimum, but whether a budget-driven reduction is a reasonable manner to

26   determine authorized hours.

27          Finally, no authority supports construing 42 U.S.C. § 1396a(a)(17), which requires

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) -
35

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1  reasonable standards to determine the "extent" of Medicaid services, as applying only to the

2  elimination of programs or eligibility.  TRO Order (Dkt. 76) at 16 n. 7.  *Lankford* invalidated a

3  State's authorization of some optional medical equipment but not other equipment – equivalent

4  to Washington's decision to reduce the "extent" of services authorized by reducing hours.  451

5  F.3d at 501, 511-13.  And *V.L.* addressed not only an eligibility change but *also* the reduction of

6  in-home care hours for recipients who maintained eligibility.  669 F.Supp.2d at 1112, 1117-18.[57]

7              **b.    Sufficiency**

8          Medicaid's "sufficiency" requirement mandates that "[e]ach service must be sufficient in

9  amount, duration, and scope to reasonably achieve its purpose."  42 C.F.R. § 440.230(b).  While

10  States do enjoy discretion over the amount of Medicaid services, when the level of service is

11  insufficient to achieve a specific Medicaid program's purposes, it is invalid.  *Curtis v. Taylor*,

12  625 F.2d 645, 651 (5th Cir. 1980) (to determine whether service is sufficient, courts consider

13  whether level of service achieves specific program's purposes); *Mitchell v. Johnson*, 701 F.2d

14  337, 347-51 (5th Cir. 1983) (reduction of services and frequency of dental checkups violated

15  sufficiency requirement); *Lankford*, 451 F.3d at 511-13 (providing some respiratory and other

16  equipment but denying coverage of other related equipment violated sufficiency); *see also*

17  *Weaver*, 886 F.2d at 197-200 (failure to cover AZT prescription); *Charpentier v. Belshe*, 1994

18  WL 792591, at *5 (E.D. Cal. Dec. 21, 1994) (limiting reimbursement to no more than 20% of

19  Medicare's reasonable charge).[58]

20          Here, the reduced in-home hours will force some beneficiaries from their homes, while

21  putting those who stay at home at increased health risk, such that they will no longer be

22

23      [57] This Court also based its conclusion on the availability of the ETR process.  TRO Order (Dkt. 76) at 16
24  n. 7.  For reasons previously explained, that process does not provide adequate protections to beneficiaries.  *See
supra* at 25-26 & nn. 43-44.
25      [58] Thus, this Court's reliance upon *Alexander v. Choate*, 469 U.S. 287, 303 (1985), which explains that
States have flexibility in determining the amount of benefits to cover, was misplaced.  TRO Order (Dkt. 76) at 17:5-
26  15.  States' flexibility is subject to the requirement of sufficiency set forth in 42 C.F.R. §440.230(b).  Moreover,
*Alexander* explicitly did not decide whether the government action at issue in that case violated the Medicaid Act;
27  the Supreme Court used the language quoted by this Court in the course of deciding whether disabled individuals
had been deprived of required access to services in violation of the Rehabilitation Act, not the Medicaid Act.  469
U.S. at 303-04 & n.23.

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) - 36

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

1  sufficient to fulfill the purpose of the State's in-home personal care services programs: to enable

2  individuals to remain safely in their homes, rather than be forced into less integrated settings.

3  *See*, *e.g.*, RCW 74.39.005(2), (3), (4), 74.39A.007; Brenneke Decl. Ex. 14 (Dkt. 17-4) at 7;

4  Brenneke Decl. Ex. 7 (Dkt. 13-3) at 3.  Reduction of hours to "well below" those previously

5  authorized "will mean that the Washington in-home personal care services programs will no

6  longer fulfill the fundamental purpose of home and community-based care, because the

7  authorized hours will not be sufficient to permit consumers to remain safely in their homes."

8  Reed Decl. (Dkt. 18) ¶¶44-45; *see also* Black Decl. (Dkt. 19) ¶32 (reduction will "undercut[] the

9  very purpose of the system"); *compare V.L.*, 669 F.Supp.2d at 118 (elimination of authorized

10  services "will likely leave affected individuals without a level of service sufficient to achieve the

11  purpose of the program").  Department officials have previously stated that the CARE system is

12  not "designed to provide all the paid hours of personal care services that might be optimally

13  beneficial for individuals," but that "the Department has determined that the hours generated by

14  CARE tool methodology are sufficient to address health and safety requirements."  3rd Brenneke

15  Decl. Ex. 4 ¶9.  A ten percent *reduction* in services that were just "sufficient" rather than

16  desirable to address health and safety requirements does not satisfy the sufficiency mandate.

17          This Court found it persuasive that Washington's hours are more generous than some

18  other states'.  TRO Order (Dkt. 76) at 17:17-18:2 & n. 8.  However, Washington spends a higher

19  percentage of its long-term care spending on home and community-based services, *as opposed to

20  nursing homes*, than any other state.  2nd LaPlante Decl. ¶3.  That means that Washington is

21  serving individuals with very serious disabilities in their own homes, which is not true in much

22  of the rest of the country.  *Id.*  As Professor LaPlante points out, that difference in acuity or

23  disability must be taken into account, and without consideration of that difference, the fact that

24  Washington has higher averages or caps on personal care hours does not mean it is any more

25  generous in relation to a particular beneficiary's needs than other states.  *Id.* ¶4.[59]

26

27          ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

[59] *Freeman*'s rejection of a sufficiency claim merits no weight here.  The *Freeman* plaintiffs, who did not
seek to represent a class, challenged much smaller cuts than those at issue here and testified that they would not

MacDONALD HOAGUE & BAYLESS
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

1

### c.  Free Choice

2  DSHS provides personal care services through COPES and other Medicaid programs

3  under Section 1915(c) and/or Section 1915(d) waivers, which are conditioned upon DSHS

4  assurances that individuals likely to require the level of care provided in a nursing facility or

5  other specified institution "are informed of the feasible alternatives" to institutional care and

6  have individual choice.  42 U.S.C. §§1396n(c)(2)(C), 1396n(d)(2)(C); *see also id.*,

7  §§1396n(c)(1), 1396n(d)(2)(A).  Regulations require "the recipient or his or her legal

8  representative will be—(1) Informed of any feasible alternatives available under the waiver; and

9  (2) Given the choice of either institutional or home and community based services."  42 C.F.R.

10  §441.302(d); see also 42 C.F.R. §§441.353(d), 303(d).

11  These "free choice" requirements are "constructed in such a way as to stress . . . two

12  explicitly identified rights - (a) the right to be informed of alternatives to traditional, long-term

13  institutional care, and (b) the right to choose among those alternatives."  *Ball v. Rodgers*, 492

14  F.3d 1094, 1107 (9th Cir. 2007) (emphasis omitted).  They "mandat[e] that participating states

15  keep each eligible Medicaid recipient apprised of these non-institutional care options and afford

16  each the opportunity to choose how to live."  *Id.* at 1111 (emphasis omitted).  "Recipients must

17  not be forced to choose between adequate health care and institutionalization."  *Ball v. Biedess*,

18  2004 WL 2566262, at *6-7; (D. Ariz. Aug. 13, 2004).  Home-based services that are inadequate

19  to meet recipients' needs do not constitute a "feasible alternative" to institutionalization, and so

20  violate the free choice provisions.  *See Ball*, 492 F.3d at 1100 (low wages caused provider

21  shortage, decreased quality of care, state failed to avoid service gaps); *Ball*, 2009 WL 1395423,

22  at *6 (requiring specific steps to prevent gaps in service so recipients would have "actual choice

23  between in-home and institutional care"); *Cramer v. Chiles*, 33 F. Supp.2d 1342 (S.D. Fla. 1999)

24  ("no real choice" when beneficiary must choose between home-based option that may not meet

25

26

27  ─────────────

actually lose any personal care services as a result of the cuts.  Def. Resp. TRO Ex. 13 (Dkt 66-2) at 17-19; *see also*
*supra* at 17-18 & n. 29.

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) -
38

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

10099.1 dl226303

1   needs or uncertain placement in institution).[60]

2        This Court correctly concluded that, if alternatives to institutional care are not feasible,

3   that violates the Medicaid free choice provision.  TRO Order (Dkt. 76) at 19:13-20:1.  However,

4   it wrongly rejected the claim based on its conclusion that services would remain adequate.  For

5   the reasons previously discussed, *see supra* at 9-18, the reduced services will force many

6   beneficiaries to leave their homes or face unsafe circumstances, and so will be inadequate to

7   constitute a feasible alternative to nursing home care.

8                    **d.      Approval of Plan Amendment**

9        When a State makes material changes in its operation of the Medicaid program, it must

10   submit a plan amendment to CMS for determination of compliance with federal requirements,

11   and may not implement that plan amendment until CMS approves it.  42 CFR §§ 430.12, 430.20,

12   447.256.  Similar obligations apply as conditions of Medicaid waiver programs.  Brenneke Decl.

13   Exs. 7-13 (Dkts. 13-3 to 17-3) (Medicaid waiver applications, at Section 8).  Implementation of a

14   plan amendment without CMS approval is unlawful, and should be enjoined.  *See Oregon Ass'n*

15   *of Homes for the Aging, Inc. v. Oregon*, 5 F.3d 1239, 1241, 1244 (9th Cir. 1993); *Exeter*

16   *Memorial Hosp. Ass'n v. Belshe*, 145 F.3d 1106, 1108-09 (9th Cir. 1998); *California Ass'n of*

17   *Rural Health Clinics v. Maxwell-Jolly*, __ F.Supp.2d __, 2010 WL 4069467, at *12-14 (E.D.

18   Cal, Oct. 18, 2010).  So should implementation of unapproved waiver amendments.

19        Plaintiffs have pointed to specific provisions of the State's Medicaid plan and waivers

20   that state that personal care services hours are awarded based on individual need as determined

21   by the CARE assessment system.  *See* Brenneke Decl. Ex. 6 Part 1 (Dkt. 13-1), Supp. 4 to Att.

22   3.1-A at 11 (DSHS will establish and follow "individualized plan of care" for personal care

23   services based on "independent assessment . . . developed by a person-centered process in

24

25        [60] Under the free choice mandate, "the feasibility of alternatives should not be determined by budgetary
     constraints.  Feasibility must be determined by the recipient's needs and treatment plan, and not solely by the funds
26   available to service that plan."  *Benjamin H*, 1999 WL 34783552, *14.  Indeed, federal "legislators were adamant
     that the determination of which long-term care options are feasible in a particular instance should be based on *an*
27   *individual's* needs, as determined by an evaluation, *and not short-term costs savings*."  *Ball*, 492 F.3d at 1114
     (internal quotation marks and brackets omitted).

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) -
39

**MacDonald Hoague & Bayless**
705 Second Avenue, Suite 1500
Seattle, Washington  98104
Tel 206.622.1604  Fax 206.343.3961

1    consultation with the individual" and "other appropriate individuals," and this plan of care

2    "[i]dentifies the State plan HCBS necessary for the individual, and furnishes . . . all HCBS which

3    the individual needs"); Brenneke Decl. Ex. 7 (Dkt. 13-3) at 171-72 ("CARE . . . assigns base

4    hours"); Brenneke Decl. Ex. 8 (Dkt. 13-4) at 101 (same).  Thus, this Court was wrong to

5    conclude that the State's Medicaid plan "does not describe a minimum number of personal care

6    service hours or, for that matter, a method of calculating personal care service hours."  TRO

7    Order (Dkt. 76) at 20:12-15.[61]  Plaintiffs have shown a likelihood of success on this claim.

8                                    **VI.    CONCLUSION**

9            Plaintiffs request that this Court issue a preliminary injunction, enjoining Defendants

10   from implementing emergency regulation WSR 11-02-041 pending trial on the merits.

11

12           DATED this 21st day of January, 2011.

13   MacDONALD HOAGUE & BAYLESS                    ALTSHULER BERZON

14

15   By:  _/s/ Andrea Brenneke_____             By:  _/s/ Stacy Leyton_____
          Andrea Brenneke, WSBA # 22027                 Stacey Leyton, CABA #203827
16        Attorneys for Plaintiffs                        *pro hac vice* Attorneys for Plaintiffs

17

18

19

20

21

22

23

24

25

26   _____
         [61] The *Freeman* decision's holding that no plan amendment was required was based on the *Freeman*
     plaintiffs' failure to identify the relevant plan and waiver provisions.  *See* Def. Resp. TRO Ex. 13 (Dkt 66-2) at
27   13:16-16:18 (reviewing plan and waiver provisions cited by plaintiffs and determining that they do not "set[] forth
     the way in which the number of personal care service hours is determined").

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) -    **MacDonald Hoague & Bayless**
40                                                                          705 Second Avenue, Suite 1500
                                                                            Seattle, Washington  98104
                                                                            Tel 206.622.1604  Fax 206.343.3961
10099.1 dl226303

1

**CERTIFICATE OF SERVICE**

2          I hereby certify that on January 21, 2011, I electronically filed the foregoing to the Clerk

3  of the Court using the CM/ECF system which will send notification of such filing to the

4  following:

5  Counsel for Defendants
   Edward Joseph Dee
6  Assistant Attorney General
   7141 Cleanwater Dr. SW
7  P.O. Box 40124
   Olympia, WA 98504-0124
8  Email:  edward.dee@atg.wa.gov; corrinnes@atg.wa.gov; kathya@atg.wa.gov;
   cherylcl@atg.wa.gov
9
   William Bruce Work
10 Assistant Attorney General
   7141 Cleanwater Dr. SW
11 P.O. Box 40124
   Olympia, WA 98504-0124
12 Email:  brucew@atg.wa.gov; corrinnes@atg.wa.gov; kathya@atg.wa.gov; cherylcl@atg.wa.gov

13

14

15          DATED this 21st day of January, 2011.

16
                                        ALTSHULER BERZON LLP
17

18                                 By:  */s/ Stacey Leyton*_____
                                        Stacey Leyton, CABA #203827
19                                      *pro hac vice* Attorneys for Plaintiffs

20

21

22

23

24

25

26

27

MOTION FOR PRELIMINARY INJUNCTION (2:10-cv-02052-TSZ) -
41

10099.1 dl226303