THE HONORABLE THOMAS S. ZILLY

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

M.R. et al.,

                          Plaintiffs,                    No.  C10-2052Z

vs.

SUSAN DREYFUS, et al.,                                   ORDER

                          Defendants.

THIS MATTER comes before the Court on plaintiffs' motion for a preliminary

injunction (docket no. 95).  This action arises out of the State of Washington's

decision to reduce Medicaid spending in 2011 in response to the current budget crisis.

The individual named plaintiffs are disabled and elderly individuals who currently

receive in-home personal care services[1] through Washington's Medicaid program,

_____

[1] This case does not involve issues relating to the provision of medical care, i.e., care
furnished by licensed medical practitioners; rather this case relates solely to in-home personal
care services, which consist of non-medical assistance with activities of daily living, such as
bathing, hygiene, and eating, and instrumental activities of daily living, such as shopping and
meal preparation.

ORDER - 1

which is administered by defendants Susan Dreyfus[2] and the Department of Social and Health Services ("DSHS").  Plaintiffs[3] seek to enjoin DSHS from implementing an across-the-board reduction in the number of personal care service hours beneficiaries currently receive in their own homes in lieu of treatment in an institution or nursing facility.[4]

Plaintiffs' lawsuit is predicated on a fundamental misunderstanding of the manner in which personal care service hours are distributed under Washington's Comprehensive Assessment and Reporting Evaluation ("CARE") method.  Plaintiffs attempt in various ways to characterize the hours allotted under CARE as a minimum, below which individuals cannot safely reside in their homes.  CARE, however,

---

[2] Defendant Dreyfus is the Secretary of the Washington State Department of Social and Health Services.  Dreyfus Decl. at ¶ 2 (docket no. 124).

[3] The plaintiffs in this case consist of fourteen individuals, two nonprofit associations ,and a union that represents personal care service providers.  Whether the organizational plaintiffs have standing to bring the claims alleged in the amended complaint remains unclear.  *See RX Pharmacies Plus, Inc. v. Weil*, 883 F. Supp. 549, 553 (D. Colo. 1995) (holding that medical providers only have standing under Medicaid provisions relating to reimbursement rates or payment procedures).  Moreover, the United States Supreme Court has granted certiorari on the question of whether medical providers may maintain a cause of action to enforce Medicaid's reimbursement rate provision, 42 U.S.C. § 1396a(a)(30)(A).  *Independent Living Ctr. of S. Cal., Inc. v. Maxwell-Jolley*, 590 F.3d 725 (9th Cir. 2009) *cert. granted* 78 U.S.L.W. 3500 (U.S. Jan. 18, 2011) (09-958).  This Court will address the standing issue once the parties have fully briefed defendants' pending motion to dismiss the plaintiff union for lack of standing, (docket no. 135).

[4] The pending motion is not the plaintiffs' first request for injunctive relief.  This case was filed on December 21, 2010, and the issues currently before the Court were the subject of a motion for a temporary restraining order ("TRO").  The Court denied the plaintiffs' request for a TRO, for the reasons set forth in its Order, on January 5, 2011.  In the short time this lawsuit has been pending, the Court has become well acquainted with the parties and the issues raised by the case.  The parties have filed more than 164 separate docket entries, and the Court has carefully reviewed all of the pleadings and heard over five hours of oral argument on two occasions concerning the issues now ripe for adjudication.

allocates hours in accordance with beneficiaries' relative needs and State budget constraints, and not on the basis of what an individual actually needs to remain in a non-institutional setting.

Since the denial of their motion for a temporary restraining order, plaintiffs have had additional time and opportunities to further brief the issues, supplement the record,[5] and present their arguments.  Plaintiffs, however, have not improved their showing of either likelihood of success on the merits or irreparable injury, and the balancing of equities and public interest tips sharply in favor of the State.  The Court therefore DENIES plaintiffs' motion and the "extraordinary" interlocutory remedy they desire.  *See* *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 376 (2008) (observing that a preliminary injunction is "an extraordinary remedy never awarded as of right").

**BACKGROUND**

Under the Medicaid Act, also known as Title XIX of the Social Security Act, 42 U.S.C. §§ 1396a-1396w, the federal government provides monetary assistance to participating States so that they may furnish medical care and other services to

---

[5] After completion of oral argument on January 28, 2011, the Court advised the parties that the motion for preliminary injunction was deemed submitted and directed the parties not to file any additional motions or documents, except for relevant supplemental authorities, until after the Court could review the enormous quantity of material submitted and render a decision.  Minute Entry (docket no. 164).  Nonetheless, plaintiffs filed an offer of proof requesting leave to amend their complaint to add certain individuals as plaintiffs.  Offer of Proof (docket no. 165).  The material submitted by plaintiffs in connection with this request are not timely for purposes of the Court's consideration of the present motion, and have not been considered, except as noted later in this Order.  Likewise, the State's Opposition and the Engels Declaration filed today, docket nos. 169 and 170, are untimely.

qualified individuals.  If a State elects to participate in Medicaid – which all fifty do – it must operate its program in conformity with applicable federal laws.  *Alexander v. Choate*, 469 U.S. 287, 289 n.1 (1985).  The federal government administers Medicaid through the Centers for Medicare and Medicaid Services ("CMS").  42 C.F.R. § 400.200.  Washington's Medicaid program is managed by DSHS.  RCW 74.04.050.

Under the Medicaid program, each participating State must submit, and have approved by CMS, a state plan for the provision of "medical assistance."  *See* 42 C.F.R. § 430.10.  Only some categories of "medical assistance," such as inpatient and outpatient hospital care, are mandatory for participating States, while others, such as in-home "personal care services," are optional.  *See* 42 U.S.C. §§ 1396d(a) & 1396a(a)(10)(A).  Washington has elected to provide "personal care services," which are defined by the Medicaid Act as services that are

> furnished to an individual who is not an inpatient or resident of a hospital, nursing facility, intermediate care facility for the mentally retarded, or institution for mental disease that are (A) authorized for the individual by a physician or in accordance with a plan of treatment or (at the option of the State) otherwise authorized for the individual in accordance with a service plan approved by the State, (B) provided by an individual who is qualified to provide such services and who is not a member of the individual's family, and (C) furnished in a home or other location.

42 U.S.C. § 1396d(a)(24).  DSHS has further divided personal care services into two types of activities for which beneficiaries might require physical or verbal assistance, namely activities of daily living ("ADLs") and instrumental activities of daily living ("IADLs").  WAC 388-106-0010.  ADLs include basic personal tasks like bathing,

dressing, eating, and toilet use, while IADLs consist of functions performed around the home or community, for example, shopping, meal preparation, and housekeeping.  *Id.*

In administering Washington's long-term personal care services program, DSHS uses a system known as CARE.  WAC 388-106-0065.  CARE begins with an individualized assessment that assesses each beneficiary's functional capacity using five criteria, namely (i) cognitive performance score; (ii) clinical complexity; (iii) mood/behavior and behavior point score; (iv) ADL score; and (v) exceptional care.  WAC 388-106-0125.  Based on the results of these examinations, the beneficiary is placed into one of five acuity classification groups (A-E).  *Id.*  For example, if an individual meets the criteria for clinical complexity, and has a cognitive performance score less than four, the individual is placed into Group "C," regardless of the individual's mood and behavior qualification or behavior points.  WAC 388-106-0125(3).  Thereafter, beneficiaries are further classified into subgroups depending upon their ADL scores.  *Id.*  DSHS performs annual CARE reassessments for all 45,000 personal care service beneficiaries to ensure that everyone is properly classified.  WAC 388-106-0050(1) ("[DSHS] will assess you *at least* annually or *more often* when there are significant changes in your ability to care for yourself.") (emphasis added).

DSHS has assigned each acuity classification subgroup a maximum number of base hours for personal care services.  WAC 388-106-0125.  Beneficiaries with the most severe functional limitations are assigned to the group and subgroup with the

highest number of base hours.  *Id.*  By emergency rule, WAC 388-106-0125, Wash. St. Reg. 11-02-041 (Dec. 30, 2010), the State identified the base hours assigned to each subgroup as follows:

**TABLE 1**

| Classification | 2010 Base Monthly Hours | 2011 Reduced Base Monthly Hours |
|---|---|---|
| E High | 416 | 393 |
| E Medium | 346 | 327 |
| D High | 277 | 260 |
| D Med-High | 234 | 215 |
| D Medium | 185 | 168 |
| D Low | 138 | 120 |
| C High | 194 | 176 |
| C Med-High | 174 | 158 |
| C Medium | 132 | 115 |
| C Low | 87 | 73 |
| B High | 147 | 129 |
| B Med-High | 101 | 84 |
| B Medium | 82 | 69 |
| B Low | 47 | 39 |
| A High | 71 | 59 |
| A Medium | 56 | 47 |
| A Low | 26 | 22 |

Once a beneficiary is assigned to an acuity classification subgroup and allocated the base number of hours associated with that subgroup, those base hours may then be adjusted, either up or down, in accordance with several factors, including: (i) the availability of informal supports; (ii) whether there are multiple clients in the same household; and (iii) the characteristics of the living environment, for example, offsite laundry facilities or wood used as a sole source of heat.  WAC 388-106-0130(2)-(4) (2010).  The result of this computation is the "maximum number of hours

that can be used to develop [a] plan of care."  Emergency Rule WAC 388-106-0130(6), Wash. St. Reg. 10-22-066 (Oct. 29, 2010).

If a change in a beneficiary's medical condition increases his or her need for personal care service hours, the beneficiary may request a reassessment.  WAC 388-106-0140; 388-106-1303(6)(a).  This request may occur at any time a beneficiary concludes the allocated hours are not sufficient.  Beneficiaries may also ask their case managers to submit an exception to rule ("ETR") request for additional hours.  WAC 388-440-0001.[6]  In 2010, out of the roughly 45,000 adult personal care service beneficiaries, DSHS processed approximately 2,020 ETR requests.  Rector Decl. at ¶ 9 (docket no. 125).  DSHS approved 89% of the requests for additional hours.  _Id._

In 2009, the State reduced the base hours for each acuity subgroup by an average of four percent, with the largest percentage decreases applied to the classifications associated with the least acuity.  _See_ Emergency Rule 388-106-0125, Wash. St. Reg. 09-14-046 (July 1, 2009).  In mid-2010, the State restored some of these base hours, using the same principle in reverse, _i.e._, the categories with the greatest acuity were placed as closely as possible to pre-existing levels, while other

---

[6] Of the individual named plaintiffs in this case, all have been informed about the ETR process since this litigation commenced, and most have requested an ETR.  At least one plaintiff (M.J.B.) has received additional hours.  Mot. at 12 n.13 (docket no. 95).  DSHS denied five of the ETR requests after the committee reviewing the requests determined that those plaintiffs did not require any additional hours to preserve their health and safety.  3d McNeill Decl. at ¶ 10 (docket no. 161).  The committee determined that two of the other ETR requests identified changed medical conditions that required reassessments in CARE, and those individuals will ultimately receive more hours when their classifications change.  _Id._

classifications did not regain as much ground.  This methodology was consistent with

explicit legislative instructions:

> The personal care services benefit shall be provided to the extent funding
> is available according to the assessed level of functional disability.  Any
> reductions in services *made necessary for funding reasons should be*
> *accomplished in a manner that assures that priority for maintaining*
> *services is given to persons with the greatest need* as determined by the
> assessment of functional disability.

RCW 74.09.520(4) (emphasis added).

At issue in this case is a new set of reductions, set in motion in September 2010,

when Washington Governor Christine Gregoire issued Executive Order 10-04, which

directed each State agency to reduce expenditures to compensate for a projected

budget shortfall in the 2011 fiscal period.  Exs. 2-3 to Brenneke Decl. (docket no. 12).

In response to the Governor's Executive Order, DSHS announced plans to reduce in-

home personal care service base hours by an average of ten percent,[7] effective January

1, 2011.  *Id.* at Ex. 4; *see also* Table 1, *supra*.  The fourteen individual named

plaintiffs in this case will experience the following reductions:

///

///

///

---

[7] This figure reflects the difference in the average numbers of base hours across all acuity
categories for 2010 (161.2 hours) and 2011 (144.4 hours).  When the decrease for each acuity
group is separately considered, the range of values is between 6.3% (Group E Medium) and
18.8% (Group B Low).  The State has imposed a greater percentage reduction on individuals
with the least amount of need.  The targeted reductions are consistent with the notion that the
individuals currently receiving only a handful of personal care service hours per month are the
most independent and therefore the least likely to require nursing home care.

**TABLE 2**

| Plaintiff | Acuity Subgroup | 2010 Base Monthly Hours | 2011 Reduced Base Monthly Hours |
|-----------|-----------------|--------------------------|----------------------------------|
| A.R. | D Med. High | 322[8] | 309 |
| M.R. | D Med. High | 236 | 215 |
| A.B. | D Med. | 185 | 166[9] |
| S.J. | C Med. High | 162 | 145 |
| M.J.B. | C Med. High | 184 | 166[10] |
| J.H. | C Med. High | 176 | 158 |
| C.B. | C Med. | 132 | 115 |
| H.C. | C Med. | 116 | 100 |
| K.S. | C Med. | 133 | 115 |
| D.W. | C Med. | 133 | 115 |
| M.B. | B High | 146 | 126 |
| J.B. | B Med. | 82 | 68 |
| An.B. | B Med. | 82 | 68 |
| T.M. | B Med. | 83 | 69 |

Exs. 1A-B, 3, 4 to Frederick Decl. (docket no. 40); _see_ _also_ _id._ at ¶ 3; Exs. 1-4 to Jane

B. Decl. (docket no. 33); _see_ _also_ _id._ at ¶¶ 4a-4d; Exs. 1-2 to S.J. Decl. (docket no. 27);

Ex. 2 to Paolino Decl. (docket no. 45); _see_ _also_ _id._ at ¶ 20; Ex. 1A to C.B. Decl.

(docket no. 29); _see_ _also_ _id._ at ¶ 22; Exs. 1-2 to Chatwin Decl. (docket no. 48); Ex. 1

to K.S. Decl. (docket no. 36); _see_ _also_ _id._ at ¶ 14; Ex. 1A to D.W. Decl. (docket

---

[8] Prior to the State's reduction, DSHS granted an ETR to A.R. that authorized an additional 165 hours beyond the 157 allocated to A.R. through her CARE assessment. Exs. 2-4 to Frederick Decl. (docket no. 40). This adjustment via ETR has the same effect as assigning A.R. to acuity subgroup E Medium.

[9] The State has subsequently reduced A.B.'s hours to 146 because her previous CARE assessment had not properly reduced available hours to account for the fact that A.B. resides with three siblings who also receive personal care services. Ex. 1 to 4th Jane B. Decl. (docket no. 167-8); _see_ _also_ WAC 388-106-0130(3)(a). A.B. retains the right to appeal this reduction. Ex. 2 to 4th Jane B. Decl. (docket no. 167-9).

[10] Plaintiff M.J.B. has been approved for an ETR that will increase her base hours. Mot. at 12 n.13 (docket no. 95).

no. 31); *see also id.* at ¶ 19; Ex. 1 to Hays Decl. (docket no. 39); *see also id.* at ¶ 21;

Maxon Decl. at ¶¶ 5, 18 (docket no. 26); Ex. 2 to Hayes Decl. (docket no. 47).  None

of the individual named plaintiffs satisfies the criteria for "exceptional" care, a

prerequisite to placement in the highest need acuity category, Group E.  Most require

only mild to moderate assistance with activities of daily living.  DSHS sent written

notifications to all beneficiaries of the planned service reductions on December 6,

2010.  *See* Ex. 1 to Brenneke Decl. at 2-3 (docket no. 12).

**PROCEDURAL HISTORY**

This litigation ensued shortly after DSHS sent out the service reduction notices.

On December 23, 2010, plaintiffs filed a motion for a temporary restraining order and

preliminary injunction.  Mot. (docket no. 11).  After extensive briefing and oral

argument on an expedited schedule, on December 30, 2010, the Court denied

plaintiffs' motion for a temporary restraining order.  Minute Order (docket no. 73);

Order (docket no. 76).

On January 6, 2011, plaintiffs appealed the Court's order denying the

temporary restraining order, thereby creating ambiguity as to the jurisdiction of both

this Court, and the Ninth Circuit.  Notice of Appeal (docket no. 78); *see also* Order at

3, *M.R. v. Dreyfus*, No. 11-35026 (9th Cir. Jan. 14, 2011) (Smith, N.R., J., dissenting).

Because of the jurisdictional ambiguity, this Court stayed the case pending review by

the Ninth Circuit, and struck, without prejudice, plaintiffs' motion for a preliminary

injunction.  Minute Order (docket no. 80).

On January 10, 2011, plaintiffs filed an emergency motion with the Ninth Circuit, seeking an injunction pending the appeal.  On January 14, 2011, the Ninth Circuit granted relief, but not in the form of an injunction pending appeal.  Order, _M.R. v. Dreyfus_, No. 11-35026 (9th Cir. Jan. 14, 2011).  Rather, the Ninth Circuit stayed the State's implementation of the emergency regulation pending a ruling by this Court on plaintiffs' motion for a preliminary injunction.  _Id._

**DISCUSSION**

> **A.**     **Standard for a Preliminary Injunction**

In order to obtain preliminary injunctive relief, a plaintiff must demonstrate (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) a balance of equities tipping in favor of relief; and (4) a weighing of public interest that supports an injunction.  _Winter_, 129 S. Ct. at 376; _see also Alliance for the Wild Rockies v. Cottrell_, 2011 WL 208360 (9th Cir. Jan. 25, 2011) (holding that the Ninth Circuit's "sliding scale" approach continues to be valid after _Winter_).[11]  A preliminary injunction is "an extraordinary remedy never awarded as of right."  _Winter_, 129 S. Ct. at 376.

---

[11] Under the sliding scale approach, "serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  _Id._ at *7.  In the present case, the parties do not address whether the Court should apply the Ninth Circuit's sliding scale approach.  Nonetheless, the Court concludes that application of the alternative standard would not lead to a different result.

ORDER - 11

**B.**   __Irreparable Harm__[12]

To show a likelihood of irreparable harm, plaintiffs argue they need only show that the State's proposed reduction "may deny them needed medical care."  _See Beltran v. Myers_, 677 F.2d 1317, 1322 (9th Cir. 1982); _see also_ _Independent Living Ctr. of S. Cal., Inc. v. Maxwell-Jolley_, 572 F.3d 644, 658 (9th Cir. 2009) (hereinafter _Independent Living Ctr. I_).[13]  In the alternative, plaintiffs argue they need only show a "serious risk" of eventual institutionalization to show a likelihood of irreparable harm. _Fisher v. Okla. Health Care Auth._, 335 F.3d 1175 (10th Cir. 2003).

Plaintiffs contend that they have satisfied the standards for irreparable harm because (1) CARE is an individualized assessment of the minimum number of hours

---

[12] In their brief, and at oral argument, plaintiffs contended that the Ninth Circuit has already concluded that plaintiffs have shown irreparable harm, and, consequently, this Court is bound by that determination.  But the Ninth Circuit did not analyze the substance of plaintiffs' request for injunctive relief, and declined to issue a temporary restraining order.  Order, _M.R. v. Dreyfus_, No. 11-35026 (9th Cir. Jan. 14, 2011).  Instead, the Ninth Circuit issued only a stay pending this Court's consideration of plaintiffs' motion for a preliminary injunction.  _Id._ Accordingly, the question of irreparable harm remains undecided for this Court's determination.  _Cf. Independent Living Ctr. of S. Cal., Inc. v. Shewry_, 2008 WL 3891211 at *5 (C.D. Cal. 2008) (holding that Ninth Circuit's order remanding case for a determination on plaintiffs' motion for a preliminary injunction was binding as to issue of irreparable harm where Ninth Circuit issued an _injunction_ pending further review by the district court).

[13] The standard articulated in _Beltran_ and _Independent Living Ctr. I_ is not applicable in this case because personal care services are not included within Medicaid's definition of "medical care."  _Compare_ 42 U.S.C. § 1396d(a)(6) (definition of medical care) _with_ 42 U.S.C. § 1396d(a)(24) (definition of personal care services).  For example, in _Beltran_, the State imposed a rule that completely eliminated eligibility to a class of individuals for Medicaid services.  677 F.2d at 1318 (denying eligibility for medical care to individuals who transferred assets in order to become eligible for assistance).  Similarly, in _Independent Living Ctr. I_, the evidence demonstrated that medical providers would cease providing services to Medicaid beneficiaries if the State went forward with its proposed ten percent reduction in reimbursement rates.  572 F.3d at 658.  In the present case, plaintiffs do not face a similar reduction or elimination of medical services.

beneficiaries actually require to remain safely in their homes, and therefore, any

reduction of the hours assessed by CARE will necessarily deny the plaintiffs needed

services and will pose a serious risk of institutionalization; or (2) even if CARE does

not assess beneficiaries' minimum needs, the individual declarations of the named and

unnamed plaintiffs demonstrate that, at least as to them, the budget reduction will deny

them needed services and pose a serious risk of institutionalization.  The Court

concludes that plaintiffs have failed to submit evidence that the reduction will deny

beneficiaries needed services, or that it will create a serious risk of institutionalization,

and therefore, plaintiffs cannot show likelihood of irreparable harm under either

standard.[14]

### 1. CARE Does Not Assess Beneficiaries' Actual Minimum Needs for Personal Care Services

Plaintiffs take the position that DSHS uses CARE to individually assess the

_minimum_ number of hours that each beneficiary actually requires, and that any cuts in

base hours will necessarily provide beneficiaries with less assistance than they

absolutely need to preserve health and safety.  Plaintiffs contention that CARE

---

[14] In addition, to establish standing necessary to obtain injunctive relief, a plaintiff must show that the likely irreparable harm relates to harm that the plaintiff "has sustained or is immediately in danger of sustaining."  _City of Los Angeles v. Lyons_, 461 U.S. 95, 101-02 (1983).  The threat of injury must be "real and immediate."  _Id._  "Abstract injury is not enough."  _Id._  The Supreme Court's heightened requirement for injury in cases involving injunctive relief is particularly relevant here, where plaintiffs seek an order from a federal court enjoining the State from implementing a State policy.  _Lyons_, 461 U.S. at 112 (noting that respect for principles of federalism require heightened showing of potential harm for plaintiffs to obtain federal injunctive relief of official state action).

assesses the "minimum" hours each beneficiary needs is misplaced.  CARE does not

assess beneficiaries' minimum needs for personal care services.

Although the Court agrees that CARE involves an individualized assessment,

the number of base hours allotted to each of the seventeen acuity subgroups is not

linked to individual need.[15]  Rather, the subgroups reflect the relative acuity of

individuals, with beneficiaries in classifications that receive more base hours having

more need for personal care services relative to those in categories associated with

lower numbers of base hours.[16]  *See* Moss Decl. at ¶ 4 (docket no. 68) ("CARE does

_____

[15] The base hours outlined in WAC 388-106-0125 are based on the time study performed prior to the adoption of CARE.  In that study, the department measured the amount of time providers spent assisting beneficiaries with their personal care needs.  Moss Decl. at ¶ 3 (docket no. 68).  DSHS then correlated the time spent by providers with the clinical characteristics of the beneficiaries involved in the study to determine the relative resource usage of beneficiaries with similar characteristics.  *Id.*  The study did not, and indeed could not, describe or predict the actual number of hours any specific beneficiary might need to perform specific tasks.  Rector Decl. at ¶ 6 (docket no. 125); Mahar Decl. at ¶ 6 (docket no. 130).  To the contrary, the study merely showed that individuals with certain clinical characteristics require more (or less) personal care service hours than individuals with different clinical characteristics.

[16] Construing CARE as assessing only relative need is consistent with the history of CARE, which DSHS implemented in 2004 in response to the legislature's direction to create a uniform system for comprehensively assessing functional disability.  RCW 74.39.005(2).  Prior to 2004, the department used an assessment tool ("Legacy") that was subjective and unreliable.  Moss Decl. at ¶ 5 (docket no. 68); Rector Decl. at ¶ 7 (docket no. 125).  The legislature directed DSHS to create a more uniform assessment tool based on objective criteria that would allocate resources more consistently and thereby ensure that individuals with similar clinical characteristics would be awarded a similar number of personal care service hours.  Leitch Decl. at ¶ 7 (docket no. 67); Mahar Decl. at ¶ 5 (docket no. 130) ("A primary goal for the redesign of the assessment tool was to develop classification levels that would ensure that clients who had the same clinical characteristics would fall within the same classification system and receive the same level of services.").  DSHS made the transition from Legacy to CARE in a "budget-neutral" manner, dividing the then-available resources between the various categories of recipients.  *See* Leitch Decl. at ¶ 7 (docket no. 67).  One of the negative consequences of a shift from a subjective assessment to an objective assessment is the loss of flexibility in dealing with individuals' unique circumstances.  *Jenkins v. Dep't of*

not measure how many hours a person 'needs,' but instead determines what a person's share of available resources should be based upon the individual's level of acuity compared to other recipients.").[17]

Similarly, the subsequent evaluation of other factors, performed after the CARE assessment assigns a beneficiary to an acuity classification subgroup, _see_ WAC 388-

---

_Soc. & Health Servs._, 160 Wn.2d 287, 310, 157 P.3d 388 (2007) (Fairhurst, J., dissenting) ("The price of uniformity is that fit may be imprecise in a particular individual's circumstances.").

[17] The Court has carefully reviewed the contrary assertions in the declarations of Charles Reed and Penny Black, filed by plaintiffs in support of their motion. Mr. Reed, however, has no personal knowledge about DSHS's development and implementation of CARE because he retired from DSHS in 2000, before CARE was developed. Reed Decl. at ¶ 6 (docket no. 18). In contrast, Ms. Black was employed by DSHS in 2004, when it transitioned to CARE. Black Decl. at ¶ 4 (docket no. 19). In her current declaration, Ms. Black states that "[t]he CARE assessment tool produces an accurate measure of essential need. . . . [It] is designed to, has proven effective to, and is used by [DSHS] to measure the unmet needs that must minimally be met in order to support a client in his or her home without compromising health or safety." _Id._ at ¶ 28. While she was still employed by DSHS, however, Ms. Black provided a declaration to the Washington State Court of Appeals in connection with an unrelated case. _See_ Black Decl. (Apr. 11, 2005), attached to Work Decl. (docket no. 71). In Ms. Black's earlier declaration, she averred that, "[f]ollowing the assessment, eligible individuals are classified into fourteen groups that reflect the intensity of care that is needed. This classification results in a baseline determination of the number of hours of in-home care [DSHS] _may be able to fund_." _Id._ at ¶ 10 (emphasis added). Thus, Ms. Black's current testimony, that CARE is an individualized determination of actual need, appears to be inconsistent with her testimony when she was employed by DSHS, which suggested that the base hour classification is not based on need, but rather on the number of "hours of in-home care that the Department may be able to fund." In any event, on balance, the Court gives more weight to the testimony of current DSHS officials, and a plain reading of the Washington statute and regulations, than to the declarations of Mr. Reed and Ms. Black, and concludes that plaintiffs have not met their burden of producing evidence that CARE evaluates beneficiaries' minimum needs for personal care services.

106-0130 (2010), does not take into consideration a beneficiary's actual individual needs when arriving at a final number of authorized personal care service hours.[18]

Moreover, construing CARE as an individualized assessment of a beneficiary's actual minimum needs cannot be squared with other facts.  For example, the parties do not dispute that the ETR process provides beneficiaries with a process for requesting, through their case manager, an increase in the number of personal care service hours over the amount authorized under CARE.  *See* Moss Decl. at ¶ 9 (docket no. 68); Rector Decl. at ¶ 9 (docket no. 125).  If plaintiffs were correct in their contention that CARE assesses each beneficiary's actual needs, the ETR process would be superfluous because beneficiaries would never require more hours than the amount they have been assessed by CARE.[19]

---

[18] For example, if a beneficiary's residence does not have on-site laundry facilities, the beneficiary automatically receives an additional eight hours of personal care services, without regard to whether the nearest laundry facilities are across the street or across town.  *See* WAC 388-106-130(6) (2010) (noting that client is entitled to eight hours of additional personal care services so long as laundry facilities are located offsite, i.e., where the client does not have facilities in his or her own home, and as a consequence, the caregiver is not available to perform other services while laundry is done).  Similarly, CARE provides for an additional eight hours of personal care services per month when a beneficiary uses wood as his or her sole source of heat.  *Id.*  The additional eight hours per month amounts to sixteen minutes per day in a typical month, more than enough in June, but likely insufficient in November.  Moreover, the Court notes that a beneficiary located in Spokane will almost certainly require more assistance with stoking a fire through the winter than will a beneficiary located in more temperate Seattle.  Nonetheless, the regulations would automatically award both such beneficiaries eight additional personal care service hours per month.

[19] Other structural components of CARE make it illogical to conclude that it determines beneficiaries' minimum needs.  For example, plaintiffs do not dispute the State's assertion that CARE's acuity classification subgroups are comprised of individuals with a wide range of ADL limitations.  Thus, for example, all individuals who meet the clinical complexity and cognitive performance requisites to warrant placement in Group C, and who also have an ADL score of between nine and seventeen, are placed into subgroup C-Medium.  WAC 388-

Also relevant is the State's four percent reduction in personal care service hours in 2009.  Plaintiffs dismiss the 2009 reduction as incomparable to the present case because it was smaller.  But logic fundamentally dictates that, plaintiffs' contention, that CARE determines minimum individual need is true, the 2009 reduction, regardless of size, must have necessarily resulted in institutionalization or injury to every single personal care service beneficiary in the State of Washington.  Not only have the plaintiffs failed to present any such evidence,[20] at oral argument, plaintiffs conceded that the admittedly larger 2011 reduction will not lead to injury or institutionalization for every beneficiary in Washington.

---

106-0125(3)(c).  Consequently, two individuals that have the exact same clinical complexity and cognitive performance are assigned to subgroup C-Medium, even if one has an ADL score of nine (indicating only a moderate need for assistance with daily activities) while the other has an ADL score of seventeen (indicating a serious need of assistance with daily activities).  _Id._; _see_ _also_ Rector Decl. at ¶ 11 (docket no. 125) (stating that the 10,000 individuals currently classified in subgroup C-Medium range significantly in the amount of assistance needed to perform ADLs and IADLS).  Thus, despite having greater need for services, a beneficiary with an ADL score of seventeen receives no more personal care service base hours than others in the C-Medium subgroup.

[20] Indeed, the only evidence in the record is that the 2009 reduction _did not_ result in any negative consequences to personal care service beneficiaries.  Moss Decl. at ¶ 8 (docket no. 68) ("When personal care hours were reduced for all recipients effective July 1, 2009, the negative consequences predicted by plaintiffs did not occur.  Health and safety were not compromised, and people were not forced into nursing homes due to lack of personal care services.").  The increases in base hours that took effect in 2010, replacing some of the hours that the State eliminated in the 2009 reductions, also contradict plaintiffs' position.  Plaintiffs point to no assessment of individual needs that triggered the rise in base hours.  Instead, the record suggests that the 2010 increases resulted merely from a budget surplus, negating any link between the numbers of base hours and what is "necessary in order to meet the individually-assessed needs of the client and to permit the client to remain safely at home." Reed Decl. at ¶ 30 (docket no. 18).

Plaintiffs' concession is consistent with the statistical information submitted by the State.  In a review of a sample of the records related to Medicaid beneficiaries who joined Washington's personal care services program after the reductions went into effect on January 1, 2011, over 99%[21] of the sampled records reflected no complaint concerning the adequacy of allotted hours.  _See_ 2d McNeill Decl. at ¶ 11 (docket no. 132).

Plaintiffs argue that CARE assesses beneficiaries' minimum needs, notwithstanding the structural and logical inconsistencies that result from that conclusion.  In support of their contention, plaintiffs cite to a number of documents in which department officials suggest that CARE is a method of determining need.  _See generally_ Exs. 3, 4 to 3d Brenneke Decl. (docket no. 120); Exs. 3-4 to 4th Brenneke Decl. (docket no. 121); Exs. 3, 5 to Logan-von Wahlde Decl. (docket no. 117); Ex. 2 to Black Decl. (docket no. 19); Ex. 2 to 5th Brenneke Decl. (docket no. 144).  Plaintiffs' reliance on the various cited documentary and testimonial exhibits for the proposition that CARE uses an individualized assessment to measure needs is misleading.  Although the cited documents do generally reference individualized assessments and beneficiary needs, the documents do not specifically address the _purpose_ of the individualized assessment, or the _need_ that is actually being measured.  DSHS's submission, and the very structure of CARE itself, demonstrate that CARE

---

[21] DSHS reviewed the records of 160 out of the 409 new and reactivated clients with care plans completed after January 1, 2011.  2d McNeill Decl. at ¶ 11 (docket no. 132).  Of that total, only one indicated that the client felt that the CARE assessment did not allot an adequate number of personal care service hours.  _Id._

uses individual assessments to measure the _relative_ needs of beneficiaries, i.e., how much a beneficiary needs personal care service relative to beneficiaries with different functional limitations.  The assessment of relative needs permits the State to fairly allocate a limited pool of resources, and to give preference to beneficiaries with the highest functional limitations.[22]

Finally, the Washington Supreme Court's opinion in _Jenkins v. Wash. Dep't of Soc. & Health Servs._, 160 Wn.2d 287, 157 P.3d 388 (2007), does not require a contrary result.  In _Jenkins_, the court addressed a provision in the CARE regulations that automatically reduced a beneficiary's personal care service hours by fifteen percent if the beneficiary lived with his or her caregiver (the "shared living rule").  _Id._ at 295.  Three beneficiaries challenged the shared living rule, arguing that it violated Medicaid's comparability requirement, 42 U.S.C. § 1396a(a)(10)(B),[23] because beneficiaries who lived with their caregiver did not receive the same number of personal care service hours as beneficiaries who did not live with their caregiver, even

---

[22] Plaintiffs suggest that, if CARE does not determine minimum needs, it violates federal laws that prohibit the provision of unnecessary medical services, as well as CMS directives that require States to make determinations on coverage based on individualized needs assessments.  _See_ 42 U.S.C. § 1396a(a)(30)(A) (state plan must "provide such methods and procedures . . . as may be necessary to safeguard against unnecessary utilization of such care and services."); _see also_ 42 U.S.C. §§ 1396a(a)(33)(A), (a)(37); 42 C.F.R. §§ 456.22-.23; Ex. D to Hamburger Decl. (docket no. 151); Ex. 5 to 3d Brenneke Decl. (docket no. 120). Nonetheless, when pressed at oral argument, plaintiffs' counsel expressly declined to argue that CARE, and by extension Washington's entire personal care services program, is invalid under federal law because individual needs are not evaluated.  As the plaintiffs have elected not to press the issue, the Court will not address it.

[23] The comparability provision mandates that the medical assistance a State provides for any individual "shall be not less in amount, duration, or scope than the medical assistance available to any other such individual."  _Id._

within the same acuity subgroup.  The court agreed, holding that the shared living rule

violated Medicaid's comparability provision because some recipients were treated

differently from other recipients where each had the same level of need.  _Id._ at 297

(citing _Schott v. Olszewski_, 401 F.3d 682, 688-89 (6th Cir. 2005)).  In this case,

however, unlike in _Jenkins_, the State is treating individuals within the same acuity

group similarly.  _Jenkins_ is therefore inapposite, to the extent it involved disparate

treatment of similarly situated beneficiaries.

In addition, however, the _Jenkins_ court also held that the shared living rule

violated Medicaid's comparability requirement because it reduced benefits based on

considerations other than recipients' actual needs for services.  _Jenkins_, 160 Wn.2d at

298-300 ("Once a person is assessed to require and receive a certain number of care

hours, the assessment cannot be reduced absent a specific showing that fewer hours are

required.").

Plaintiffs argue that under the second, alternative reasoning articulated in

_Jenkins_, the State may not reduce benefits without assessing beneficiaries' needs.  The

Court construes the alternative reasoning articulated in _Jenkins_ as dicta because it was

unnecessary to the Court's holding.  _United States v. Henderson_, 961 F.2d 880, 882

(9th Cir. 1992) (defining dicta as language that is unnecessary to the court's

holding).[24]  To the extent that the language could be read otherwise, the Court declines

---

[24] In addition, the _Jenkins_ opinion cites no authority for the broad proposition that Medicaid's
comparability provision requires the State to perform individualized needs assessments.  _See_
_Jenkins_, 160 Wn.2d at 298-300.  This Court cannot adopt the reasoning in _Jenkins_ when the
plain language of Medicaid's comparability provision (which only requires States to provide

to defer to the state court's determination on a question of federal law.[25]  _Congoleum_

_Corp. v. DLW Aktiengesellschaft_, 729 F.2d 1240, 1242 (9th Cir. 1984); _RAR, Inc. v._

_Turner Diesel, Ltd._, 107 F.3d 1272, 1276 n.1 (7th Cir. 1997) ("[I]t is nonetheless

beyond cavil that [federal courts] are not bound by a state court's interpretation of

federal law, regardless of whether [the court's] jurisdiction is based on diversity of

citizenship or a federal question.").

    The fact that CARE does not determine each beneficiary's individual minimum

need for personal care services is the primary reason why plaintiffs' heavy reliance on

_V.L. v. Wagner_, 669 F. Supp.2d 1106 (N.D. Cal. 2009), is misplaced.  In _V.L._, the court

addressed the State of California's decision to eliminate or reduce eligibility for

personal care services based on beneficiaries' scores in functional capacity tests.  _Id._ at

1109-11.  California used functional capacity testing to determine the relative needs of

individuals with different disabilities.  _Id._ at 1112 ("FI scores were intended to be used

by social workers and county and state administrators 'to compare the FI scores and FI

hours of clients on their caseload.'").  As with CARE, California's functional capacity

testing was "not meant to be used as a tool to predict the number of hours an

---

equivalent medical assistance to similarly situated beneficiaries) does not appear to require
States to perform individualized needs assessments when the State has reduced benefits in the
same proportion to similarly situated individuals.

[25] Moreover, as the Court has previously noted, CARE is not an individualized assessment of
a beneficiaries' actual needs.  _See Jenkins_, 160 Wn.2d at 315 (Fairhurst, J., dissenting) ("The
CARE tool does not—cannot—allocate state-paid personal care services based on
individuals' actual need.").  Consequently, to require the State to perform an individualized
assessment prior to reducing benefits would be nonsensical.

individual beneficiary needed." _Id._  Unlike Washington's method for allocating personal care service hours, however, to be eligible for California's personal care services program, a state statute required social workers to make a determination that each beneficiary "would not be able to remain safely in his/her home without [the authorized personal care services]." _Id._ at 1111.  Consequently, California's decision to reduce services based on the relative needs assessment would necessarily result in harm, because the State had already determined that all of the program's beneficiaries required the authorized services to remain safely in their homes, independent of the State's functional capacity assessment. _Id._ at 1121-22.  By contrast, in Washington, personal care services are authorized _exclusively_ based on relative need for services, and Washington's statutes do not require DSHS to make an individualized determination that each beneficiary needs services to remain safely in his or her home.[26]

///

///

///

///

_____

[26] For similar reasons, the Court rejects plaintiffs' reliance on _Mayer v. Wing_, 922 F. Supp. 902 (S.D.N.Y. 1996).  In that case, Medicaid beneficiaries located in New York received personal care services based on a physician's determination of the number of hours the patient actually needed to preserve the patient's health and safety. _Id._ at 905 ("On the basis of the various assessments, a medical review team determines the number of hours of care that an applicant will need.").  Washington, by contrast, has elected to provide personal care services under its state plan, rather than by physician authorization.

### 2.    The State's Budget Reduction Will Not Cause Harm to Specific Beneficiaries

In support of their motion for a preliminary injunction, plaintiffs filed approximately eighty declarations[27] relating to fourteen named plaintiffs and twenty-one additional unnamed potential class members.  The Court may not, however, consider evidence of injury to non-parties because in the Ninth Circuit, "system-wide injunctive relief is not available based on alleged injuries to unnamed members of a proposed class."  _Hodgers-Durgin v. de la Vina_, 199 F.3d 1037, 1045 (9th Cir. 1999) (en banc).[28]  Thus, the Court will only address in detail, in this Order, the harm, or threat of harm, alleged by the remaining twelve[29] named plaintiffs.

With respect to the individual named plaintiffs, plaintiffs' counsel suggests that the Court, in its previous Order denying plaintiffs' request for a TRO, discounted or trivialized the severity of the various plaintiffs' medical conditions by treating their

---

[27] The Court reduced that number to seventy-nine when it granted defendants' motion to strike (docket no. 158), and struck the declaration of Jennifer Wujick (docket no. 119). Minute Entry (docket no. 164).

[28] In an abundance of caution, however, the Court has reviewed the declarations filed on behalf of the unnamed potential class members.  Plaintiffs now seek to add these individuals as plaintiffs and to amend the complaint.  _See_ Offer of Proof (docket no. 165).  In the event the additional plaintiffs are joined, the Court can address their specific complaints at a later date.

[29] The number has been reduced from fourteen to twelve because two of the plaintiffs no longer face a threat of harm.  Plaintiff M.J.B. has received an ETR increasing her hours and plaintiff H.C. passed away on January 15, 2011, for reasons unrelated to the issues presented in this case.

allegations of harm as merely speculation.[30]  Mot. at 13 (docket no. 95).  To the

contrary, nothing in the Court's Order should be construed as minimizing the severe

disabilities of any of the individual named plaintiffs, or the importance of the services

provided through the State's programs.  Nonetheless, although the Court has

thoughtfully considered the allegations in each of the plaintiffs' declarations, in light

of the prevailing standards for injunctive relief, the Court cannot conclude that

plaintiffs have shown a likelihood of irreparable harm.  In particular, the declarations

relating to the individual named plaintiffs fail to show a threat of harm because they

(1) ascribe the threat of institutionalization to plaintiffs' deteriorating medical

conditions, unrelated to the provision of personal care service hours; (2) demonstrate

ineffective management of currently allocated personal care service hours; or (3)

identify non-personal care services as the cause of their predicted institutionalization.

a.  Deteriorating Medical Conditions

With respect to nine of the named plaintiffs, M.R., S.J., A.B., An.B., M.B., J.B.,

J.H., D.W., and C.B., the record reflects that their medical conditions have deteriorated

---

[30] Plaintiffs cite to _Winter_ for the proposition that specific, predictive judgments are not speculative, and may be considered by the Court in determining a likelihood of irreparable harm.  129 S. Ct. at 378.  In _Winter_, the Supreme Court addressed a proposed injunction that would require naval vessels engaged in military exercises to suspend use of certain types of sonar when vessels detected marine mammals within a specified distance.  _Id._ at 371.  The Court held that the testimony from military officers regarding the effect of the injunction, based on their _actual experience_ with similar (although not identical) interruptions in the use of sonar during training exercises, was not speculation, but rather, a specific, predictive judgment.  _Id._ at 380.  Here, unlike in _Winter_, the plaintiffs do not support their formulaic recitation of "likely" harm (which the Court notes is repeated verbatim or nearly verbatim throughout the various declarations) with the type of specific evidence that would render the opinions specific, predictive judgments, rather than mere speculation.

since their last CARE assessment.  *See* Maxon Decl. at ¶¶ 20, 29 (docket no. 26)

(M.R.); 2d Maxon Decl. at ¶¶ 4-13, 18 (docket no. 102) (M.R.); S.J. Decl. at ¶ 20

(docket no. 27); 2d Braddock Decl. at ¶ 3 (docket no. 100) (S.J.); C.B. Decl. at ¶ 23

(docket no. 29); 2d Hayes Decl. at ¶ 7 (docket no. 103) (J.H.); 2d Jane B. Decl. at ¶¶ 6,

6a, 6b (docket no. 96) (A.B., M.B., An.B. & J.B.); D.W. Decl. at ¶ 6 (docket no. 31)

(noting that, after latest assessment took place in September 2010, D.W. was

hospitalized for ten days in December 2010 for a heart attack); McIntosh Decl. at ¶ 7

(docket no. 32) (D.W.).  Consequently, the Court is unable to determine whether the

alleged threat of institutionalization these particular plaintiffs face is the result of the

State's reduction in personal care service hours or the deterioration in their medical

conditions.[31]

---

[31] Even if the Court could conclude that the allegations in the declarations relating to these nine individual plaintiffs raised questions of potential harm resulting from the planned reductions, the State submitted evidence controverting the possibility of any harm.  *See* McNeill Decl. at ¶ 6 (docket no. 131) (M.R.); Peterson Decl. (docket no. 127) (S.J.); Harper Decl. (docket no. 128) (A.B., An.B., J.B., M.B.); Chan Decl. (docket no. 129) (J.H.).  For example, defendants submitted undisputed evidence that J.H. requested new living arrangements because his live-in provider, Ms. Hayes, refused to allow him to contact family members, and he no longer felt safe.  Chan Decl. at ¶ 6 (docket no. 129).  Although Ms. Hayes disputes the underlying facts, i.e., whether she refused to allow J.H. to contact family members, plaintiffs submit no evidence controverting the fact that J.H. sent a request to his case manager to change his living arrangements.  Consequently, his placement in a nursing facility is unrelated to the number of hours DSHS has allocated for his care in 2011, but rather is based on the availability of temporary care options following J.H.'s emergency removal from his living arrangements.  *Id.* ¶ 9.  Moreover, many of the allegations in plaintiffs' declarations appear to be purely speculative.  For example, one of A.B.'s providers, Jeanine Starr, testifies that the reduction in services "*could* result in the need for [A.B] to seek emergency room care and [A.B.] will *likely* be admitted to a nursing home at that point."  Starr Decl. at ¶ 26 (docket no. 34) (emphasis added).  The chain of events described in Ms. Starr's declaration is speculative at best, and does not demonstrate a *likelihood* of irreparable harm.

b.     Inefficient Use of Currently Allocated Personal Care
Service Hours

The record reflects that, in response to the State's budget cuts, plaintiffs K.S.

and A.R. have reduced or eliminated their weekend care provider hours.  K.S. Decl. at

¶ 15 (docket no. 36); Albert Decl. at ¶ 12 (docket no. 37) (K.S.); Frederick Decl. at

¶ 18 (docket no. 40) (A.R.).  Prior to the reduction, K.S. received 133 personal care

service hours, which she apportioned 93 hours to her weekday provider, and 40 hours

to her weekend provider.  K.S. Decl. at ¶¶ 14-15 (docket no. 36); Morrow Decl. at ¶ 5

(docket no. 38).  Although DSHS only reduced K.S.'s hours by 18, she responded by

releasing her weekend provider entirely.  K.S. Decl. at ¶ 6 (docket no. 36); Albert

Decl. at ¶ 12 (docket no. 37).  Now K.S. is receiving more hours during the week than

she previously received (115 instead of 93), but has no coverage on the weekend,

which she contends will result in harm.  3d K.S. Decl. at ¶ 7 (docket no. 145); 2d K.S.

Decl. at ¶¶ 4, 6 (docket no. 97).  The State responds that, rather than simply releasing

her weekend provider, K.S. could have worked with her case manager to develop a

schedule with shorter gaps between care.  *See* 2d McNeill Decl. at ¶¶ 6-7 (docket

no. 132).  The Court concludes that a factual dispute exists as to whether the cause of

K.S.'s lack of weekend services could be resolved by effective case management.

Similarly, the decision by A.R.'s guardian, Ms. Frederick, to eliminate care

provider hours on Sundays appears to be an issue that might be addressed through case

management.  Specifically, Ms. Frederick decided to cut out one day of care on the

weekend because it was "inconvenient for [the provider]" to work a partial shift on

Sunday.  2d Frederick Decl. at ¶ 5 (docket no. 113).  The State agrees that the lack of assistance on Sundays could create a problem for A.R.'s health or safety, particularly given Ms. Frederick's inability to assist with A.R.'s care.  2d McNeill Decl. at ¶ 5 (docket no. 132).  But the State notes that Frederick should not have simply acceded to the provider's request to eliminate a partial Sunday shift for convenience reasons.  _Id._ The Court can only conclude that the declarations relating to A.R. do not suggest a likelihood of irreparable injury because, until the State has had the opportunity to correct the gap in care through case management, the Court cannot determine whether the threat of harm is the result of the State's reduction, or the decision by A.R.'s guardian to give preference to the provider's convenience over A.R.'s care needs.

These plaintiffs' apparent failure to contact their case managers about their concerns is particularly noteworthy.  _See_ 2d McNeill Decl. at ¶ 3 (docket no. 132). Rather than giving the State the opportunity to correct any gaps in care, these plaintiffs appear to assume that the reduction will result in harm and that the only alternative to reinstatement of their hours is institutionalization.

<div align="center">c.   <u>Non-Personal Care Services</u></div>

Plaintiff T.M.'s provider, a family member who currently lives with T.M., is concerned that as a result of the State's reduction in T.M.'s personal care service hours from eight-three to sixty-nine, she will have no alternative but to seek other employment outside the home.  Hays Decl. at ¶¶ 4, 6 (docket no. 39).  She believes that if she is forced to take a position outside the home, T.M. faces a significant threat

of institutionalization because T.M. needs constant supervision and "is incapable of

staying safe while alone for more than a few minutes." _Id._ at ¶ 6.  Plaintiffs M.R.,

A.B., M.B., and A.R. likewise argue that they face a threat of institutionalization

because the budget reduction will reduce available services for supervision, exercise,

and medication management.  Maxon Decl. at ¶ 26 (docket no. 26) (M.R.); Starr Decl.

at ¶ 26 (docket no. 34) (A.B.); Jane B. Decl. at ¶ 23 (docket no. 33) (A.B., M.B.);

Partridge Decl. at ¶¶ 5b, 28 (docket no. 35) (M.B.); Frederick Decl. at ¶ 18 (docket

no. 40) (A.R.).  But personal care services do not include supervision, exercise, or

medication management.  _See_ WAC 388-106-0010 (defining personal care services as

"physical or verbal assistance with activities of daily living (ADL) and instrumental

activities of daily living (IADL) due to your functional limitations.").[32]  Plaintiffs

cannot show a likelihood of irreparable harm based on factors that are unrelated to the

reduction in personal care services.[33]

      Plaintiffs have not shown that the budget reduction might deny any of the

individual named plaintiffs needed services, or that it poses a serious risk of

---

[32] Although regulations define ADLs as including assistance with certain locomotion, the Court understands the regulations to refer to transit between living spaces or areas within living spaces, not the type of exercise necessary to preserve a beneficiary's health, which is more akin to physical therapy.  _See_ WAC 388-106-0010; Harper Decl. at ¶ 10 (docket no. 128) (noting that personal care services do not include assistance with exercise); _see also_ 2d McNeill Decl. at ¶ 8 (docket no. 132) (noting that personal care services do not include supervision).

[33] None of these plaintiffs are in the highest acuity classification subgroup (_see supra_ Table 2 at 9) (T.M. – B Medium; M.R. – D Medium-High; A.B. – D Medium; M.B. – B High; and A.R. – B Medium-High) and could ask for either a reclassification to a higher subgroup, or an ETR, which could address any problems caused by service reductions.

institutionalization.[34]  On balance, in reviewing the plaintiffs' and the defendants' declarations, the Court cannot conclude that plaintiffs have shown by a preponderance of the evidence that the allegations contained in plaintiffs' declarations are more likely true than the contrary allegations in the defendants' declarations.  Accordingly, the Court cannot conclude that plaintiffs have shown the likelihood of irreparable injury necessary to justify a preliminary injunction.

### C.      Likelihood of Success on the Merits

Although plaintiffs have failed to show a likelihood of irreparable harm, the Court has also considered the likelihood of success on the merits of plaintiffs' claims that the decreases in personal care service hours violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution, the Americans with Disabilities Act, and the Medicaid Act, and has concluded that plaintiffs have failed to meet their burden on that prong of the preliminary injunction analysis as well.

///

///

---

[34] Plaintiffs argue that the Court need not rely on the individual plaintiffs' showing of potential harm because the department has conceded that the cuts will result in individuals moving to nursing homes.  *See* Ex. 4 to Brenneke Decl. (docket no. 12-8 at 7) (excerpt from the State's policy plan noting that "[i]n some cases, a safe in-home plan of care will not be possible and clients may need to go to community residential or nursing facility settings.").  At oral argument, defendants did concede that some beneficiaries might require more care than the amount allocated after the reduction, and thus may end up moving into a nursing home at some future time.  Defendants argue, however, that these issues can be resolved by effective case management, and use of the ETR process.  The Court concludes that it cannot determine on the present record whether the claimed "serious risk" of institutionalization is the result of the hours reduction or plaintiffs' failure to properly manage otherwise adequate resources.

### 1.    Due Process Claim

Plaintiffs' Fourteenth Amendment due process claim, formerly addressed with little detail,[35] is now the centerpiece of their argument in favor of a preliminary injunction.  Now, for the first time, in their brief filed on January 21, 2011 (docket no. 95), plaintiffs contend that the Due Process Clause entitles them to notice of (1) the right to request an ETR if the reduced hours are insufficient to meet their health and safety needs; (2) the right to a CARE reassessment; and (3) the availability of alternative Medicaid benefits, such as nursing homes.  The Due Process Clause does not, however, require the State to provide notice of the specific information sought by the plaintiffs.  Moreover, as previously noted in the Court's Order denying plaintiffs' motion for a preliminary injunction, Medicaid recipients are not entitled to notice and a hearing when the State implements a mass change that affects some or all recipients.

<div style="margin-left:2em">

a.    <u>The State Had No Obligation to Give Notice of the ETR or ARE Reassessment Processes or the Alternatives to Community-Based Care</u>

</div>

Plaintiffs argue that DSHS's service reduction notice should have identified the available alternatives to increase beneficiaries' personal care services hours, including the ETR and CARE reassessment processes, and also should have notified

---

[35] In the first round of briefing on plaintiffs' motion for a temporary restraining order, plaintiffs devoted little more than three pages of discussion to their due process claim.  Mot. at 23-25 (docket no. 11); Reply at 7-8 (docket no. 69).  Moreover, although citing to the seminal United States Supreme Court cases on notice and hearing rights, <u>Goldberg v. Kelly</u>, 397 U.S. 254 (1970), and <u>Matthews v. Eldridge</u>, 424 U.S. 319 (1976), plaintiffs limited their due process analysis to whether the State had failed to comply with Medicaid's regulatory notice requirements when DSHS sent out the original reduction notification letters in December 2010.

beneficiaries of alternatives to community-based care.  However, the hours awarded via an ETR are not an entitlement to which plaintiffs hold a legitimate property interest because, by definition, an ETR is an award of hours in excess of the amount the beneficiary is entitled to by rule.  WAC 388-440-001(1)(b).  Accordingly, plaintiffs have no right to notice or a hearing as to the availability of the ETR process.  <u>Bd. of Regents v. Roth</u>, 408 U.S. 564, 577 (1972) (holding that a beneficiary of state aid has no right to notice or a hearing unless the beneficiary has a legitimate property interest in the entitlement).  With respect to the right to a reassessment, which plaintiffs contend is critical in light of the evidence of changes in their informal supports, the State may modify an existing assessment without notice or an opportunity for a hearing when a beneficiary experiences a change in available informal supports.  WAC 388-106-0050(2)(c).  Accordingly, the State is under no obligation to provide notice of the right to a reassessment under the present circumstances.  Finally, with respect to plaintiffs' contention that the State should have provided notice of care alternatives, plaintiffs already have notice.  In order to receive community-based care, plaintiffs must sign a waiver acknowledging their right to institutional care.  <u>See</u> 2d McNeill Decl. at ¶ 12 (docket no. 132).

> b.   <u>The State Had No Obligation to Provide Notice and</u>
> <u>Hearing Rights for a Mass Change in Benefits</u>

Although Medicaid regulations provide for notice and an opportunity to be heard in connection with certain State actions, <u>see</u>, <u>e.g.</u>, 42 C.F.R. § 431.200, recipients are not entitled to a hearing if the sole issue is a state law requiring an

automatic change affecting some or all recipients.  42 C.F.R. § 431.220(b).  The

limitation on the hearing requirement arises out of the practical consideration that,

absent some factual dispute about an individual's right to benefits, a hearing would

serve little, if any purpose.  *See* *Rosen v. Goetz*, 410 F.3d 919, 926 (6th Cir. 2005);

*Benton v. Rhodes*, 586 F.2d 1, 3 (6th Cir. 1978) ("[M]atters of law and policy are not

subject to any hearing requirements under the applicable regulations, whether the

hearing be pre- or post-termination.").  Washington law is in accord, as both the statute

and regulations disclaim any right to a hearing for the purpose of challenging mass

changes to public benefits programs.  RCW 74.08.080(1)(b) ("An applicant or

recipient has no right to an adjudicative proceeding when the sole basis for the

department's decision is a state or federal law that requires an assistance adjustment

for a class of recipients."); WAC 388-418-0020(9) (noting that fair hearing rules do

not apply to a mass change in medical assistance benefits).

Plaintiffs appear to concede[36] that a mass change does not give rise to hearing

rights; only changes that create disputed facts give rise to hearing rights.  *See*

*Washington v. DeBeaugrine*, 658 F. Supp. 2d 1332, 1335 (N.D. Fla. 2002) ("Both

sides have agreed further that there is no right to a hearing when there is no factual

issue attending a denial or reduction in services—that is, when there is no factual issue

to be heard.").  Nonetheless, plaintiffs contend that the State's reduction in this case

necessarily gives rise to factual questions as to whether individual beneficiaries will

---

[36] Mot. at 25 (docket no. 95) (noting that hearings must only be provided for challenges to
service reductions that are *factually erroneous*).

have sufficient personal care service hours to meet their needs.  While an across-the-board reduction will always raise factual questions about the effect of the reduction on specific individuals, it does not create factual questions as to the reduction itself.  _See_, _e.g._, _Jeneski v. Myers_, 163 Cal. App. 3d 18, 32, 209 Cal. Rptr. 178 (1984) ("The initial cutback is indeed an across-the-board reduction in benefits mandated by state law and is not an individual denial thereof . . . [and therefore] we do not believe that an evidentiary hearing prior to termination was mandatory.").[37]  The wholesale nature of the State's budget reduction is fatal to plaintiffs' due process claim because an across-the-board reduction is, by its very nature, unrelated to the specific facts of any individual case, and therefore not a proper subject for an evidentiary hearing.[38]

Plaintiffs are not entitled to notice or hearing rights for an across-the-board budget reduction, and as such, have failed to show a likelihood of success on the merits of their due process claim.

///

///

---

[37] Plaintiffs retain the right to request a reassessment under CARE, or to ask their case manager to request an ETR on their behalf.  Both events provide for a right to grieve or appeal the decision.  See WAC 388-106-1305; 388-440-0001(4).

[38] In the alternative, plaintiffs rely heavily on _Budnicki v. Beal_, 450 F. Supp. 546 (E.D. Pa. 1978), for the proposition that even an across-the-board reduction of Medicaid benefits requires a hearing.  In _Budnicki_, the court held that the State could not reduce Medicaid benefits with an across-the-board budget reduction without providing notice and an opportunity for a hearing, pursuant to 45 C.F.R. § 205.10(a)(4).  450 F. Supp. at 551-52.  The Sixth Circuit subsequently rejected the legal theory adopted in _Budnicki_.  _Benton_, 586 F.2d at 3.  Moreover, the regulation at issue in _Budnicki_ is no longer applicable.  _See_ 42 C.F.R. § 431.220(b); _Rosen_, 410 F.3d 919, 926 (6th Cir. 2005).

2.      **Americans with Disabilities Act Claim**

Plaintiffs fail to show a likelihood of success on their Americans with

Disabilities Act ("ADA") claim because (i) the State's budget reduction does not leave

individuals with no choice to submit to institutional care to obtain needed services, and

therefore does not violate the ADA's integration mandate; and (ii) it is likely that

requiring the State to continue current funding levels for personal care services

indefinitely would constitute a fundamental alteration in the State's Medicaid program.

a.      <u>The Reduction to Personal Care Service Hours Does Leave
Plaintiffs with No Alternative but to Submit to Institutional
Care to Obtain Needed Services</u>

The ADA precludes public entities from administering programs in ways that

have the effect of segregating disabled individuals from the general community.

<u>Olmstead v. L.C. ex rel Zimring</u>, 527 U.S. 581 (1999).  Known as the "integration

mandate," and codified by regulation, the ADA requires that persons with disabilities

receive services in the most integrated setting appropriate to their needs.  28 C.F.R.

§ 35.130(d); <u>Cota v. Maxwell-Jolly</u>, 688 F. Supp. 2d 980, 994 (N.D. Cal. 2010) (citing

<u>Olmstead</u>, 527 U.S. at 597).  In order to comply with the integration mandate, States

must implement reasonable modifications to otherwise discriminatory state policies,

practices, or procedures, although the ADA does not require States to make

modifications that "fundamentally alter" the nature of the service program or activity.

28 C.F.R. § 35.130(b)(7).[39]

---

[39] The fundamental alteration defense is an affirmative defense that the Court considers only
if the plaintiff has met its burden in showing a likely violation of the ADA's integration

To analyze whether a State's actions violate the ADA's integration mandate, the Court must apply the following three-prong test:  (1) whether the State's treatment professionals have determined that community placement is appropriate; (2) whether the affected persons consent to community placement; and (3) whether the placement can be reasonably accommodated, "*taking into account the resources available to the State and the needs of others with . . . disabilities*."  *Olmstead*, 527 U.S. at 607 (emphasis added).[40]

Here, plaintiffs rely heavily on *Fisher*, 335 F.3d 1175, contending that the State's budget reduction will violate the ADA's integration mandate by forcing individuals to either forego needed personal care services or move to a nursing home. In *Fisher*, the State of Oklahoma imposed a limit on the number of prescriptions that beneficiaries in community-based care programs could receive each month.  *Id.* at 1178.  The State did not impose a limit on the number of prescriptions that beneficiaries living in nursing facilities could receive.  *Id.*  The plaintiffs, a group of individuals receiving community-based care, sued under the ADA, arguing that Oklahoma's new prescription limitations facially discriminated against beneficiaries

---

mandate.  *See Olmstead*, 527 U.S. at 603-04.  The Court may consider the viability of affirmative defenses in addressing whether plaintiffs have shown a likelihood of success on the merits.  *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1158 (9th Cir. 2007) ("Because the burdens at the preliminary injunction stage track the burdens at trial, once the moving party has carried its burden of showing a likelihood of success on the merits, the burden shifts to the non-moving party to show a likelihood that its affirmative defense will succeed.").

[40] Although the cited section of *Olmstead* only commanded a plurality of votes, the Ninth Circuit has adopted it as controlling authority.  *See Townsend v. Quasim*, 328 F.3d 511, 519 n.3 (9th Cir. 2003); *Sanchez v. Johnson*, 416 F.3d 1051, 1064 n.7 (9th Cir. 2005).

who had chosen community-based care, and would compel beneficiaries to either move into nursing homes or forego needed medication.  *Id.* at 1179.  The Tenth Circuit held that the facial discrimination violated the ADA's integration mandate because it forced individuals to move into nursing homes to obtain needed medical care.  *Id.* at 1182.

*Fisher* is distinguishable from the present case.  In *Fisher*, the court addressed a case of facial discrimination.  The State provided certain services in nursing homes that it did not provide to individuals living outside nursing homes.  *Id.* at 1179; *compare* *Townsend*, 328 F.3d at 517 (noting that the problem with the State program was not *whether* the State provided the services, but *where* it provided the services). The ADA prohibits States from providing services to beneficiaries living in institutions while simultaneously limiting the availability of those same services to beneficiaries who elect to live in a community-based setting.  *See* *Townsend*, 328 at 517.  In the present case, the record does not reflect that the State is providing services to individuals in institutions that it has declined to provide to individuals living in community-based settings.  To the contrary, plaintiffs' evidence demonstrates that individuals living in community-based settings currently receive *more* and *better* care than individuals living in institutions.  *See* Anderson-Webb Decl. at ¶ 31 ("I am worried that in a nursing home, [J.P's] pressure sores will not improve because [J.P.] will not get the attention [J.P.] needs to combat infection and move often enough.") (docket no. 105); *see also* Jane B. Decl. at ¶ 24c (docket no. 33) (An.B); Davis Decl. at

¶ 33 (docket no. 30) (C.B.); Maxon Decl. at ¶ 30 (docket no. 26) (M.R.); Paulino Decl.

at ¶ 26 (docket no. 45) (M.J.B.); Hays Decl. at ¶ 32 (docket no. 39) (T.M.); McIntosh

Decl. at ¶ 21 (docket no. 32) (D.W.); Faatoafe Decl. at ¶ 26 (docket no. 56) (Z.J.); Lee

Decl. at ¶ 30 (docket no. 147) (G.R.); Frost Decl. at ¶ 21 (docket no. 149) (J.W.).

Based on the record, therefore, the Court cannot conclude that the reduction

discriminates against beneficiaries that have elected community-based care.

Consequently, unlike in _Fisher_, where the State facially discriminated against

individuals in community-based settings by only making some medically necessary

services available in an institutional setting, here, plaintiffs' evidence does not

demonstrate that the reduction leaves them no choice but to submit to institutional

care.[41]

Plaintiffs also argue that they are not required to show that the budget reduction

leaves them no alternative but institutional care, relying heavily on _Brantley v._

_Maxwell-Jolley_, 656 F. Supp. 2d 1161 (N.D. Cal. 2009), for the proposition that they

only need to demonstrate that the State's proposed action poses a serious risk of

institutionalization.  In _Brantley_, California attempted to impose a limit on Medicaid

beneficiaries of three days of Adult Day Health ("ADH") services per week.  _Id._ at

1167.  Prior to the change, beneficiaries could have up to five days of ADH per week.

_Id._ at 1164-65.  Individuals in California's program obtained ADH services by

---

[41] In _Fisher_, the plaintiffs presented evidence from their physicians that they required more
than five prescriptions per month.  _Id._ at 1179 ("[One plaintiff] takes approximately sixteen
prescription medications . . . all of which are prescribed by her doctors.").  Conversely here,
plaintiffs' personal care services are not _medically_ necessary to preserve the plaintiffs' health
and safety.

participating in a rigorous medical screening evaluation over a three-day period.  *Id.* at 1165.  Following the lengthy assessment, performed by doctors, nurses, social workers, and physical therapists, among others, the team of evaluators prepared a plan of care, which included certifications that the number of days of ADH authorized by the plan were medically necessary to preserve the health of the specific beneficiary. *Id.*  In reviewing the likelihood of success on the merits of the plaintiffs' claim that the State's planned reduction violated the ADA's integration mandate, the court held that, under *Fisher*, the plaintiffs need not show that the State's action would leave the plaintiffs no choice but to go into an institution to obtain needed medical care.  *Id.* at 1170.  Instead, the *Brantley* court held that plaintiffs had met their burden because the reduction posed a "serious risk" of institutionalization.  *Id.* at 1171.  In reaching its decision, the court relied heavily on the physician-prepared care plans, which certified that the authorized ADH benefits were medically necessary to preserve the health and safety of individual beneficiaries and to prevent the need for institutionalization.  *Id.* at 1172.

     *Brantley* is inapposite.  As a factual matter, each of the plaintiffs in *Brantley* had physician-certified care plans indicating that ADH care was medically necessary to preserve their health and safety, and to prevent the need for institutionalization. *See*, *e.g.*, *id.* ("Of the 100 participants, 44 of them have Medi-Cal approved [care plans] certifying a need for four to five days per week of attendance to avoid institutionalization.").  Conversely, the hours assessed in CARE do not represent the

minimum number of hours necessary to prevent institutionalization, and plaintiffs

point to no analogous certification by a physician or other professional that says

otherwise.

Moreover, the court in _Brantley_ erroneously relied upon _Fisher_ for the

proposition that a plaintiff need only show a "serious risk" of institutionalization to

establish a violation of the integration mandate.[42]   _Id._ at 1171.  In _Fisher_, the Tenth

Circuit did not state that a beneficiary need only show a "serious risk" of

institutionalization to show a likelihood of success on the merits of an ADA

integration mandate claim.  335 F.3d at 1184.  To the contrary, the court in _Fisher_ held

that plaintiffs had shown a likelihood of success on the merits "[b]ecause the [State's

action] does not allow the plaintiffs to receive services for which they are qualified

_unless they agree to enter a nursing home_."  _Id._ at 1182 (emphasis added).  Thus, in

_Fisher_, the court required the plaintiffs to show that they had _no choice_ but to enter

into a nursing home to obtain needed care.  In _Brantley_, the court expressly rejected

the defendants' claim that _Fisher_ required plaintiffs to show that the State's action left

---

[42] The Civil Rights Division of the United States Department of Justice ("DOJ") filed an
amicus brief in support of plaintiffs' claims, arguing that under ADA regulations, parties need
only show a threat of eventual institutionalization to establish a violation of the integration
mandate, rather than a threat of immediate institutionalization.  Amicus Br. (docket no. 139).
DOJ argues that, as the agency charged with enforcement of the ADA, the Court must give
deference to its interpretation of ADA regulations.  _Id._  But DOJ has not promulgated
regulations interpreting the ADA's integration mandate to require only a showing of eventual
institutionalization to show a violation of the integration mandate.  To the contrary, DOJ has
merely taken a position in this litigation that the Court should adopt its interpretation of the
regulation.  The Court owes no deference to a self-serving agency interpretation taken solely
in the context of ongoing litigation.  _Mid-America Care Found. v. NLRB_, 148 F.3d 638, 642
(6th Cir. 1998); _Alaniz v. Office of Personnel Mgmt._, 728 F.2d 1460 (Fed. Cir. 1984).

them no choice but to enter a nursing home, holding instead that *Fisher* only required

plaintiffs to show a "serious risk" of institutionalization to demonstrate a likelihood of

success on their ADA claim. *Brantley*, 656 F. Supp. 2d at 1170 ("Defendants fail to

cite any relevant authority imposing a 'no choice' requirement."). The Tenth Circuit

only discusses the "serious risk" of institutionalization in the context of its analysis of

*likelihood of irreparable harm*. 335 F.3d at 1184. Accordingly, the *Brantley* court

erred in concluding that a "serious risk" of institutionalization is sufficient to show a

*likelihood of success on the merits* of an ADA integration mandate claim. The proper

standard to show a violation of the integration mandate, set forth in *Fisher*, requires

plaintiffs to show that the State's action leaves them no choice but to submit to

institutional care to obtain services for which they are otherwise qualified.

> b.  <u>Any Order Requiring the State to Continue Funding
> Personal Care Services at Pre-2011 Levels Likely
> Constitutes a Fundamental Alteration of the State's
> Medicaid Program</u>

Even if plaintiffs could establish a likelihood of success on their claim that the

State's budget reduction violated the ADA's integration mandate, the Court concludes

that the State has met its burden in presenting evidence that the return to pre-2011

funding levels would likely constitute a fundamental alteration of the State's Medicaid

program. Courts have construed the third element of the *Olmstead* test as

incorporating the fundamental alteration defense. *See*, *e.g.*, *Arc of Wash. State, Inc. v.

Braddock*, 427 F.3d 615, 618 (9th Cir. 2005) ("The Supreme Court has instructed

courts to be sympathetic to fundamental alteration defenses, and to give States

'leeway' in administering services for the disabled."); _see_ _also_ _Olmstead_, 527 U.S. at 604 ("Sensibly construed, the fundamental alteration component of the reasonable-modifications regulation would allow the State to show that, in the allocation of available resources, _immediate relief for the plaintiffs would be inequitable, given the_ _responsibility the State has undertaken for the care and treatment of a large and_ _diverse population of persons with mental disabilities_.") (emphasis added).  The State can satisfy its burden to show that the requested modification is a "fundamental alteration" by submitting evidence demonstrating that the modification would in fact compel cutbacks in services to other Medicaid recipients.  _See_, _e.g._, _Townsend_, 328 F.3d at 520 (noting that the State could be entitled to the benefit of the fundamental alteration defense if it could show that the added financial burden would result in cutbacks to other Medicaid programs); _see_ _also_ _Fisher_ 335 F.3d at 1183 (rejecting State's argument that the need to fill a budget deficit was sufficient to constitute a "fundamental alteration" of the State's Medicaid program, but noting that a budget deficit might be sufficient if the State submitted evidence demonstrating that preserving the beneficiaries' right to unlimited prescriptions would in fact compel cutbacks in services to other Medicaid recipients).

Here, the State has submitted unrefuted evidence that it will need to make drastic cuts in other state programs if this Court grants plaintiffs' requested preliminary injunction.  _See_, _e.g._, Drefus Decl. at ¶ 6 (docket no. 124) (describing alternative programs that will be reduced or eliminated if the Court enjoins the State

from reducing funding for the personal care services program); Ex. 3 to 2d Work Decl.

(docket no. 134) (describing other cuts DSHS will likely be required to make to social

services beginning in March 2011).

Plaintiffs have failed to show a likelihood of success on their claim that the

State's reduction of hours constitutes a violation of the ADA's integration mandate,

and even if they could show likely success, their proposed modification would likely

constitute a fundamental alteration of the State's Medicaid program.  So long as a

State is genuinely and effectively in the process of deinstitutionalizing disabled

persons with an even hand, courts should not interfere.  _Arc of Wash. State, Inc._, 427

F.3d at 620.  Based on the record in this case, the Court finds that Washington has a

genuine and effective commitment to deinstitutionalization.  Over the last decade, the

number of institutionalized disabled individuals in Washington has steadily declined.

Leitch Decl. at ¶ 2 (docket no. 67); Moss Decl. at ¶ 2 (docket no. 68).  The number of

institutionalized disabled individuals continued its decades-long decline even _after_ the

State reduced the budget for personal care services by four percent in 2009, and

despite the fact that the number of individuals who are eligible for institutional care

has steadily increased.  Lindeblad Decl. at ¶¶ 6, 11 (docket no. 159) (noting that the

number of individuals eligible for institutional care increased from 39,506 in FY 2008

to 44,709 in FY 2010, and is forecasted to be approximately 51,693 by FY 2013).

Indeed, despite the 2009 reduction, the State transitioned approximately 4,400

individuals from institutional care to in-home or residential care in 2010.  _Id._ at ¶ 6.

Given that the State has a system in place that has been proven to work, and indeed has been repeatedly referred to by plaintiffs in this litigation as the "gem" of the fifty States, the Court sees no basis for meddling with matters that are more appropriately left to state legislators and administrators.

### 3. Medicaid Act Claims

Plaintiffs' Medicaid Act claims, tabbed as the primary focus of this lawsuit at the temporary restraining order stage of the case, have now been relegated to an afterthought.  Plaintiffs raise no new arguments for the Court's consideration, instead restating the points that the Court rejected when it denied plaintiffs' motion for a temporary restraining order.  Accordingly, the Court will only briefly address the merits of plaintiffs' Medicaid Act claims.

#### a. Reasonable Standards Requirement

Medicaid requires that state plans have "reasonable standards . . . for determining . . . the extent of medical assistance under the plan which . . . are consistent with the objectives of [Medicaid]." 42 U.S.C. § 1396a(a)(17).  Plaintiffs contend that DSHS's reduction in personal care services is unreasonable because it will decrease available services below the level necessary for beneficiaries to remain safely in their homes.  Plaintiffs have not shown that CARE determines the actual minimum personal care service needs of individual beneficiaries, and they have not established that the hours awarded after the State's proposed downward adjustment will fail to meet any individual plaintiffs' specific needs.  Consequently, plaintiffs

have not shown a likelihood of success on the merits of their reasonable standards claim.[43]

b.   Sufficiency Requirement

Medicaid's sufficiency provision requires that "[e]ach service must be sufficient in amount, duration, and scope to reasonably achieve its purpose." 42 C.F.R. § 440.230(b).  Service levels are sufficient if they meet the purposes of the specific program.  _Curtis v. Taylor_, 625 F.2d 645, 651 (5th Cir. 1980).  Whether the available personal care service hours after the reduction are sufficient to meet the program's purposes must be examined in the context of the substantial discretion States are afforded to choose the proper mix of amount, scope, and duration limitations on Medicaid coverage.  _See Alexander_, 469 U.S. at 303 (holding that Medicaid merely

---

[43] Plaintiffs cite several cases for the proposition that a reduction in Medicaid services without consideration of the needs of individual beneficiaries is unreasonable.  _See Lankford v. Sherman_, 451 F.3d 496 (8th Cir. 2006); _V.L._, 669 F. Supp. 2d 1106.  But those cases involved the complete elimination of programs, or the wholesale elimination of categories of eligibility. For example, in _Lankford_, the State of Missouri passed a law that eliminated optional coverage for Medicaid recipients for durable medical equipment ("DME").  451 F.3d at 501. The Missouri agency administering Medicaid then passed emergency regulations that reinstated the right of recipients to some, but not all, of the medically necessary DME devices. _Id._  The Eighth Circuit held that the reinstatement of eligibility as to only a portion of the DME devices was unreasonable because the regulation did not provide any mechanism for individuals to obtain non-covered DME devices.  _Id._ at 513.  Similarly, in _V.L._, the State of California passed a law that eliminated some beneficiaries' eligibility for all covered services. 669 F. Supp. 2d at 1117.  The law also eliminated categories of eligibility for other recipients. _Id._  Conversely, here, none of the beneficiaries are losing eligibility for in-home personal care services or categories of care.  DSHS is merely exercising its broad discretion to modify the extent of medical assistance in light of scarce resources.  _Beal v. Doe_, 432 U.S. 438, 444 (1977).

provides a package of services that has the general aim of assuring that individuals will receive necessary medical care, it does not assure "adequate health care.").[44]

In this case, DSHS has continued to provide a substantial number of in-home personal care service hours following implementation of the 2011 reduction. Indeed, the record reflects that over 99% of the beneficiaries sampled that have joined the program since January 1, 2011, have not questioned the adequacy of personal care service hours allocated pursuant to CARE. 2d McNeill Decl. at ¶ 11 (docket no. 132). In light of the broad discretion granted to states to craft a manageable Medicaid plan, plaintiffs have not shown that the 2011 reduction fails to satisfy the purpose of Washington's program, namely providing disabled individuals with assistance with their ADLs and IADLs. WAC 388-106-0010.

c.      Comparability Requirement

Medicaid's comparability provision requires states to provide "comparable services when individuals have comparable needs." 42 U.S.C. § 1396a(a)(10)(B). Plaintiffs do not contend, however, that the 2011 reduction treats similarly situated beneficiaries differently. See, e.g., Jenkins, 160 Wn.2d at 297 ("[C]ourts have consistently . . . found that states violated the comparability requirement where some recipients are treated differently from other recipients where each has the same level of need."). At oral argument, counsel for plaintiffs conceded that all similarly situated

---

[44] Plaintiffs contend that any reliance on _Alexander_ is misplaced because that case addressed violations of the Rehabilitation Act. Mot. at 36 n.58 (docket no. 95). The Supreme Court's discussion about the purpose of the Medicaid Act in _Alexander_ is nonetheless guidance in this Court's consideration of whether the State's 2011 budget will provide sufficient resources to meet the program's purposes.

beneficiaries (i.e., beneficiaries in the same acuity subgroup) are subject to the same reduction in hours.  Moreover, CMS regulations interpreting the comparability provision appear to contemplate that state agencies "may place appropriate limits on a service."  42 C.F.R. § 440.230(d).[45]  Accordingly, plaintiffs have failed to show a likelihood of success on the merits of their comparability claim.

### d.    Free Choice Requirement

Medicaid's free choice provision requires that beneficiaries be "informed of the feasible alternatives" to institutional care, and have individual choice.  42 U.S.C. §§ 1396n(c)(2)(C), 1396n(d)(2)(C).  Here, plaintiffs apparently contend that the State did not inform them of feasible alternatives when it distributed notices of the planned reductions in services in December 2010.  But plaintiffs in this case are necessarily already aware of alternatives to institutional care.  By virtue of their receipt of personal care service, either under Washington's state plan or through one of its Medicaid waiver programs, the plaintiffs are already participating in Washington's alternative to

---

[45] Specifically, the regulations provide that "[t]he agency may place appropriate limits on a service based on _such criteria as_ medical necessity or on utilization control procedures." 42 C.F.R. § 440.230(d) (emphasis added).  The Court reads the regulation's use of the words "such criteria as" to mean that "medical necessity" and "utilization control procedures" are examples, not the only grounds upon which an agency may place limitations on a service. _See, e.g.,_ Health Care Financing Administration, Proposed Rules, Payment for Covered Outpatient Drugs under Drug Rebate Agreements with Manufacturers, 60 Fed. Reg. 48442, 48458 (1995) (noting that prior to enactment of an amendment to Title XIX in 1990 applicable only to prescription drugs, "[s]tates could establish amount, duration, and scope restrictions on Medicaid services, including prescription drugs . . . . based on such criteria as medical necessity and utilization control, _or [these restrictions]could be based on other factors_ so long as the amount of the services provided was sufficient to 'reasonably achieve its purpose'") (emphasis added).

institutional care.  At oral argument, plaintiffs posited an entirely novel legal theory, contending that whenever the State alters its community-based services, the State is obligated to inform beneficiaries of their right to receive *institutional* care.  Plaintiffs cite no authority to support this proposition, which is directly contrary to the plain language of the free choice provision.[46]  *See*, *e.g.*, 42 U.S.C. § 1396n(d)(2)(C) (stating that individuals must be informed of the "feasible alternatives to the provision of *skilled nursing facility or intermediate care facility services*.") (emphasis added); *see also* 42 U.S.C. § 1396n(c)(2)(C).  The Court rejects any such requirement, and concludes that plaintiffs have failed to demonstrate a likelihood of success on the merits for their freedom of choice claim.[47]

e.    Federal Approval Requirement

Finally, plaintiffs contend that the 2011 reduction is a material change in the State's Medicaid plan that requires federal approval.  *See* 42 C.F.R. § 430.12(c)(1)(ii). As previously noted by this Court, and also by a different court in this district in connection with the 2009 budget reduction, federal approval is not required because Washington's Medicaid plan does not describe a minimum number of personal care

---

[46] The Court also notes that plaintiffs received notice of their right to receive alternative care when they originally elected to receive community-based care in lieu of institutional care. *See*, *e.g.*, 2d McNeill Decl. at ¶ 12 (docket no. 132).

[47] The Court also rejects plaintiffs' contention that the reduction in services will place beneficiaries in the untenable position of either choosing to go without needed care or submitting to unwarranted institutionalization.  *See*, *e.g.*, *Ball v. Rodgers*, 492 F.3d 1094, 1107 (9th Cir. 2007).  As previously noted, plaintiffs have failed to meet their burden to show a likelihood of irreparable harm, and as such, cannot show that the reduced services will fail to satisfy beneficiaries' health and safety needs.

service hours or, for that matter, a method of calculating personal care service hours.

Order at 20 (docket no. 76); see also Freeman v. Wash. Dep't of Soc. & Health Servs.,

2010 WL 3720285 (W.D. Wash.).  As such, the planned reductions do not amend the

state plan or trigger the need for federal approval.  See Freeman, 2010 WL 3720285 at

*9 ("Because [Washington's] state Medicaid plan does not indicate the number of

hours or the methodology to be used in determining the number of hours to be

provided to recipients, any modification to that methodology need not be reflected in

an amendment to the state plan.").  Accordingly, plaintiffs have failed to show a

likelihood of success on the merits on this claim.

### D.   Balance of the Equities and the Public Interest

The Court is tasked with balancing plaintiffs' claims of potential harm with the

State's inability to fund the personal care services program.  Plaintiffs argue that when

balancing the medical needs of the indigent against a State's budgetary crisis, the

Ninth Circuit has come down firmly on the side of preserving medical benefits.

Independent Living Ctr. I, 572 F.3d at 659 ("State budgetary concerns cannot . . . 'be

the conclusive factor in decisions regarding Medicaid.'").  However, these reductions

do not involve medical care.  Rather, this case deals with personal care services;

assistance with activities of daily living performed by caregivers who have no

particular medical training.

In addition, the record includes evidence about the steps the State will be

required to take if the service reductions cannot take effect.  Dreyfus Decl. at ¶ 6

(docket no. 124); Ex. 3 to 2d Work Decl. (docket no. 134).  Consequently, the Court is presented not merely with a question of finance, but rather, availability of funding for other critical Medicaid and social service programs.[48]  Plaintiffs respond to the State's concerns by arguing that the State can deal with the current fiscal crisis by (1) raising taxes; (2) closing institutions;[49] or (3) simply declining to balance the budget, in contravention of state law.[50]  None of plaintiffs' proposals seriously addresses the potential harm that will result to other needy beneficiaries if the State is forced to make cuts to other social service programs.

Finally, as the Court noted in its denial of plaintiffs' motion for a temporary restraining order, DSHS has conducted a comprehensive review to determine how best to accomplish the fiscal goals mandated by the governor, and it has applied its expertise in weighing the competing interests of the various clients it serves.  Thus, even if a few of the plaintiffs ultimately require institutionalization as a result of the

---

[48] The reductions to personal care services will save the State $19.2 million dollars over the remaining five months of the fiscal biennium.  Dreyfus Decl. at ¶ 5 (docket no. 124).  Thus, for each month the State is enjoined from implementing the reduction in personal care service hours, the State might have to find an additional $3.8 million dollars by cutting other social service programs.  *See id.*

[49] The Supreme Court has expressly rejected any reading of the ADA that would force states to close institutions to fund community-based care.  *Olmstead*, 527 U.S. at 604 ("The ADA is not reasonably read to impel States to phase out institutions, placing patients in need of close care at risk.").

[50] Plaintiffs contend that the Washington State Constitution permits the State to run a budget deficit.  *See* WASH. CONST. art. 8, §§ 1(b), 8.  But State law *requires* the governor to balance the budget if at any time during the fiscal biennium, the governor projects a cash deficit.  *See* RCW 43.88.110(7) ("If at any time during the fiscal period the governor projects a cash deficit . . . the governor *shall* make across-the-board reductions in allotments . . . so as to prevent a cash deficit.") (emphasis added).  To the extent plaintiffs actually contend that violating State law is an alternative to the budget reductions, the Court rejects that contention.

State's reduction in services, the Court cannot conclude that the threat to these individuals outweighs the State's interest in preserving the carefully orchestrated personal care services program that currently serves more than 45,000 individuals.  For the same reasons, the Court cannot conclude that the possible threat of institutionalization for a few personal care service beneficiaries outweighs the State's interest in balancing the competing needs of a host of different state-sponsored social service programs that currently provide aid to a diverse group of medically and financially disadvantaged state residents.

The Court concludes that the balance of the equities tips in favor of the State, and as a consequence, the public interest would not be served by forcing DSHS to target perhaps more vulnerable individuals or programs while the merits of plaintiffs' claims in this matter are resolved.

**CONCLUSION**

For the foregoing reasons, the Court DENIES plaintiffs' motion for a preliminary injunction, docket no. 95.

IT IS SO ORDERED.

The Clerk is directed to send a copy of this Order to all counsel of record.

DATED this 9th day of February, 2011.

Thomas S. Zilly
United States District Judge

ORDER - 50